UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NUCAP INDUSTRIES, INC. and <br> NUCAP US INC., <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT BOSCH LLC and BOSCH <br> BRAKE COMPONENTS, LLC, <br><br> Defendants. | Case No. 15-cv-2207 <br><br> Hon. Joan B. Gottschall |

## **Memorandum Opinion & Order**

Defendants Robert Bosch LLC and Bosch Brake Components LLC (collectively, "Bosch") were customers of plaintiffs, Nucap Industries Inc. and Nucap US. Inc. (collectively, "Nucap") from September 2008 to approximately December 2014. Nucap sold aftermarket brake components to Bosch, which Bosch incorporated into the brake pads it manufactures. The parties' relationship came to a halt on or about December 17, 2014, when Bosch informed Nucap that Bosch would no longer be purchasing supplies from Nucap.

Nucap filed suit in this court shortly thereafter, alleging that Bosch misappropriated Nucap's library of brake component drawings, infringed Nucap's copyrights, and interfered with Nucap's exclusive supply relationship with Trelleborg Rubore Inc. ("Trelleborg Rubore"). Bosch now moves to stay this proceeding pursuant to an arbitration provision incorporated by reference into Bosch's purchase orders. For the reasons set forth herein, Bosch's motion to stay is denied.

## I. Background

### A. Bosch's Purchase Orders

In September 2008, Bosch acquired the brake pad business of Morse Automotive ("Morse").[1] Morse had been a longtime customer of Nucap until it was acquired by Bosch.

Nucap and Morse did not have a master agreement governing Morse's purchase of brake components from Nucap. Instead, Morse issued purchase orders to Nucap for brake components, including backing plates, shims, and brake hardware. Nucap supplied those parts to Morse and invoiced Morse. None of the purchase orders that Morse issued to Nucap referred to any standard terms and conditions in the purchase orders themselves or in any other document.

After Bosch took over Morse, Bosch continued to issue individual purchase orders for brake components to Nucap. These purchase orders did not state that additional terms and conditions applied.

Beginning in March 2009, however, Bosch added a line to the bottom of the purchase orders it issued to Nucap. The line provides:

> THE TERMS AND CONDITONS OF PURCHASE ARE AVAILABLE AT WWW.BOSCHNASUPPLIERS.COM AND INCORPORATED HEREIN BY REFERENCE [sic], SHALL BECOME A BINDING AGREEMENT UPON SELLER COMMENCING PERFORMANCE OF THIS PURCHASE ORDER, OR UPON SELLER OTHERWISE ACKNOWLEDGING ACCEPTANCE, WHICHEVER OCCURS FIRST.

(*See* ECF No. 35.)

Bosch's Terms and Conditions bear on its motion to stay because, since at least September 1, 2010, they have contained a compulsory arbitration clause in Section 32.[2] This

---

[1] When ruling on a motion to stay, the court may consider evidence outside the pleadings. *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809-10 (7th Cir. 2011); *Armbrister v. Pushpin Holdings, LLC*, 896 F. Supp. 2d 746, 753 n.3 (N.D. Ill. 2012). In this case, both parties have submitted declarations and other documentation for the court's review.

section states, in pertinent part, that "all disputes arising out of or relating to the Order shall be resolved through binding arbitration."[3] (Bosch Mem. Ex. A, ECF No. 44.) The Terms and Conditions also identify the documents that "are incorporated into and shall be part of the Order." (*Id.*) These documents are:

> (i) any executed supply agreement between Buyer and Seller; (ii) Material Releases . . . issued by Buyer to Seller under the Order; (iii) prints and specifications for the Supplies; (iv) Buyer's policies, as revised by Buyer from time to time; and (v) any written agreement between Buyer and Seller which provides therein that it shall be part of the Order.[4]

(*Id.*)

In 2011, Bosch proposed that the parties enter into a master "Corporate Agreement" and "Purchase and Sale Agreement." (*See* Declaration of Montu Khokhar ("Kohkar Decl."), Ex. 5, ECF No. 48.) Both agreements incorporated Bosch's Terms and Conditions by reference to Bosch's website, www.boschnasuppliers.com. Nucap responded to Bosch's proposal in writing on May 17, 2011. In this correspondence, Nucap stated that it "cannot have any blind acceptance of Bosch standard terms and conditions." (*Id.* Ex. 5.) Nucap countered with a list of ten "terms that Nucap would require" in any master agreement. In the end, the parties could not agree to a master agreement, so they reverted back to transacting with each other on an individual purchase order by purchase order basis.

