# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NUCAP INDUSTRIES INC. and | ) | |
| NUCAP US INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 15-cv-2207 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| ROBERT BOSCH LLC and BOSCH | ) | |
| BRAKE COMPONENTS LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiffs Nucap Industries Inc. and Nucap US Inc. (collectively, "Nucap") brought this

suit against Robert Bosch LLC and Bosch Brake Components LLC[1] (collectively, "Bosch")

alleging a number of different causes of action. However, the two causes of action that are

relevant to this opinion pertain to Nucap's claims for trade secret misappropriation and tortious

interference with contract and prospective economic advantage. Nucap now seeks a preliminary

injunction enjoining Bosch from using or disclosing (1) Nucap's drawings; (2) drawings created,

modified, evaluated, validated, verified, qualified, overlaid, compared to, or approved using

Nucap's drawings; and (3) all other documents based upon or reflecting information derived

from Nucap's drawings, for any purpose. [Proposed Preliminary Injunction Order, p. 4, ECF No.

576-1.] Nucap also asks the court to order Bosch to return and delete Nucap's drawings, to

quarantine all drawings that were created or validated using Nucap's drawings, and to identify all

third parties or affliates whose brake components were evaluated, validated, or otherwise

compared to Nucap's drawings. [*Id.* pp. 2-4.]. Nucap further seeks to bar Bosch from

---

[1] Nucap filed its First Amended Complaint ("FAC") on February 4, 2016 adding Robert Bosch GmbH as a
defendant. [FAC, ECF No. 239.] However, Robert Bosch GmbH is not a party to this preliminary injunction
proceeding.

purchasing or selling brake pads whose components were previously supplied by Nucap and where the replacement supplier component or drawing was validated or modified using any Nucap drawing. [*Id.* p. 5.] Finally, Nucap seeks to have the court enjoin Bosch from doing business with Trelleborg AB, Trelleborg Sealing Solutions Detroit, or any party, subsidiary or affiliate thereof (collectively, "Trelleborg"). [*Id.* pp. 5-6.] A four-day hearing on Nucap's motion took place in early May 2016. For the following reasons, Nucap's motion for a preliminary injunction is granted in part and denied in part.

## I. BACKGOUND

### A. The Parties

Nucap is based in Ontario, Canada and specializes in designing and manufacturing aftermarket brake components for vehicles, including backing plates, shims, and brake hardware (collectively, "brake components'). [Nucap Proposed Findings of Fact ("FOF") ¶ 1, ECF No. 563.] Bosch is based in Illinois and is in the business of, among many things, making and selling aftermarket brake pads. [*Id.* ¶ 75.] Bosch entered the aftermarket brake pad industry in 2008 by acquiring Morse Automotive ("Morse"). [*Id.* ¶ 76.] Before being acquired by Bosch, Morse purchased aftermarket brake components from Nucap and Nucap's predecessor Anstro Manufacturing ("Anstro"). [Bosch FOF ¶ 8, ECF No. 559.] Once Bosch acquired Morse, it continued to purchase aftermarket brake components from Nucap. [*Id.*]

A brake pad, whether it be an Original Equipment ("OE") brake pad installed by a vehicle manufacturer or an aftermarket brake pad like the ones made and sold by Bosch, typically consists of a backing plate, friction material, a shim, and hardware (such as a wear sensor). [*Id.* ¶ 1.] Nucap supplies brake components to customers like Bosch who create brake pads by molding a "friction lining" onto the backing plate. [Nucap FOF ¶ 2, ECF No. 563.]

Companies like Bosch then attach shims and brake hardware to the backing plate (with friction lining) to create finished aftermarket brake pads.  [*Id.*]

**B. Nucap's Database of Drawings**

Nucap manufactures its brake components based on drawings that it creates.  Montu Khokhar ("Khokhar"), CEO of Nucap, testified during the preliminary injunction hearing that Nucap has invested hundreds of millions of dollars in order to create a database of component drawings and associated tooling.  [Preliminary Injunction Hearing Transcript ("Hr'g Tr.") at 78:5-78:23, 79:16-80:3, 218:24-219:17 (Khokhar).]  Nucap's database consists of drawings for every brake component that it manufactures, which number more than 12,000.  [Nucap FOF ¶¶ 10-11.]  Nucap begins the process of developing its brake component drawings as soon as a new vehicle or vehicle model is released.  [*Id.* ¶ 21.]  Nucap starts this process by obtaining the OE braking assemblies for the new vehicle and then reverse engineering them in order to design a backing plate that meets the fit and function requirements of the brake caliper.  [*Id.* ¶¶ 23-24.]  Nucap's engineering team then creates a final drawing that specifies the perimeter, dimensions, tolerances, and fit and function requirements.  [*Id.* ¶ 25.]  Khokhar testified that it takes anywhere from several days to several weeks to design and complete this process for a single brake.  [Hr'g Tr. at 68:16-69:8 (Khokhar).]

Nucap's backing plate and shim drawings contain information needed to build the production tooling to manufacture the components in accordance with Nucap's specifications.  [Nucap FOF ¶ 13.]  Nucap's drawings also reveal the component "perimeter" or "outline."  According to Nucap, the "perimeter" depicted in its drawings will not exactly align with the outline of its physical components because the components are subject to manufacturing tolerances.  [*Id.* ¶ 15.]  Tolerances are the minimum and maximum measurement for various

dimensions. [*Id.* ¶ 16.] Nucap's drawings indicate three different types of tolerances—"critical" tolerances, "specified" tolerances, and "unspecified" tolerances. "Critical" tolerances are generally specified down to the 1/1,000th of an inch, and are deemed critical by Nucap for fit and function of the brake component in the brake caliper. [*Id.* ¶ 18.] The other two types of tolerances are not deemed to be "critical."

Nucap's entire trade secret claim is premised on the argument that its brake component drawings are its "crown jewels" and its core competitive advantage. [Hr'g Tr. at 78:12-23, 116:7-9, 133:19-25, 137:16-20 (Khokhar).] Nucap argues that the value of its drawings, and of its business, depends on the drawings being proprietary and confidential, not being generally known to actual or potential competitors, and not being "misused" to develop or strengthen actual or potential competitors. [Hr'g Tr. at 137:11-139:17, 140:10-23 (Khokhar).] To that end, Nucap claims that it takes numerous steps to safeguard the confidentiality of its component drawings. First, Nucap states that it requires its employees to execute a non-disclosure agreement that prohibits them from making any unauthorized use, publication, or disclosure during or subsequent to employment by Nucap. [Hr'g Tr. at 86:15-20 (Khokhar).] Nucap employees also receive training on Nucap's policies and procedures for handling Nucap's drawings and other information that Nucap deems confidential and proprietary. In terms of security, Nucap maintains hard copies of drawings only in secure areas at Nucap and access to those drawings is limited to necessary employees. [Hr'g Tr. at 86:15-22 (Khokhar).] Electronic copies are maintained on a secure server in a secure area at Nucap's Toronto facility. Access to the electronic copies within Nucap is limited to only specific approved engineers. Approved engineers are issued usernames and passcodes that are required to access the electronic copies. [Hr'g Tr. at 86:15-22 (Khokhar).] Some of Nucap's drawings contain a confidentiality legend

which provides notice that Nucap's drawings constitute Nucap's proprietary and confidential trade secret information. [*See e.g.* Nucap Drawings, Plaintiff's Preliminary Injunction Hearing Exhibit ("PTX") 471, PTX 459; Hr'g Tr. at 86:23-87:13 (Khokhar).]

Nucap also provides certain of its customers with access to its drawings. Nucap claims that it provides its drawings on a confidential basis and for the sole purpose of allowing its customers to perform quality-control of Nucap's components. [Hr'g Tr. at 85:1-86:10 (Khokhar).] Nucap requires some of its customers to sign confidentiality agreements ("Terms of Use Agreements") in order to access or continue to access Nucap's drawings. [*See e.g.* Bosch China Terms of Use Agreement, PTX 461, Nucap-0162868-74; Hr'g Tr. at 95:12-24 (Khokhar).] Nucap provided a number of Bosch employees with access to its drawings during their business relationship. No one employed by either of the Bosch defendants[2] signed a Term of Use Agreement.

### C. Termination of the Relationship Between Bosch and Nucap

After Bosch began purchasing aftermarket brake components from Nucap in late-2008/early 2009, it quickly became Nucap's largest customer. [Bosch FOF ¶¶ 8-9, ECF No. 559; Nucap FOF ¶ 83, ECF No. 563.] By 2014, Nucap supplied Bosch with more than 90% of the brake components that Bosch required for assembly into its brake pads. [Hr'g Tr. at 90:1-6 (Khokhar).] However, the business relationship between Bosch and Nucap started to downshift in late 2014. The parties, of course, blame one another for the breakdown in the relationship, but the circumstances that precipitated the breakdown have no bearing on the court's decision of the issues before it. What is of particular relevance in this case is what happened after the relationship came to a screeching halt in November 2014.