---

[2] The "North American Terms and Conditions of Purchase" that Bosch submitted indicate that they were "[l]ast revised September 1, 2010." Bosch has not filed a copy of the terms and conditions before they were revised on September 1, 2010.

[3] The term "Order" refers to "the purchase order and/or scheduling agreement issued by Robert Bosch LLC and/or its Northern American affiliate(s) as specified in the purchase order and/or scheduling agreement, or revision thereto. . . ." (Bosch Mem. Ex. A.)

[4] The term "Supplies" refers to "the supplies and/or services to be provided to Buyer by Seller as specified on the purchase order and/or scheduling agreement." (*Id.*)

### B. Nucap's Terms of Use

Over the past two decades, Nucap has spent millions of dollars researching and developing a library of thousands of brake component drawings. Bosch began seeking access to these drawings in October 2008, according to a declaration from Montu Khokhar, Nucap's Chief Operating Officer. At that time, Khokhar indicates that "Bosch told Nucap that it required access to drawings for internal quality control requirements." (Khokhar Decl. ¶ 28.) Khokhar further states that "Bosch confirmed that it would keep Nucap's drawings confidential, and would not disclose them to any third parties or misappropriate the drawings." (Id.) Based on Bosch's representations, Nucap "agreed to provide certain Nucap drawings to Bosch and to grant specified Bosch engineers access to Nucap's Engineering Database." (Id.)

Although Bosch does not directly challenge Khokhar's explanation of how Bosch began accessing Nucap's drawings, Christopher Thornton, a Bosch Purchasing Manager, describes a different course of dealing. (*See* Bosch Reply, Ex. A, Declaration of Christopher Thornton ("Thornton Decl."), ECF No. 57.) Thornton avers that each transaction between the parties commenced when Nucap (a) "informed Bosch of available components, identified with unique 'FMSI' numbers," and (b) "sent drawings and specifications for those components to Bosch." (*Id.* at 17.) Bosch then "identified the component parts it was interested in purchasing, and Nucap shipped samples of those components parts for Bosch to inspect." (*Id.*) Next, "Bosch issued purchase orders to Nucap identifying the quantity required at the prices quoted by Nucap of desired components." (*Id.*)

Thornton's recollection, however, is not necessarily at odds with Khokhar's explanation. Khokhar describes a separate line of communications that started in or around October 2008 regarding Bosch's desire to have its engineers access Nucap's online database of engineering

drawings. Thornton's declaration does not shed any light on this dialogue. Nor does Bosch submit any other evidence that speaks to its request to gain access to Nucap's Engineering Database circa 2008.

Regardless, by October 2012, the process by which Bosch's engineers could access Nucap's Engineering Database became more formal, evident in the written "Terms of Use" Agreements that several of Bosch's engineers executed. On October 17, 2012, a Nucap employee, Pouyan Ezzatian, sent an email to a Bosch Product Engineer, Zhang Yi, entitled, "NUCAP Web Access." (*See* Nucap Opp. Ex. 7.) Ezzatian wrote: "Regarding your request to access [sic] NUCAP online catalogue, please review and sign [sic] attached document in order to proceed. Thanks in advance for your cooperation." *Id.*

> Yi responded on October 23, 2012:
>
> Dear Pouyan,
>
> Sorry for this late reply as I have been in training last week and this week.
>
> Regarding the use of Nucap account, what I want to discuss with you is that 7 members in our team need to get drawings from Nucap web. You can find the information of our team members in the following table. Therefore, all of us will need to use this account. We have signed the attached document separately. Do you see any problem if our team (7 members) share this account?