---

[2] As will be explained in greater detail, employees from Bosch China, a separate company and a non-party to this case, executed a Terms of Use Agreement with Nucap.

Nucap's supplier relationship with Bosch ended late 2014 with an exchange of emails and letters expressing dissatisfaction with one another. The first email, sent by Nucap to Bosch on November 10, 2014, stated that Nucap was placing Bosch on a "complete business pause." [11/10/14 Email, Defendants' Preliminary Injunction Hearing Exhibit ("DTX") 76, Nucap-0000709.] Bosch responded by sending a letter to Nucap, dated December 17, 2014, informing Nucap that it would no longer be considered for any future business. [12/17/14 Letter, PTX 254, Nucap 0000174.] The dissolution of the relationship between Bosch and Nucap put immense pressure on Bosch to find replacement suppliers for the brake components that Nucap previously supplied to Bosch. Failure to do so would have likely resulted in a plant shutdown. Bosch went into "survival mode" and created a "task force" to approve replacement suppliers ("Nucap Task Force").

The Nucap Task Force Engineers overlaid and compared Nucap's drawings and replacement supplier drawings in order to "approve" replacement supplier components. [11/14/14 Bosch Internal Email, PTX 165, BBC-NU00442646.] As part of the overlay process, Bosch engineers overlaid the Nucap drawings with the component drawings belonging to the potential replacement suppliers. [Hr'g Tr. at 479:11-481:16 (Vijay Chavda ("Chavda"), Bosch Engineer).] Bosch engineers checked the "critical dimensions" to ensure that the components would fit and function in the brake caliper of the vehicle and also fit in Bosch tools, which were designed based on Nucap's drawings. [Hr'g Tr. at 481:23-482:13 (Chavda).] Bosch claims that it conducted only a "perimeter-to-perimeter" check to determine whether the replacement component was the same basic shape as the Nucap component. Bosch states that none of the critical information in Nucap's drawings was used during this process.

Bosch also argues that the aforementioned process was only the first step in a two-step process to approve replacement suppliers. After Bosch determined that the Nucap drawing and replacement supplier drawing were similar, it would order the replacement supplier part to conduct a physical fit test in its machinery. Only if and when a potential replacement part passed Bosch's physical fit testing would Bosch approve and release the part for production. [New Product Release Checklist, DTX 61, BBC-NU00417655.] Therefore, the overlays conducted were a "weeding out" process, and none of the information actually contained in the drawings was used, according to Bosch.

Nucap, on the other hand, argues that Bosch's practice of "approving" replacement suppliers using this overlay method constitutes trade secret misappropriation. Moreover, Nucap claims that Bosch actually marked up and modified potential replacement suppliers' drawings using information from Nucap's drawings. Nucap has produced emails indicating that it was Bosch's intent to "mark-up" potential suppliers' drawings to show the suppliers what needed to be changed with the possibility of including "the tolerance as a recommendation." [12/14/14 Bosch Internal Email, PTX 76, BBC-NU00192331.] In fact, there are concrete examples of Bosch having disclosed information derived from Nucap's drawings. [Nucap FOF ¶ 189, ECF No. 563; Bosch FOF ¶ 121(a)-(g), ECF No. 559.]

Bosch states that even if it disclosed Nucap's drawings or the information contained therein, the disclosures were incidental and infrequent. Additionally, Bosch argues that it has quarantined all of Nucap's drawings, so there is no further risk of disclosure. Finally, Bosch maintains that there was no agreement between the parties that would have required Bosch to maintain the confidentiality of Nucap's drawings. Rather, the only agreements between the parties were a series of purchase orders, over 8,000 in total, which Bosch sent to Nucap when it

decided to order a part. Nucap disagrees. First, Nucap argues that there was, in fact, a confidentiality agreement in place between Nucap and Bosch, and, second, the purchase orders do not apply in this case as this case pertains to Nucap's trade secret claims.

## D. Purchase Order Contracts

At all times, Bosch and Nucap conducted their business pursuant to purchase orders submitted by Bosch to Nucap. [Bosch FOF ¶ 12, ECF No. 559.] From 2009 until the end of the relationship in 2014, Bosch issued purchase orders to Nucap that specified all the material terms for a purchase, including parties, specific parts, quantity, price, payment terms, delivery/shipping terms, and total cost. Nucap then accepted the purchase order, delivered components to Bosch, and invoiced Bosch for the components supplied pursuant to that specific purchase order. [*Id.* ¶ 14.] Since September 1, 2010, each and every purchase order sent by Bosch to Nucap explicitly incorporated the Bosch "Terms and Conditions of Purchase" (the "POTCs") using the following language:

> THE TERMS AND CONDITIONS OF PURCHASE ARE AVAILABLE AT
> WWW.BOSCHNASUPPLIERS.COM AND INCORPORATED HEREIN BY
> REFERENCE, SHALL BECOME A BINDING AGREEMENT UPON SELLER
> COMMENCING PERFORMANCE OF THIS PURCHASE ORDER, OR UPON
> SELLER OTHERWISE ACKNOWLEDGING ACCEPTANCE, WHICHEVER
> OCCURS FIRST.

[Bosch Purchase Orders, DTX 2, Nucap-0076363.] The language cited above appears immediately after the "Total Cost" calculation on each purchase order. [*Id.*] The current version of the POTCs were last revised on September 1, 2010. [*Id.* ¶ 23.] From September 1, 2010 through November 2014, Bosch issued to Nucap, and Nucap shipped components pursuant to, more than 8,000 separate purchase orders that expressly incorporated the POTCs by reference. [*Id.* ¶ 24.] Also during that time, the POTCs were available for review, download, or print at www.boschnasuppliers.com. [Hr'g Tr. at 642:9-16, 643:20-23 (Christopher Thornton

("Thornton"), Bosch Purchasing Manager).] Bosch argues that several provisions of the POTCs explicitly give it (1) the right to audit, obtain and copy Nucap's drawings (§ 18.1, § 23.7); (2) ownership rights in the prints, drawings and other technical information relating to the parts ordered by Bosch (§ 2.2, § 22.1, §22.4, § 22.3), and (3) the right and license to use all prints, drawings and other technical information relating to the parts ordered by Bosch for any purpose, including a transition to a new supplier (§ 16.1, § 22.4, § 22.5). [Bosch POTC, DTX 1, BBC-NU199875-87.] As discussed more fully below, Nucap raises several arguments regarding the inapplicability of the POTCs as they relate to Nucap's drawings and proprietary information.

### E. Global Agreements

On March 2, 2011, Chris Thornton, a Bosch purchasing manager, sent to Bill Murray, Nucap's Vice President of Global Sales, a draft "Purchase and Sale Agreement" and a draft "Corporate Agreement" for consideration. [3/2/11 Email and attachments, DTX 13, Nucap-0160600-31.] Both the draft Purchase and Sale Agreement and the draft Corporate Agreement referenced the POTCs. [*Id.*] From March 2, 2011 through May 17, 2011, Mr. Murray discussed the draft agreements with other Nucap executives. [4/19/11 Email, DTX 15, Nucap-0159422-23.] On the morning of May 17, 2011, Mr. Murray sent Mr. Thornton an email setting forth ten "Talking Points for Contract." The email sent by Mr. Murray included the following talking point: "We cannot have any blind acceptance of Bosch standard terms and conditions." [5/17/2011 Email, DTX 18, Nucap-0158740.]

On May 17, 2012, one year after the Bosch-Nucap emails described above, Mr. Thornton followed up with Mr. Murray to obtain an "update" on Nucap's internal discussions regarding contract issues, including Nucap's consideration of the POTCs. Mr. Murray responded to Mr. Thornton's inquiry by stating, "I spoke to our attorney, Jonathan Kleib [sic], yesterday and asked

him to get the agreement along with his comments over to you this week." [5/17/2012 Email, PTX 691, Nucap-0174287.] After the parties' May 17, 2011 discussions, and after Nucap's internal consideration of the POTCs, Nucap never identified to Bosch any further objection to, or specific issues with, the POTCs or with any specific provision contained therein. Nucap ultimately elected not to execute the draft agreements. [2/28/13 Email, DTX 31, Nucap-0050421-R.] Instead, the parties continued to do business on a purchase order-by-purchase order basis.