(*Id.*)

Just as Yi represented, his signed agreement and the signed agreements from the members of his team—Christian Wecker, Senior Manager Engineer, Yan Weiqing, Product Engineering Supervisor, Qi Ying, Senior Product Engineer, Chen Lili, Product Engineer, Zeng Fanfan, Product Engineer, and Jin Lifeng, Product Engineer—were attached to his email. Each agreement provided as follows:

> The purpose of this letter is to set forth in writing the terms and conditions under which Bosch China ("**you**") may use NUCAP Industries Inc.'s ("**NUCAP**")

certain copyrighted materials to be provided to you by NUCAP, such as part prints, drawings, images, box shot, screen shots, and texts (the "**Materials**"), and for the use of certain trademarked materials, such as logos, marks and icons. By signing this letter, you agree to abide by the terms and conditions set forth in this Agreement.

NUCAP authorizes you to view the information contained in the materials, whether provided in Adobe PDF form or in AutoCAD, only for inspection purposes. This authorization is not a transfer of title in the Materials or copies of the Materials and is subject to the following restrictions:

1. you must retain on all copies of the Materials, all copyright, trademark and other proprietary notices contained in the Materials;
2. you may not modify, reproduce, distribute, display, sell, alter, perform or otherwise use the Materials in any manner whatsoever;
3. you must not transfer the Materials to any other person;
4. you agree to comply with all applicable copyright laws in your use of the Materials and to prevent any unauthorized copying or use of the Materials; and
5. you acknowledge that by providing you the Materials, you do not obtain any ownership right, license, title, or other interest in the Materials.

(*Id.*)

Eventually, Bosch sought to replace the engineer-specific process of obtaining access to Nucap's Engineering Database with a master confidentiality agreement. On June 5, 2013, Bosch sent Nucap a document titled, "Mutual Non-Disclosure Agreement" ("Mutual NDA"). (*See* Khokhar Decl. Ex. 8.) The agreement defined "confidential information" to encompass "documents, drawings, models, apparatus, sketches, designs, schedules, product plans, marketing plans, technical procedures, manufacturing processes, software prototypes, samples, methodologies, formulations, patent applications, know-how, experimental results, specifications and other business information." (*Id.*) According to Nucap, Bosch indicated that the Mutual NDA "was intended to govern the disclosure and use of Nucap's drawings, and Nucap understood that the Mutual [NDA] was intended to govern the disclosure and use of Nucap's drawings." (Khokhar Decl. ¶ 34.)

Ultimately, the parties could not agree on the terms Bosch proposed in the Mutual NDA. But rather than scrap their commercial dealing altogether, the parties proceeded in accordance with an understanding that Khokhar memorialized and sent to several Bosch representatives via email on June 27, 2013. (*See* Khokhar Decl. Ex. 9.) The email, titled "Bosch prints distribution," stated:

> Team – there has been some miscommunication internally about how to handle print distribution for Bosch. This has resulted in some delays in Bosch's product development.
>
> See below for clear instruction going forward.
>
> 1) Bosch will not be able to sign the confidentiality contract, however, Bob Wilkes has sent us numerous emails showing us how Bosch intends to control print distribution internally
> 2) Due to Bosch and NUCAP relationship, NUCAP is willing to offer prints to Bob and his specified team members. 2 from US, 1 in Europe, and 2 in China, which he will identify
> 3) Tim Wietlispach, Engineer on Bob's team in US will be requesting the majority of the prints
> 4) These requests should go directly to Pouyan
> 5) Pouyan will assess the request and have the prints forwarded by our catalogue and print coordinator, Amrit
> 6) Bill, Jayson, or Gerry may be copied on the print requests, but they must all be directed to Pouyan
> 7) NUCAP must respond in a timely manner

(*Id.*)

On that same day, Bob Wilkes of Bosch responded to Khokhar's email, calling it "a major breakthrough in cooperation between Nucap and Bosch and the beginning of an opportunity to turn things around." (Khokhar Decl. Ex. 10.) Wilkes confirmed that certain engineering personnel, whom he identified by name and Bosch branch location, "can request drawings" from Nucap. *Id.* The email also asserted:

> In the future, we will need to open this up to our Purchasing Quality (PUQ), Purchasing (PUR), and Quality (QMM) departments for all locations. Please

7

> consider that these should be added and would likely be two people from each manufacturing location for purchasing and purchasing quality, as well as 1 person from Quality.