## F. Confidentiality Agreements

It is Nucap's position that a confidentiality agreement governing the use and access of its drawings existed between it and Bosch. However, the record reveals that the parties never executed a written agreement. First, Nucap points to a Terms of Use Agreement that was executed between Bosch China and Nucap. [Bosch China Terms of Use Agreement, PTX 461, Nucap-0162868.] Despite sharing the Bosch name, Bosch China is a separate entity from the Bosch defendants. [Bosch FOF ¶ 73, ECF No. 559.] Bosch China has separate officers, managers and director, separate employees, and separate operations. While the Bosch defendants purchase parts from Bosch China pursuant to supply contracts, the Bosch defendants exercise no formal control over Bosch China. [*Id.* ¶ 74.]

Nucap separately presented the Bosch defendants involved in this motion with the Terms of Use Agreement on June 5, 2013. [6/5/13 Email, DTX 40, Nucap-0171750.] Bosch rejected Nucap's Terms of Use Agreement proposal and instead sent back a draft Mutual Non-Disclosure Agreement ("NDA") for Nucap's consideration. [6/5/13 Email, PTX 295, Nucap-0139867.] The proposed NDA and the Terms of Use Agreement were never executed by either Bosch or Nucap. On June 27, 2013, Nucap's CEO Montu Khokhar sent an internal email stating that

"Bosch will not be able to sign the confidentiality contract." [6/27/13 Email, DTX 45, Nucap-0138229.] However, in the same email, Mr. Khokhar assured his team that "Bosch intends to control print distribution internally." [*Id.*]

Besides the Bosch China agreement and the exchange of proposed confidentiality agreements, Nucap claims that Bosch made several assurances that it would use Nucap's drawings solely for the purpose of internal quality control. [Nucap FOF ¶ 209, ECF No. 563.] Nucap argues that Bosch intended that Nucap rely on those assurances and that, in reliance of those assurances, Nucap provided Bosch with access to Nucap's drawings. [*Id.*] Nucap also argues that Bosch "continued throughout the parties' relationship to provide assurances to Nucap regarding [its] use of Nucap's drawings." [*Id.* ¶ 211.]

Nucap also relies on a number of internal communications from Bosch employees to support its argument that Bosch understood that Nucap's drawings were confidential and that Bosch was required to maintain that confidentiality. Nucap points to a number of internal Bosch documents, including documents authored by Mr. Thornton, which state that supplier drawings are the intellectual property or proprietary information of the respective suppliers and not of Bosch. [*See e.g.*, 3/22/13 Email, PTX 64, Nucap-0144700; 8/29/13 Email, PTX 97, BBC-NU00249763; 4/16/14 Email, PTX 102, BBC-NU00258949.] Bosch, in turn, argues that the *internal* communications between Bosch personnel were never meant to create a confidentiality agreement between Bosch and Nucap. Rather, the internal communications merely recited Bosch's own internal policies regarding supplier drawings and were never intended to create a binding obligation as to Nucap.

### G.  Nucap's Relationship with Trelleborg

Trelleborg produces materials that are used to manufacture shims. Nucap claims that it and Trelleborg had a valid and enforceable exclusive agreement whereby Trelleborg supplied its materials exclusively to Nucap; Nucap claims that the relationship began between Trelleborg and Nucap's predecessor, Anstro, in 1993. [Nucap FOF ¶ 291.] Nucap claims that this exclusive agreement and relationship provided Nucap with exclusivity for Trelleborg-produced materials in the North American market. [*Id.* ¶ 292.] However, Nucap admits that there was never a formal agreement executed between Trelleborg and Anstro or Trelleborg and Nucap. In fact, Nucap and Trelleborg attempted to reduce their agreement to a written contract in 2011, but the parties could not reach an agreement. [*Id.* ¶ 295.]

Despite the absence of any formalized agreement, Nucap insists that it and Trelleborg had an exclusive agreement and relationship that continued until November 2014. [Bennett Deposition Transcript ("Tr.") at 211:12-25, 212:1-2, Plaintiffs' Preliminary Injunction Motion Exhibit ("PMX") 36.] During his deposition, however, John Bennett, Managing Director of Trelleborg, acknowledged that there was no written supply agreement between Trelleborg and Nucap or even an oral supply agreement. [*Id.* 270:6-15.] Moreover, to the extent that there was an exclusive supply arrangement between Nucap and Trelleborg, it was Trelleborg's understanding that it could be cancelled at any time because there was no official contract. [*Id.* 271:2-7.] Mr. Bennett also testified that Nucap was not Trelleborg's only customer. [*Id.* 97:12-25 (while Nucap purchased a majority of Trelleborg's shim materials, Trelleborg also sold shim materials to a company called Federal Mogul).]

Nevertheless, Nucap claims that Bosch was aware of Nucap and Trelleborg's allegedly exclusive agreement and relationship. [Nucap FOF ¶¶ 303-04, ECF No. 563.] Nucap argues Bosch was aware of this relationship because in May 2013, Bosch China raised with Trelleborg a

potential supply relationship between Trelleborg and Bosch China but was rejected.  The record

is unclear regarding whether Bosch China was aware that this deal fell through because of the

"exclusive relationship" that allegedly existed between Nucap and Trelleborg.  Nucap also points

to a series of internal Bosch emails characterizing the relationship between Trelleborg and Nucap

as an "exclusive" relationship.  [May/June 2013 Email String, PTX 123, BBC-NU335379-81.]

However, those emails also reveal Bosch's understanding that there was no written agreement

between Trelleborg and Nucap and that the parties operated on a "gentlemen's agreement."  [*Id.*

BBC-NU00335380.]

On November 20, 2014, shortly after Nucap put Bosch on a "business pause," Lutz

Marschall, CEO of Bosch, sent an email to Nucap's CEO, Montu Khokhar, to inform him and

Nucap that Bosch intended to contact Trelleborg and a separate shim provider, Wolverine, in

order to discuss the purchase of shim material.  [11/20/14 Email, DTX 137, BBC-NU00011329.]

Nucap never responded to Marschall's email.  Marschall followed through on his intention and

reached out to Mr. Bennett.  Marschall and Bennett exchanged several emails in an attempt to

establish a business relationship between Trelleborg and Bosch's replacement suppliers.

[11/25/14 Email, PTX 32, BBC-NU00019174.]  In the last email of that chain, sent by Bennett to

Marschall at 1:24 p.m., Bennett expresses reluctance on behalf of Trelleborg to supply Bosch's

replacement suppliers.  [*Id.*]  After receiving this email, Mr. Thornton reached out to his

colleagues in the Central Purchasing Division at Bosch GmbH in Germany as well as executives

of Robert Bosch LLC in order to ask them to approach a Trelleborg affiliate in Germany—

Trelleborg Sealing Solutions—with whom Bosch GmbH already had a good business

relationship to seek its support in putting "pressure" on Trelleborg's "top management" to

support Bosch.  [11/25/14 Email, PTX 35, BBC-NU00019394.]

On November 25, 2014 at 1:30 p.m., Mr. Thornton sent an email to Stefan Lundstrom, Bennett's boss at Trelleborg, referencing the long-standing relationship between Trelleborg and Bosch across multiple business sectors and stating that Bosch needed Trelleborg's immediate support in directly supplying shim materials.  [11/25/14 Email, PTX 437, TSSD0001412.]  Mr. Lundstrom then sent an internal email and stated his understanding that Bosch's email represented a threat to take away business from Trelleborg Sealing Solutions (Germany) if Trelleborg did not agree to supply shim material to Bosch.  [11/27/14 Email, PTX 438, TSSD0002828.]  The next day, on November 26, 2014, Trelleborg provided Bosch with a quote to supply Bosch with the same shim materials it supplied to Nucap.  [11/26/14 Email with attachments, PTX 68, BBC-NU00180276-79.]  Trelleborg continues to supply Bosch's replacement shim suppliers with materials that were supplied arguably exclusively to Nucap. [Bennett Tr. at 254:11-25, 255:1-4, PMX 36.]

## H.  Lawsuit

On January 16, 2015, following the termination of the business relationship between Bosch and Nucap, Nucap's outside counsel wrote to Bosch General Counsel Thomas Williams ("Williams") requesting written assurance that Bosch would not "misuse" or disclose Nucap's drawings in Bosch's possession.  [1/6/15 Letter, PTX 252, BBC-BU02323087-88.]  Nucap's outside counsel wrote to Williams again four days later and repeated the request for written assurances that Bosch had not and would not misuse or disclose Nucap's drawings.  [1/20/15 Letter, PTX 412, Nucap-0235914.]  On January 23, 2015, Williams responded to Nucap's stating that he was not aware of any confidentiality agreement or any written agreement whatsoever between Bosch and Nucap.  [1/23/15 Letter, PTX 469 ECF No. 221-9.]  However, Williams stated that to the "extent that any [agreement] exist[s], Bosch has honored and will honor its

obligations pertaining to the documents and information received from Nucap." [*Id.*] Nucap claims that it filed the instant action based on Bosch's failure to provide adequate assurances that it was not misusing Nucap's drawings, as well as Nucap's belief that Bosch could not have so quickly qualified so many replacement components without misusing Nucap's drawings. [Complaint, ECF No. 1.]