(*Id.*)

### C. Nucap's Allegations

Nucap alleges that it "allowed select pre-approved Bosch employees to access Nucap's extensive library of proprietary drawings" in response to Bosch's demands during the parties' commercial relationship. (Compl. ¶ 14, ECF No. 1.) "Unbeknownst to Nucap," Bosch allegedly "engaged in a deliberate plan" to replace Nucap as its supplier of aftermarket brake components with low-cost, third-party manufacturers in China and elsewhere. (*Id.* ¶ 15.) Nucap alleges that Bosch disseminated Nucap's drawings and specifications to these low-cost manufacturers so that they could use "Nucap's drawings and specifications to copy Nucap-designed brake components." (*Id.* ¶ 18.) Nucap further alleges that Bosch knowingly "interfered with Nucap's [exclusive] supply agreement with Trelleborg Rubore" in order to acquire the advanced steel-rubber composite materials that Nucap had used for the shims that it sold to Bosch. (*Id.* ¶ 20.) Based on these allegations, Nucap brings claims against Bosch for trade secret misappropriation (Count I), copyright infringement (Count II), tortious interference with contract (Count III), unfair competition (Count VI), and unjust enrichment (Count V).

### I. Legal Standard

Under the Federal Arbitration Act ("FAA"), written provisions in a contract "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects the "liberal federal policy favoring arbitration and

the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (citations and internal quotation marks omitted).

Courts also recognize, however, that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation and internal quotation marks omitted). "[B]ecause arbitration is a matter of contract," an arbitration agreement "must [be] place[d] . . . on an equal footing with other contracts, and enforce[d] . . . according to [its] terms." *Gore v. Alltel Communs., LLC*, 666 F.3d 1027, 1031 (7th 2012) (quoting *Concepcion*, 131 S. Ct. at 1745 (citation omitted)).

## II. Discussion

Bosch predicates its motion to stay on the arbitration clause incorporated by reference from the Terms and Conditions on Bosch's website into each purchase order the parties executed between September 2010 and December 2014. Nucap contends that it never agreed, and the parties did not contemplate, that Bosch's access to and use of Nucap's drawings would be subject to Bosch's Terms and Conditions. Nucap also challenges Bosch's assertion that Bosch's Terms and Conditions were available on its website, meaning that Nucap could not have viewed them even if Nucap had notice of their applicability.

Bosch's motion to stay raises a host of factual and legal issues. When did Bosch's purchase orders begin referencing the company's Terms and Conditions? Did Bosch's Terms and Conditions contain an arbitration clause before they were revised on September 1, 2010, and if so, what were its terms? With respect to the purchase orders executed after September 1, 2010, what law applies to determining whether the arbitration clause contained in Bosch's Terms and Conditions was validly incorporated into the purchase orders and became binding on the parties? And, of course, was Nucap in fact bound by the arbitration clause?

9

Setting these questions aside, the court focuses its analysis on a different inquiry: if the purchase orders validly incorporated Bosch's Terms and Conditions, is the scope of the arbitration provision broad enough to encompass Nucap's allegations and claims?

Where the scope of an arbitration clause is at issue, "federal courts apply state-law principles of contract formation" in determining "whether a contract's arbitration clause applies to a given dispute."[5] *Gore*, 666 F.3d at 1031. "Once it is clear, however, that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Id.* "To this end, a court may not deny a party's request to arbitrate an issue unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (citations and quotation marks omitted).

One complication in this matter is the fact that Nucap and Bosch, as a company and through some of its engineers, have entered into separate confidentiality and "Terms of Use" agreements that did not contain arbitration clauses. "[W]here the parties enter into two agreements[,] though only one contains an arbitration clause, and the plaintiff brings a cause of action based, at least in part, on conduct contrary to the agreement that does not have the arbitration clause, the parties can be compelled to arbitrate only if (1) the clause itself is broad enough to encompass their dispute, or (2) the agreement containing the clause incorporates the other by reference." *Gore*, 666 F.3d at 1033.