In response to the suit filed by Nucap, Bosch claims that it instituted a quarantine in April 2015 of all Nucap drawings and instructed its employees to make no further use of Nucap's drawings or information. [4/15/15 Quarantine Meeting Minutes, PTX 117, BBC-NU00282849.] Bosch states that since May 2015, no Bosch employee has (a) performed any overlay comparison of a Nucap drawing with a prospective third-party supplier's drawing, or (b) disclosed any Nucap drawing (or any information from any Nucap drawings) to any third party. [Bosch FOF ¶ 124, ECF No. 559.]

## I. Nucap's Allegations of Harm

Nucap argues that Bosch's alleged misappropriation of its trade secrets has caused it harm. Nucap alleges that its sales of backing plates to customers other than Bosch decreased by approximately 5 million units in 2015. [Nucap FOF ¶ 342, ECF No. 563.] Further, Nucap states that its shim sales to customers other than Bosch has decreased by approximately 12 million units. [*Id.* ¶ 343.] Nucap also argues that it has suffered price erosion and that it has reduced prices by approximately 14% on about 90% of its components; it maintains that these price reductions are different from past reductions, which were mostly based on Nucap's increasing manufacturing efficiencies. [*Id.* ¶ 344.] As a result of these price reductions, Nucap claims that it was forced to reduce its workforce from 710 employees to approximately 555 employees. [*Id.* ¶ 347.] Nucap also claims that its decreased revenues have undermined its research and

development, which, in turn, has damaged its reputation and caused a loss of goodwill. [*Id.* ¶¶ 348-49.] Nucap claims if that if an injunction is not granted in its favor, it will be irreparably harmed.

Bosch, however, claims that Nucap's own internal sales reports show that Nucap's total sales to customers other than Bosch actually increased from November 2014, when Bosch allegedly started its misconduct, to April 2015, when Bosch instituted its quarantine of Nucap's drawings. [Nucap April 2015 Global Sales Report, DTX 116, Nucap-0186225; Nucap June 2015 Global Sales Report, Defendants' Preliminary Injunction Opposition Exhibit ("DOX") 74, Nucap-0186060.] Accordingly, Bosch argues that not only will Nucap's trade secret claims fail, but Nucap cannot prove any harm from Bosch's alleged misconduct. Therefore, according to Bosch, Nucap's motion for preliminary injunction should be denied.

## II.     LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001). A preliminary injunction is "a very serious remedy," and it is "never to be indulged in except in a case clearly demanding it." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000) (internal quotation omitted). To succeed on a motion for a preliminary injunction, a party must show that (1) it has some likelihood of success on the merits; (2) it has no adequate remedy at law; and (3) it will suffer irreparable harm if the court does not grant the preliminary injunction. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011) (citations omitted).

The threshold for demonstrating a likelihood of success on the merits is low. *D.U. v. Rhoades*, 825 F. 3d 331 (7th Cir. 2016) (citing *Michigan v. United States Army Corps of*

*Engineers*, 667 F.3d 765, 782 (7th Cir. 2011).  In framing the probability of success necessary for a grant of injunctive relief, the Seventh Circuit has stated on a number of occasions that the plaintiff's chances of prevailing need only be better than negligible.  *Rhoades*, 825 F.3d at 331; *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (to obtain preliminary relief, the plaintiff must show that it has a better than negligible chance of success on the merits of at least one of its claims); *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502-03 (7th Cir. 2008) (same).   Moreover, a party seeking a preliminary injunction must demonstrate, among other things, that traditional legal remedies, such as money damages, would be inadequate.  *Girl Scouts*, 549 F.3d at 1095.  Finally, Plaintiffs seeking preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  In *Winter*, the Court noted that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.*

If the moving party demonstrates the above three factors, "the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied."  *Ezell*, 651 F.3d at 694 (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2011)).  The balancing process "involves engaging in ... [a] sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position."  *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

# III. ANALYSIS

## A. Illinois Trade Secrets Claims Act

Count I alleges trade secret misappropriation in violation of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.* To state a valid ITSA claim, a plaintiff must allege (1) the existence of a trade secret, (2) misappropriation of that trade secret through improper acquisition, disclosure, or use, and (3) resultant damages. *Liebert Corp. v. Mazur*, 357 Ill.App.3d 265, 281, 293 Ill.Dec. 28, 827 N.E.2d 909 (Ill. App. Ct. 2005); *see also PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995) ("A party seeking an injunction [under the ITSA] must ... prove both the existence of a trade secret and misappropriation."). The ITSA defines a trade secret as information that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). The ITSA further defines a trade secret as "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers." *Id.*

### i. Existence of a Trade Secret

#### a. Nucap's Drawings Contain Information that is Valuable and Not Generally Known

Nucap argues that its drawings, including the data contained therein, constitute a trade secret. Nucap states that it has "invested hundreds of millions of dollars and countless engineering hours" over two decades to develop its library of drawings and tooling. [Mot. for Prelim. Injun., p. 13, ECF No. 219.] Nucap's drawings reflect its component specifications, dimensions, manufacturing tolerances, and fit and function requirements. [*Id.*] It claims that the

drawings are not publicly available, and that their value hinges on the drawings not being used by, or to qualify, competitor suppliers who have not made the same investment as Nucap. [*Id.*] Bosch, on the other hand, argues that the technical information in Nucap's prints and drawings does not qualify for trade secret protection. Bosch argues that Nucap's trade secret claims are overly broad and vague because Nucap claims that its "entire library" of backing plate, shim and brake hardware drawings constitute a trade secret. *See GlobalTap LLC v. Elkay Mfg. Co.*, 2015 WL 94235, at *5 (N.D. Ill. 2015) ("to sustain a trade secrets claim a party must do more than simply persist in the blunderbuss statement that '[e]verything you got from us was a trade secret'…That view is wrong as a matter of law.") (quoting *Nilssen v. Motorola, Inc.*, 963 F.Supp. 664, 672 (N.D. Ill. 1997)).

Bosch misconstrues Nucap's claims. Nucap has done more than argue that everything Bosch received from Nucap is a trade secret. In fact, the record demonstrates that Nucap has adequately and sufficiently articulated why each part of its drawings constitutes a trade secret by discussing the amount of time, effort, and technical expertise required to develop those drawings and accompanying specifications, dimensions tolerances, and other technical information. [*See generally*, Nucap FOF ¶¶ 8-33, ECF No. 576.] The sheer volume of Nucap's drawing library does not obfuscate the fact that Nucap has articulated why each drawing is a trade secret.

In addition, Bosch argues that Nucap's drawings are not trade secrets because all of the information in Nucap's drawings is readily ascertainable by proper means. First, Bosch argues that the drawings are not trade secrets because the Friction Materials Standards Institute ("FMSI"), an automotive trade group, publishes brake component outlines, which provide the same information that is found in Nucap's drawings. However, Bosch's own witness, Vijay Chavda, conceded during his deposition that the FMSI outlines are different from Nucap's actual

drawings as they do not reveal manufacturing tolerances or other critical information. Bosch also admits that it could not recreate Nucap's drawings from FMSI outlines. [Mot. for Prelim. Injun., pp. 13-14, ECF No. 219 (citing Vijay Chavda Tr. at 69:18-24; 90:17-91:1).] The FMSI outlines state on their face that they "may not have sufficient information to be used for manufacturing." [*Id.* pp. 13-14, fn. 10 (citing Declaration of Montu Khokhar ¶38).]

Second, Bosch states that Nucap's drawings are created by measuring OE parts using a coordinate measuring machine ("CMM") and then importing those CMM measurements into an AutoCAD computer program to create the drawings. Therefore, Bosch argues, Nucap's drawings could be easily reverse engineered from OE brake assemblies "with a few button pushes." [Resp. in Opp. to Mot. for Prelim. Injun., p. 27, ECF No. 313.] Nucap, on the other hand, argues that Nucap's brake components do not reflect all of the specifications and fit and function requirements in its drawings, and that a competitor's engineering team would have to spend an enormous amount of time trying to reproduce the drawings' information by reverse engineering. Even then, argues Nucap, the competitor would not be able to replicate Nucap's components.