In *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657 (7th Cir. 2002), the Seventh Circuit considered a plaintiff's obligation to arbitrate where one of his contracts with the defendant

---

[5] The parties do not suggest that Illinois law or the Convention on Contracts for the International Sale of Goods—the two bodies of law that the parties contend apply to interpreting the purchase orders and Bosch's Terms and Conditions—differ with respect to understanding the scope of the arbitration clause. The court therefore applies Illinois law and follows Seventh Circuit precedent.

10

contained an arbitration clause, but the other contract into which the parties entered did not. The first contract was an agreement ("Acquisition Agreement") by which the plaintiff sold his company to the defendant for $7 million. *Id.* at 660. The Acquisition Agreement provided that the plaintiff would receive $300,000 in cash at the closing, the balance on December 15, 2000, and one million shares in the defendant's stock on December 15, 2010. *Id.*

"As a condition precedent to the Acquisition Agreement, the parties also executed" an employment agreement ("Employment Agreement"). *Id.* "Under the terms of that agreement," the plaintiff agreed to work for the defendant as a senior vice-president of his former company, under the ownership of the defendant. *Id.* The defendant agreed to pay the plaintiff a salary of $125,000 a year in exchange for his services. *Id.* The Employment Agreement contained an arbitration clause, which stated: "Except for any matters for which this Agreement expressly provides otherwise, any matter in dispute under or relating to this Agreement shall . . . be finally resolved by binding arbitration." *Id.*

When the defendant's payment obligations became due on December 15, 2000, the defendant defaulted, and the plaintiff brought suit for breach of contract and fraud. The defendant moved to dismiss on the ground that the plaintiff's claims were subject to the arbitration clause in the Employment Agreement. The district court granted the motion to dismiss, holding that "the employment agreement is incorporated by reference into the acquisition agreement, the two agreements are clearly interrelated and are explicitly part of the entire agreement." (internal citation and quotation marks omitted). Also important to the district court was the breadth of the arbitration clause, which the court found "cover[ed] all matters relating to the employment agreement." *Id*.

On appeal, the Seventh Circuit began its review of the district court's ruling by identifying the "possible sources of [the plaintiff's] obligation to arbitrate. . . ." *Id.* at 662. One source was whether "the Employment Agreement's arbitration clause [was] broad enough, by its own terms, to encompass disputes under the Acquisition Agreement."[6] *Id.* If the arbitration clause subsumed disputes arising under the Acquisition Agreement, then, the Seventh Circuit opined, the plaintiff would have been required to arbitrate his action. *Id.*

"At the outset of [this] inquiry," the Seventh Circuit noted that "it [was] important to examine the two contracts as a whole and to determine their relationship to each other." *Id.* at 663. The two agreements, the court explained, "were both necessary, but self-contained, as components of a comprehensive business transaction." *Id.* The court continued:

> While the contracts are related, they are not two sections of the same agreement; they are separate, free-standing contracts. Each contract delineates rights and duties independent of the other and that pertain to a particular subject matter. One contract may be fully performed while the other is breached. The employment contract deals exclusively with [plaintiff's] employment. By contrast, the Acquisition Agreement concerns the parties' rights and duties with respect to [plaintiff's] sale of [his company] to [defendant] . . . Indeed, both contracts are complete on their own. There are no terms missing from either contract that must be filled in with borrowed terms from the other. Both are supported by consideration and meet all of the conditions of a valid contract. Finally, the contracts deal with distinct subject matter and contemplate different periods of completion. The Employment Agreement governs what the parties intend to be an ongoing relationship, with provisions for renewal, severance and ongoing compensation. The Acquisition Agreement governs the sale of [the plaintiff's company] to [defendant] Travelbyus. Performance of the contract would have been complete had [defendant] made the required payment to [plaintiff] on December 15, 2000.