Information that is generally known or understood within an industry, even if not known to the public at large, does not qualify as a trade secret. *Learning Curve*, 342 F.3d at 722 (quoting *Pope v. Alberto–Culver Co.*, 296 Ill.App.3d 512, 230 Ill.Dec. 646, 694 N.E.2d 615, 617 (1st Dist. 1998)). A corollary to this is that there generally can be no trade secret protection for a product that is available in the market. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1267 (7th Cir. 1992); *BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 709–10 (7th Cir. 2006) (Wisconsin UTSA); *Chemetall GMBh v. ZR Energy, Inc.*, 138 F.Supp.2d 1079, 1083 (N.D. Ill. 2001). However, information that is derived from public

sources, but requires laborious accumulation, culling, and/or analysis of the public information can still qualify as a trade secret. *See Stampede Tool Warehouse, Inc. v. May*, 272 Ill.App.3d 580, 209 Ill.Dec. 281, 651 N.E.2d 209, 216 (1st Dist.), *appeal denied*, 163 Ill.2d 589, 212 Ill.Dec. 438, 657 N.E.2d 639 (1995); *RKI, Inc. v. Grimes*, 177 F.Supp.2d 859, 873–74 (N.D. Ill. 2001). In such situations, an accused party who contends the information can be acquired from public sources must show that it independently acquired the information from public sources. *See Hexacomb Corp. v. GTW Enterprises, Inc.*, 875 F.Supp. 457, 466–67 (N.D. Ill.1993). The party asserting the trade secret still has the burden of establishing that the information qualifies as a trade secret.

For the reasons already stated, Nucap has adequately shown that the information contained in its drawings qualifies as a trade secret. Bosch, however, has argued that reverse engineering of Nucap's drawings is possible—and legal—and cites *Kewanee Oil Co. v. Bicron Corp.*, 416 US. 470 (1974) for the proposition that trade secret law does not offer protection against discovery by fair and honest means, such as by reverse engineering. It is uncontested that Bosch did not reverse engineer Nucap's components. Instead, Bosch makes the argument that it, or any of Nucap's competitors, could have cheaply and easily reverse engineered Nucap's components. Bosch's argument is not well taken.

Bosch's statement, contained in a footnote in its response brief, that it would cost a competitor a total of $600 (1000 samples of a specific Nucap plate at an average price of $.60 per plate) to reverse engineer a Nucap component oversimplifies the issue. First, the $600 figure cited by Bosch does not take into account the costly machinery involved or the engineering expertise required to accomplish such a feat. Second, if the barrier to reverse engineering a Nucap component is only $600 and "a few button pushes," it is unclear why Bosch's

replacement suppliers would not pursue that method instead of having their drawings allegedly qualified or validated by Bosch.

Further, in a preliminary injunction context, evidence that information may be reverse engineered does not establish that information is not a trade secret. *La Calhene, Inc. v. Spolyar*, 938 F.Supp. 523, 529-30 (W.D. Wis. 1996); *see also Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 2d, 890, 899 (Minn. 1983) (a finding that information that cannot be readily reverse engineered can support finding of trade secret). Furthermore, a trade secret "can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001). Accordingly, the court finds that the information contained in Nucap's drawings is a trade secret.

### b. Nucap Took Steps to Protect its Proprietary Information

It is not enough to establish that the information contained in Nucap's drawings is valuable and not generally known. Nucap must also establish that it protected the confidentiality of its drawings. Information is considered a trade secret if it is the subject of reasonable efforts to maintain its confidentiality. 765 ILCS 1065/2(d); *see also CMBB LLC v. Lockwood Mfg., Inc.*, 628 F.Supp.2d 881, 885-87 (N.D. Ill. 2009). Conversely, protection of trade secrets is "forfeited when the secret-holder fails 'to take reasonable steps to prevent gratuitous disclosure.'" *Ultraviolet Devices, Inc. v. Kubitz*, No. 09 CV 5697, 2009 WL 3824724, at *6 (N.D. Ill. Nov. 13, 2009) (citing *BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 708 (7th Cir. 2006)).

Bosch contends that Nucap took none of the basic, reasonable, and required steps to maintain the secrecy of its drawings and the data contained therein. In particular, Bosch alleges that from September 2010 through the end of their business relationship, Nucap and Bosch operated without any non-disclosure or restricted use agreement, despite the fact that the parties exchanged competing non-disclosure agreements and ultimately decided against executing an agreement of any sort. Moreover, Bosch highlights the fact that Nucap occasionally required other companies and individuals to sign a "Terms of Use" agreement before accessing Nucap's drawings. Bosch, however, was never required to execute an agreement prior to gaining access to Nucap's drawings.[3] Finally, Bosch argues that just over a third of Nucap's drawings (6,000 out of 15,000) contained a confidentiality or proprietary legend of any kind. Therefore, the vast majority of Nucap's drawings were disclosed to Bosch without any restrictions on their use. In other words, Bosch argues that Nucap did nothing to protect its proprietary information other than ask Bosch to sign a non-disclosure agreement, which Bosch rejected.

The court disagrees. *American Center for Excellence*, --- F.Supp.3d ---, 2016 WL 3165763, at *6 (court rejected defendants' argument that an unsigned non-disclosure agreement is not evidence of reasonable measures of protection under the ITSA). In addition to requesting that Bosch execute a Terms of Use Agreement, Nucap maintains that Bosch orally agreed to keep Nucap's drawings confidential. Nucap also points to the fact that Bosch sent its internal guidelines for "preserving" its suppliers' drawings to Nucap as evidence that Bosch understood Nucap's drawings to be proprietary. [3/26/13 Email, PTX 298, Nucap-0144556.] And although the majority of Nucap's drawings did not contain a confidentiality legend, the fact that a

---

[3] Nucap argues that the Terms of Use Agreement executed by Bosch China, a non-party, applies to the Bosch defendants in the instant action. This issue will be addressed more fully below, but the court finds that Bosch China and the Bosch defendants in this case are separate entities. Therefore, the Terms of Use Agreement is not applicable to the Bosch defendants.

considerable number of drawings did contain the legend, especially the newer drawings, suggests that Nucap treated these drawings as trade secrets. Nucap also took measures internally to protect the confidentiality of its drawings. Those facts, taken together, suggest that Nucap's precautions were reasonable, especially at the preliminary injunction stage. *American Center for Excellence*, ---F.Supp.3d---, 2016 WL 3165763 at *6 ("[O]nly in an extreme case can what is a 'reasonable' precaution be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case.") (quoting *Learning Curve Toys*, 342 F.3d at 725-26 (holding that an oral confidentiality agreement constituted a reasonable effort to protect trade secrets)); *Elmer Miller, Inc. v. Landis*, 253 Ill. App. 3d 129, 192 Ill.Dec. 378, 625 N.E.2d 338, 342 (1993) (same for a business that provided files only to a small number of employees and stressed to them the confidentiality of those files); *Jones v. Ulrich*, 342 Ill. app. 16, 95 N.E.2d 113, 117-18 (1950) (same for an inventor who shared drawings of a phosphate spreader upon the defendant's request, explaining that "[w]hile there was no express agreement that defendant was to hold the information so disclosed as a confidential matter…such an agreement was implied"); *see also Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177 (7th Cir. 1991) ("The mere fact that Rockwell gave piece part drawings to vendors— that is, disclosed its trade secrets to a limited number of outsiders for a particular purpose—did not forfeit trade secret protection.") (internal quotes omitted). Accordingly, the court disagrees with Bosch that Nucap took *no* steps to protect its information. The Purchase Order Terms and Conditions, however, call into doubt the efficacy of Nucap's purported efforts to maintain confidentiality.

### c. Purchase Order Terms and Conditions

There is no dispute that there was no global supply agreement or any other general contract governing the relationship between Bosch and Nucap. Rather, Bosch and Nucap conducted their business on the basis of purchase orders submitted by Bosch to Nucap. Bosch has claimed that since September 1, 2010, each and every purchase order sent by Bosch to Nucap explicitly incorporated the Bosch "Terms and Conditions of Purchase" (the "POTCs") using the following language:

> THE TERMS AND CONDITIONS OF PURCHASE ARE AVAILABLE AT WWW.BOSCHNASUPPLIERS.COM AND INCORPORATED HEREIN BY REFERENCE, SHALL BECOME A BINDING AGREEMENT UPON SELLER COMMENCING PERFORMANCE OF THIS PURCHASE ORDER, OR UPON SELLER OTHERWISE ACKNOWLEDGING ACCEPTANCE, WHICHEVER OCCURS FIRST.

[Bosch Purchase Orders, DTX 2, Nucap-0076363.] Bosch claims that from September 1, 2010 through November 2014, it issued to Nucap more than 8,000 separate purchase orders that expressly and conspicuously incorporated by reference the POTCs. The amount of money paid by Bosch to Nucap pursuant to the aforementioned purchase orders totaled more than $170 million. Nucap admits that at no time did it ever reject an order based on the language contained in the purchase order or the POTCs and it also never marked or altered the language of the POTCs.