---

[6] The other possible source of an obligation to arbitrate was the Acquisition Agreement's purported incorporation of the Employment Agreement by reference. *See Rosenblum*, 299 F.3d at 662. However, this basis for subjecting the parties to arbitration does not exist in this case. Neither Nucap nor Bosch contends that Nucap's Terms of Use or other confidentiality agreements incorporated Bosch's purchase orders or Terms and Conditions by reference. To the contrary, the Terms and Conditions state that each Order includes "any written agreement between Buyer and Seller which provides therein that it shall be part of the Order," and there is no evidence that any confidentiality agreements between Nucap and Bosch provided that it would be considered part of any purchase order.

*Id.*

Like the contracts at issue in *Rosenblum*, Bosch's purchase orders and Nucap's confidentiality agreements were "necessary, but self-contained, as components of a comprehensive" commercial relationship. Undoubtedly, the purchase orders and confidentiality agreements are related; but for the former, the latter never would have existed. But such a causal link does not negate the fact that the purchase orders and confidentiality agreements were "complete on their own." *Id.* The purchase orders dictated the price, quantity, and delivery of component parts that Bosch obtained from Nucap. The confidentiality agreements, by comparison, governed Bosch's use and prohibited Bosch's transfer of Nucap's copyrighted materials, including Nucap's drawings and designs. No terms in either set of agreements filled in gaps in the other. Nor would any breach of a purchase order have affected Bosch's performance or obligations arising under the confidentiality agreements. In sum, "there is no indication that the parties intended that" the Terms and Conditions on Bosch's website, including the arbitration provision, would apply to a dispute over Bosch's alleged misappropriation of Nucap's intellectual property and breach of the confidentiality agreements it and its engineers entered into with Nucap. *Id.*

Bosch argues that its Terms and Conditions expressly incorporated Nucap's "prints and specifications" into each purchase order, so any dispute over the drawings "arise[s] under or is related to the purchase order[s] and is well within the scope of the arbitration clause." (Bosch Reply at 6.) But Bosch's argument oversimplifies the analysis that applies in this situation. As in *Rosenblum*, the issue here is whether the scope of the arbitration clause in one agreement extends to a violation of another agreement, which lacks an arbitration clause.

Even though Nucap's "prints and specifications" were made part of Bosch's purchase orders—or at least those executed after September 1, 2010—Nucap's claims concern Bosch's alleged misuse of those prints and specifications and other Nucap intellectual property. Nucap's claims do not touch upon Bosch's or Nucap's performance under the purchase orders; Bosch "could [have] fully compli[ed] with [every purchase order] and still cause[d] [Nucap's] injury by [misappropriating Nucap's trade secrets]." *See AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573 (7th Cir. 1999) (concluding that a plaintiff's antitrust claim did not arise under its agreement, which contained an arbitration clause, with a defendant, in part, because the agreement did "not regulate the price" the defendant could charge); *see also Washburn v. Societe Commerciale De Reassurance*, 831 F.2d 149, 151 (7th Cir. 1987) (dispute not subject to arbitration where "there [was] no evidence or allegation that either party did not perform its duties or obligations under the" contract that contained the arbitration clause at issue).

Indeed, even Bosch recognizes that Nucap's allegations center upon Bosch's compliance with Nucap's Terms of Use or other confidentiality agreement. (*See* Bosch Reply at 12, ECF No. 57) ("Nucap's 'Terms of Use' actually support Bosch's repeated statements that it has done nothing improper with Nucap's drawings, since Bosch is entirely permitted to use Nucap's drawings and specifications for 'inspection purposes[,]" such as quality control and fit testing. Because Nucap's Complaint fails to provide the required specificity of alleged improper conduct, *there is no basis to conclude that Bosch's use of the drawings was in violation of the Nucap Terms of Use*.") (citation omitted) (emphasis added).

Thus, although Bosch's Terms and Conditions incorporated "prints and specification" into the purchase orders, Nucap's complaint involves a different subject matter altogether: Bosch's alleged misappropriation of Nucap's drawings and trade secrets in violation of the

14

confidentiality agreements the parties executed. For this reason, Nucap's claims fall outside the scope of the arbitration clause in Bosch's Terms and Conditions.

## III. Conclusion

Accordingly, Bosch's motion to stay is denied. This matter is set for status on July 10, 2015. The court will address Nucap's pending motion for expedited discovery at that time.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 1, 2015