Bosch points to several sections of the POTC that it claims demonstrate that Bosch was not restricted in any way in how it used Nucap's drawings. Some of the provisions of the POTC cited above even purport to give Bosch ownership of Nucap's drawings and the information contained therein. This language appears to belie Nucap's argument that it scrupulously protected its proprietary information. In fact, according to the language in the POTCs, Nucap at worst sold its intellectual property to Bosch and at best granted Bosch the ability to use Nucap's

drawings without any restrictions. However, Nucap raises several arguments regarding the inapplicability of the POTCs to the issues present in this case.

First, Nucap argues that the court has already rejected Bosch's reliance on the POTCs when it denied Bosch's motion to stay the case pending arbitration. Nucap points to the court's holding that there "was no indication that the parties intended that the [Bosch POTC] apply to a dispute over Bosch's alleged misappropriation of Nucap's intellectual property." [7/1/15 Order, pp. 13-14, ECF No. 63.] A closer reading of this court's July 1, 2015 order reveals that its decision that the POTCs did not apply to the dispute over Nucap's trade secrets was based on the understanding that a separate confidentiality agreement between the parties had been executed. [*Id.*, p. 10 ("One complication in this matter is the fact that Nucap and Bosch, as a company and through some of its engineers, have entered into separate confidentiality and "Terms of Use" agreements that did not contain arbitration clauses.").] Discovery has revealed, however, that the Terms of Use agreement referenced in the order was an agreement executed by Nucap and Bosch China, a separate entity from the Bosch defendants in this case. Nucap admits that the Bosch China entities are individually incorporated. [Nucap Res. to Bosch's Proposed Conclusions of Law ("COL") ¶ 18, ECF No. 592.] Nucap also admits that Bosch China is not a party to this case. [*Id.*] Although Nucap disagrees with Bosch's assertion that Bosch China is a "completely separate company" with "separate operations" from the Bosch defendants, it does not attempt to "pierce the corporate veil" so as to impute Bosch China's actions to the Bosch defendants.

As a general principle, related companies are not liable for one another's actions unless they effectively operate as a single entity such that a litigant shows that the corporate veil must be pierced. A party moving to pierce a corporate veil has a substantial burden. *See Kelsey Axle & Brake Div., Div. of Kelsey–Hayes Co. v. Presco Plastics, Inc.*, 187 Ill.App.3d 393, 135 Ill.Dec.

4, 543 N.E.2d 239, 243 (1989). Illinois courts use a two-prong test to determine whether a plaintiff has met this burden: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) adhering to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. *Int'l Fin. Servs. Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004).

To determine whether a unity of interest exists, the Court may consider numerous nondispositive factors, including: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders." *Fontana,* 298 Ill.Dec. 654, 840 N.E.2d at 778. These factors focus on whether the corporation is a sham that acts at the whim of the controlling party. *See Laborers' Pension Fund v. Lay–Com, Inc*, 580 F.3d 602, 611 (7th Cir. 2009). No evidence has been presented to support the argument, or even the inference,[4] that any of the aforementioned factors have been satisfied so as to pierce the corporate veil. Therefore, with the benefit of discovery, the court finds that the Terms of Use Agreement applied to Bosch China and not the Bosch defendants. Accordingly, Nucap's reliance on the court's July 1, 2015 order is misplaced.

---

[4] Nucap has not advanced the theory that the corporate veil between the Bosch defendants and Bosch China should be pierced, either in its amended complaint or in its motion for preliminary injunction. *Gass v. Anna Hosp. Corp.*, 392 Ill. App. 3d 179, 331 Ill.Dec. 854, 911 N.E.2d 1084, 1092 (2009) ("One who seeks to have the courts apply an exception to the rule of separate corporate existence must seek that relief in his pleading."). However, Nucap denies the assertion that Bosch China and the Bosch defendants are separate companies with separate operations.

Nucap next argues that the POTCs do not apply because the parties negotiated a separate agreement concerning Nucap's drawings and never intended or understood that the POTCs governed those drawings.  However, in support of its position, Nucap points to the Bosch China Terms of Use agreement already discussed above.  Nucap also directs the court's attention to a series of oral communications between the parties and an exchange of competing non-disclosure agreements that Nucap argues demonstrates an understanding or agreement between the parties that Bosch had a duty to maintain the confidentiality of Nucap's drawings.  However, the record makes clear that the parties did not execute either of the nondisclosure agreements that were exchanged.  Instead, Nucap's argument that a separate confidentiality agreement existed between it and Bosch rests almost entirely on purported oral communications that took place between the parties.  Section 23.4 of the POTC appears to speak to this very issue:

> Section 23.4    Seller agrees not to assert any claim against Buyer or its suppliers with respect to any technical information that Seller has disclosed or may disclose to buyer in connection with the Supplies covered by the Order, except to the extent expressly covered by a separate *written* confidentiality and/or license agreement *signed* by Buyer or by a valid patent expressly disclosed to Buyer prior to or at the time of the Order.  (Bosch POTC, DTX 1 , BBCNU00199875 (emphasis added).]

Section 23.4 of the POTC clearly states that Nucap is barred from asserting a claim against Bosch with respect to any technical information that Nucap has disclosed to Bosch except to the extent expressly covered by a separate *written* agreement *signed* by Bosch.  Nucap can point to no such agreement.

Nucap also argues that the POTCs are inapplicable in the instant matter because it expressly rejected the POTCs.  Not only does the evidence submitted to the court contradict that assertion; it actually bolsters Bosch's argument that Nucap was aware of the existence of the POTCs.  As noted earlier, Bosch and Nucap focused on the POTCs in early 2011 in connection

with discussions regarding a draft Purchase and Sale Agreement and a draft Corporate Agreement (collectively, "draft agreements"). The draft agreements were sent by Bosch to Nucap on March 2, 2011. [3/2/11 Email, DTX 13, Nucap-0160600.] An email was sent to Bosch on May 17, 2011 stating Nucap could not agree to the draft agreements with Bosch by blindly accepting Bosch's standard terms and conditions. [5/17/11 Email, PTX 302, Nucap-0158740.] Nucap also prepared a trip report memorializing a meeting with Bosch wherein Nucap stated that Bosch had invited Nucap to identify any issues that Nucap had with Bosch's standard terms and conditions. [Trip Report, DTX19, Nucap-0091527.] Approximately six months later, on January 9, 2012, Nucap signed a Bosch Quality Assurance Agreement ("QAS") which expressly referenced Bosch's POTCs.[5] [QAS, DTX 28, Nucap-0154453.] Bosch claims that it followed up with Nucap regarding the draft Corporate Agreement and any outstanding issues that Nucap might have had with the POTCs and received no response. Instead, Nucap decided not to execute the draft agreements and the parties continued to conduct business on a purchase order-by-purchase order basis. At no other point did Nucap raise any concerns regarding the POTCs. This exchange does not rise to an outright rejection of the POTCs as Nucap continued to do business with Bosch pursuant to purchase orders that explicitly incorporated the POTCs.

It is Nucap's position that the POTCs are governed by the United Nations Convention on Contracts for the International Sale of Goods (the "CISG")[6], which requires a meeting of the

---

[5] Bosch did not sign the QAS, which calls into question whether the agreement was fully executed. However, the court references the QAS only to demonstrate Nucap's awareness of the POTCs. *See Colvin ex rel. Bricklayers Union Local No. 6 Indiana Pension Fund v. Larry E. Webb Construction Co., Inc.*, 542 F.Supp.2d 890, 896 (N.D. Ind. 2008) ("A person is assumed to have read and understood the documents he signed.").

[6] The CISG "applies to contracts of sale of goods between parties whose places of business are in different states…when the States are Contracting States." CISG, Art. 1(a). The United States, Canada, and the province of Ontario have all adopted the CISG. *See* 15 U.S.C.A.App. at 332 (1998); *Ajax Tool Works, Inc. v. Can-Eng Mfg.*

minds on essential terms for the formation of an agreement. CISG, Art. 8, 14(1), 18(1); *see also Similar Shipping Ltd. v. Global Fishing, Inc.*, 540 Fed. Appx. 565, 567 (9th Cir. 2013). Thus, according to Nucap, the court must consider the parties' intent and "all relevant circumstances of the case," including the parties' negotiations, conduct, and statements. [Reply in Support of Mot. for Prelim. Injun., p. 17, ECF No. 398 (citing CISG Art. 8(1), (2)).]

Nucap argues that the POTCs were not incorporated into any sales agreement as there was no "meeting of the minds" on this issue. However, as stated, the purchase order language incorporating the POTCs appeared plainly on each purchase order issued to Nucap from at least September 1, 2010 until the relationship between the parties ended. Thus, the POTCs became part of the contract once Nucap performed on each of the purchase orders. *See e.g.*, *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) ("[f]or a contract to incorporate all or part of another document by reference, the reference must show an intention to incorporate the document and make it part of the contract."); *Magid Glove & Mfg. Safety Co., LLC v. Tower Intern., Inc.*, No. 10 C 7377, 2011 WL 1118883, at *2 (N.D. Ill. Mar. 25, 2011) ( finding terms and conditions incorporated into purchase order where "the purchase orders stated in clear and prominent language that they were conditioned on plaintiff's assent to the Terms and Conditions."); *see also Lease Management Equip. Corp. v. DFO Partnership*, 392 Ill. App. 3d 678, 331 Ill.Dec. 300, 910 N.E.2d 709, 715 (Ill. App. Ct. 2009) ("Where a contract incorporates another document by reference, its terms become part of the contract"). Assuming *arguendo* that the CISG and not Seventh Circuit case law applies, it appears that incorporation by reference is still valid. CISG Advisory Council Opinion No. 12, Rule 1, Comment 7 ("Where there is a clear and conspicuous reference to the incorporation of the standard terms, there should in principle be

---

*Ltd.*, 2003 WL 223187, at *3 (N.D. Ill. Jan. 30, 2003). Bosch does not dispute the applicability of the CISG to the instant case, but argues that its application does not affect the outcome.

no problem about the incorporation of the terms as acceptance by the offeree of the offer based on such document, creates the reasonable impression in the mind of the offeror that the offer has been accepted without any modification."); CISG Advisory Council Opinion 13, Rule No. 3 ("a party is deemed to have had a reasonable opportunity to take notice of the standard terms…where…the terms are made available to and retrievable electronically by that party and are accessible to that party.").

Nucap, on the other hand, argues that the terms in the POTCs are so "surprising and unusual" that they could not be incorporated by reference. More specifically, Nucap argues that the transfer of ownership of Nucap's intellectual property to Bosch is so "surprising and unusual" that it cannot be part of the agreement. In support of its argument, Nucap cites the comments to CISG Advisory Council Opinion 13, Rule 7, which state the following:

> 7.1. Where the standard terms of a party have been successfully incorporated into a contract according to the rules set out above, the other party is bound by those terms whether it has read them or not, or is aware of their contents or not. The standard terms usually cover familiar terrain and that is one of the reasons why many parties simply do not bother to read them at the time of the negotiations even where they are subjectively aware of the inclusion of those terms.

> 7.2. However, where the terms are of such a nature that the other party could not reasonably have expected them, such surprising terms should not form part of the consensus between the parties. This is not a validity issue but a contract formation issue and therefore falls within the scope of the CISG. It is simply not a risk that can be ascribed to the party in such circumstances. If the party using the standard terms wishes to include such terms, it needs to specifically inform the other party of their existence and inclusion. In the UNIDROIT principles it is stated that a party is not bound to a term that the party by virtue of their content, language or presentation are of such a character that it could not reasonably have expected them to be included in the standard terms.

Comment 7.1 mirrors the rule in the Seventh Circuit regarding the adherence to terms of a contract. *See Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992) (warning that "a party who agrees to terms in writing without understanding or

investigating those terms does so at his own peril"). Rule 7.2, however, states that where terms are of such a nature that the other party could not reasonably have expected them, they will not form part of the contract unless the party seeking to include such terms specifically informs the other party of their existence and inclusion. Unsurprisingly, Nucap has not provided any case law to support its position that the transfer of its rights and interest in its drawings to Bosch is surprising and unusual. "U.S. federal caselaw interpreting and applying the CISG is scant." *Usinor Industeel v. Leeco Steel Products, Inc.*, 209 F.Supp.2d 880, 884 (N.D. Ill. 2002) (quoting *MCC-Marble Ceramic Center, Inc. v. Ceramica Nuoava d'Agostino, S.p.A.*, 114 F.3d 1384, 1389 (11th Cir. 1998) ("Despite the CISG's broad scope, surprisingly few cases have applied the Convention in the United States.")).

Without legal precedent or an adequate factual basis, the court cannot determine whether the provisions of the POTCs relating to Nucap's drawings are "surprising and unusual" except to say that Nucap, a sophisticated party, certainly had the opportunity to review the POTCs and in fact demonstrated its awareness of the POTCs through emails produced in discovery. It appears that if Nucap had the opportunity to review the POTCs and accepted the purchase orders through its conduct, then it should be bound by them. *ConFold Pacific, Inc. v. Polaris Industries, Inc.*, 433 F.3d 952, 955 (7th Cir. 2006) ("when dealing with a substantial contract between 'commercially sophisticated parties ... who know how to say what they mean and have an incentive to draft their agreement carefully,' there is great merit to the rule that the meaning of an unambiguous contract is a question of law rather than of fact, with the consequence 'that unambiguous contractual language must be enforced as it is written.') (quoting *In re Kmart Corp.*, 434 F.3d 536, 541 (7th Cir. 2006)).

However, the court need not and will not decide, at this point, whether the POTCs exclusively controlled the parties' relationship as they pertain to Nucap's drawings. This is the subject of Bosch's Motion for Summary Judgment. [Bosch MSJ, ECF No. 340.] Rather, the analysis of the POTCs affects whether Nucap has demonstrated that it has a better than negligible chance of success on its claims. Based on the record before it, the existence of the POTCs certainly undermines Nucap's chances of succeeding on its trade secret claims. Because of the sliding scale approach in the Seventh Circuit, the less likely that Nucap is to win, the more the balance of harms needs to weigh in its favor. *Girls Scouts*, 549 F.3d at 1086.

### ii. Misappropriation

Before addressing the balance of harms, Nucap must first demonstrate that Bosch misappropriated its trade secrets. To prevail on a claim for misappropriation of a trade secret under" ITSA, Nucap "must demonstrate that the information at issue was a trade secret, that it was misappropriated, and that it was used in the defendant's business." *American Center for Excellence*, ---F.Supp.3d---, 2016 WL 3165763, at *5 (citing *Learning Curve Toys*, 342 F.3d at 721. Misappropriation is defined as including:

> (1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) disclosure or use of a trade secret of a person without express or implied consent by another person who:
>
>> (A) used improper means to acquire knowledge of the trade secret; or
>>
>> (B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
>>
>>> (I) derived from or through a person who utilized improper means to acquire it;
>>>
>>> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

> (III) derived from or through a person who owed a duty to the
> person seeking relief to maintain its secrecy or limit its use; or ....

765 ILCS 1065/2(b).

"Improper means" is defined as including theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means. Reverse engineering or independent development shall not be considered improper means." *Id.* 1065/2(a); *see also U.S. Gypsum Co. v. LaFarge North America, Inc.*, 508 F.Supp.2d 601, 624 (N.D. Ill. 2007).

Bosch argues that it has not misappropriated Nucap's drawings because the POTCs gave Bosch ownership of the drawings. However, Bosch argues that even if the POTCs do not apply, it still did not misappropriate Nucap's drawings. First, Bosch argues that there was no confidentiality agreement between it and Nucap which would have limited Bosch's use of Nucap's drawings. Second, Bosch argues that its perimeter-to-perimeter comparisons between Nucap drawings and the replacement drawings did not constitute a misappropriation as no information was revealed to Nucap's competitors.

Discovery has revealed, however, that information from a small number of Nucap's drawings was disclosed to Nucap's competitors. [12/1/14 Email, PTX 71, BBC-NU00182009.] In fact, Bosch admits that there may have been information from thirteen brake parts that it disclosed to third parties that may have originated from Nucap's drawings. [Bosch Proposed Conclusions of Law ¶ 46, 88 ECF No. 560.] Assuming *arguendo* that the POTCs do not control, some of Nucap's drawings may have been improperly used or disclosed.

### iii. No Adequate Remedy at Law

Nucap argues that Bosch's alleged misappropriation of its trade secrets has resulted in lost customers and sales, price erosion, and damage to Nucap's research and development department and its goodwill. Bosch argues that these alleged losses can be computed and that Nucap can be made whole by money damages. However, Nucap correctly states that some of the damages claimed are not amenable to simple monetary calculations. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001) ("[I]t is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation, and loss of goodwill.")

### iv.    Irreparable Harm/Balance of Harms

There is a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation. *Computer Associates Intern. v. Quest Software, Inc.*, 333 F.Supp.2d 688 (N.D. Ill. 2004) (citing *ISC-Bunker Ramo Corp. . Altech Inc.*, 765 F.Supp. 1310, 1329 (N.D. Ill. 1990). The defendants may rebut this presumption by demonstrating that plaintiff will not suffer any harm if the injunction is not granted. Nucap may be irreparably harmed if Bosch discloses Nucap's trade secrets, *i.e.*, Nucap's drawings and the information contained therein, to third parties who then would not have to invest the time and effort to develop their own library of drawings. Bosch has not presented sufficient evidence to rebut the presumption of irreparable harm that would occur in such circumstances. However, the harm may be minimized or altogether eliminated if Bosch maintains its quarantine on Nucap's drawings. This would prevent further use or disclosure of Nucap's trade secrets to third parties.

Given the existence of the POTCs and the lack of a written confidentiality agreement between the parties to outline Bosch's responsibilities regarding safeguarding Nucap's drawings,

the court is not convinced that Nucap's likelihood of success is particularly high. Given that, the balance of harms must weigh more heavily in Nucap's favor.

The relief that Nucap seeks is disproportionate to its potential harm. Although Nucap amended its proposed preliminary injunction order and narrowed the relief sought only to enjoin the sale of those Bosch products that were qualified using Nucap's drawings, that too is still overbroad. No evidence has been presented that demonstrates that Bosch's overlay of Nucap's drawing over a potential replacement supplier's drawing is a misappropriation or a violation of any confidentiality agreement that may or may not have existed. The only misappropriation that appears to have occurred is the disclosure of a few of Nucap's drawings to third parties. Nucap has disclosed, at most, a dozen such instances. To require Bosch to shut down sales and production of almost its entire aftermarket brake line based on a disclosure of these dozen drawings is excessive, especially in light the existence of the POTCs. Moreover, there is no evidence that disclosure or the risk of disclosure is ongoing. The court finds that monetary damages *can* be determined for the drawings that were allegedly misappropriated by their disclosure to competitors, so long as Bosch is enjoined from further use or disclosure of Nucap's drawings.

Accordingly, the court finds that the prudent course of action is to grant Nucap's motion for preliminary injunction in part and to deny it in part. Bosch is enjoined from further use and/or disclosure of Nucap's library of drawings. Bosch is therefore ordered to maintain the quarantine on Nucap's drawings to ensure their confidentiality. Bosch is further ordered to quarantine all other documents reflecting information derived from Nucap's drawings and to identify all affiliates and third parties to whom Nucap's drawings or confidential information were disclosed, or whose components were approved by Bosch based, in whole or in part, on any

Nucap drawing or information, including any overlay of a Nucap drawing.[7]  Bosch has stated

that it has already undertaken all or nearly all of the aforementioned actions.  This order serves to

bind Bosch to those commitments until a trial on the merits has concluded.

### B. Tortious Interference with Contract and Tortious Interference with Prospective Economic Advantage

Nucap argues that Bosch tortuously interfered with Nucap's contractual relationship with

Trelleborg and also interfered with Nucap's prospective economic advantages (collectively,

"tortious inference") when it convinced Trelleborg to supply it and its replacement suppliers

materials for making shims.

Under Illinois law, to succeed on a claim for tortious interference with contractual

relations, Nucap must demonstrate: (1) a valid and enforceable contract; (2) defendant's

awareness of the contractual obligation; (3) defendant's intentional and unjustified inducement of

the breach; (4) a subsequent breach caused by defendant's unlawful conduct; and (5) resultant

damages.  *Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir. 2004).  Similarly, the elements

of a tortious interference with prospective economic advantage claim are: "'(1) [the plaintiff's]

reasonable expectation of entering into a valid business relationship; (2) the defendant's

knowledge of the plaintiff's expectancy; (3) purposeful and unjustified interference by the

defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business

relationship; and (4) damages to the plaintiff resulting from such interference.'"  *Botvinick v.*

*Rush University Medical Center*, 574 F.3d 414, 417 (7th Cir. 2009); *Chicago's Pizza, Inc. v.*

*Chicago's Pizza Franchise Ltd. USA*, 384 Ill.App.3d 849, 862, 323 Ill.Dec. 507, 893 N.E.2d 981,

993 (1st Dist. 2008).

---

[7] The specific language is laid out in the Conclusion, *infra* Section IV.

As noted earlier, the Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. *See Girl Scouts*, 549 F.3d 1079, 1085–86. "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015).

It is clear in this case that Nucap became aware of Bosch's intention to source shim materials directly from Trelleborg as early as November 20, 2014 when Marschall emailed Khokhar to advise that Bosch would be reaching out directly to Trelleborg to explore the option of purchasing materials. [11/20/14 Email, DTX 137, BBC-NU00011329.] However, Nucap did not file the instant motion for preliminary injunction until January 29, 2016—a full 13 months later. *See Traffic Tech, Inc. v. Kreiter*, 2015 WL 9259544, at *16 (N.D. Ill. Dec. 18, 2015) (citing *Ixmation, Inc. v. Switch Bulb Co., Inc.*, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014) ("[U]nexcused delay on the part of [the movant] is grounds for denial of a motion because 'such delay implies a lack of urgency and irreparable harm.'" (citation omitted))); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011) ("[T]he likelihood of irreparable harm takes into account how urgent the need for equitable relief really is.").

Nucap makes no attempt to explain its delay in bringing its motion for preliminary injunction as to its claim for tortious interference. In its response to Nucap's motion for preliminary injunction, Bosch argues that Nucap's motion should be denied in its entirety as the presumption of irreparable harm is rebutted by Nucap's delay in bringing the motion. [Bosch Resp. to Mot. for Prelim. Injun., pp. 38-39, ECF No. 313 (citing *Stokely-Van Camp v. Coca-Cola Co.*, No. 86 6159, 1987 WL 6300, at *3 (N.D. Ill. Jan. 30, 1987).] Nucap responds to Bosch's

argument by stating that any delay in bringing its motion was attributable to its reliance Bosch's false statements to the court that it did not use Nucap's drawings for any reason. [Nucap Reply in Support, pp. 31-32, ECF No. 398.] The court did not address the issue of delay as it pertained to Nucap's trade secret claim because this explanation for Nucap's "delay" is plausible.

However, the same cannot be said for Nucap's tortious interference claims, which are separate and distinct from its trade secret claims. Nucap provides no explanation for its delay in filing its motion for preliminary injunction as to those claims. Moreover, the presumption of irreparable harm to the plaintiff pertains to cases of trade secret misappropriation. *Computer Assocs. Int'l*, 333 F.Supp.2d at 700. The tortious interference claims are not trade secret claims and Nucap is not entitled to a presumption of irreparable harm. The record does not demonstrate how Nucap would be irreparably harmed if Bosch is not enjoined from continuing to do business with Trelleborg. Therefore, Nucap has failed to demonstrate the likelihood of irreparable harm, as required for a preliminary injunction. Accordingly, the court denies Nucap's motion as it pertains to its counts for tortious interference.

## IV.    CONCLUSION

For the reasons set forth above, Nucap's motion for preliminary injunction [219] is granted in part and denied in part. Bosch is ordered to do the following:

1. Until a trial on the merits is concluded, Bosch, its employees and agents, and those acting in concert with them, are enjoined from further using or disclosing (1) Nucap's drawings, (2) drawings created, modified, evaluated, validated, verified, qualified, overlaid, compared to, or approved using Nucap's drawings, and (3) all other documents based upon or reflecting information derived from Nucap's drawings, for any purpose.

2. Bosch shall segregate, quarantine, and not use for any purpose (1) all drawings created, modified, evaluated, validated, verified, qualified, overlaid, compared to, or approved using Nucap's drawings, and (2) all other documents reflecting information derived from Nucap's drawings.

3. Bosch shall identify all affiliates and third parties to whom Nucap's drawings or confidential information were disclosed and provide contact information for the individuals at these affiliates and third parties who are knowledgeable about the disclosure of Nucap's drawings or information.

4. Bosch shall identify all affiliates and third parties whose brake components were evaluated, validated, verified, qualified, overlaid, compared to, or approved based on or following any use of Nucap's drawings, and for each such entity shall (1) identify all such components and (2) provide contact information for the individuals at these affiliates and third parties who are knowledgeable about said evaluation, validation, verification, qualification, overlay, comparison, or approval.

5. Bosch shall complete this disclosure outlined in paragraphs 4 and 5 within ten (10) business days of this order.

6. Bosch shall disclose a list of all persons who accessed, referenced, used, or disclosed any Nucap drawings on or after Bosch's alleged notice of quarantine of Nucap's drawings on April 14, 2015. This disclosure shall include (1) a description of all steps taken by Bosch to quarantine Nucap's drawings, (2) identification of documents reflecting Bosch's quarantine and persons most knowledgeable about the quarantine, and (3) an identification of all physical or electronic quarantine areas established, the security and

restrictions imposed, and the persons who have access those quarantine areas.  Bosch

shall provide this disclosure within ten (10) business days of this order.

7.  This order shall become effective upon the setting of a bond, scheduled for September 7,

2016 at 9:30 a.m.

Date:   August 29, 2016                               _____/s/_____

                                                      Joan B. Gottschall
                                                      United States District Judge