**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NUCAP INDUSTRIES, INC., and | ) | |
| NUCAP US, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 15 C 2207 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| ROBERT BOSCH LLC; BOSCH | ) | |
| BRAKE COMPONENTS LLC; and | ) | |
| ROBERT BOSCH GMBH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are cross motions for partial summary judgment and a motion to dismiss two antitrust counterclaims pleaded in the defendants' amended answer. The motions for summary judgment primarily involve a contract formation dispute with an antecedent choice-of-law question. Finding that the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), United Nations Convention on Contracts for the International Sale of Goods, Mar. 2, 1987, 52 Fed. Reg. 6262, 1489 U.N.T.S. 3, governs the formation dispute, the court denies the cross motions for summary judgment because the evidence of the parties' extensive negotiations and dealings raises genuine factual disputes material to the formation analysis under the CISG. Notably, the CISG allows consideration of one party's subjective intent when forming a contract "where the other party knew or could not have been unaware what that intent was." *Id.* art. 8(1). The court grants the motion to dismiss the counterclaims because they fail to allege adequately the basis for defining the relevant markets.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Except where otherwise noted, the court draws the following undisputed facts from Nucap and Bosch's cross motions for summary judgment.[1] Nucap objects to some of the assertions made in Bosch's Local Rule 56.1 statement on two general grounds. (*See* Nucap's Resp. to Bosch's SOF 1–2, ECF No. 468.)

First, the depositions, affidavits, and evidence cited in certain paragraphs of Bosch's Local Rule 56.1 statement do not support the factual proposition for which they are cited, according to Nucap, and those paragraphs must therefore be disregarded. *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."). Specifically, Nucap objects to paragraphs 5, 8–9, 13, 25–27, 29, 52, 65, 68, 69, and 71 on this ground. Nucap's response to paragraph 5, however, includes no citation to factual material disputing it, and despite Nucap's general objection on pages 1–2, Nucap lists paragraphs 25 and 26 as undisputed. (ECF No. 468 at 10.) Paragraphs 65 and 68 characterize the claims asserted in Nucap's original complaint. (ECF No. 468 at 22, 23.) The court can determine the complaint's scope for itself. Finally, Nucap cites its entire amended complaint, motion for preliminary

---

[1] In the interest of brevity, only one citation is provided when a fact appears more than once in the parties' cross statements. *See Am. Safety Cas. Ins. Co. v. City of Waukegan*, 776 F. Supp. 2d 670, 678 n.1 (N.D. Ill. 2011) (adopting same practice). Nucap and Bosch cite to tab numbers in paper copies of the exhibits attached to their motions for summary judgment. Nucap's exhibits to its Local Rule 56.1 Statement of Facts can be found at ECF No. 474 (Ex. 1); ECF No. 475 (Ex. 18, 23); ECF No. 476 (Ex. 29–32, 34–35, 39); ECF No. 477 (Ex. 45, 47, 49–51); ECF No. 651 (Ex. 19–22, 24–28 filed under seal); ECF No. 652 (Ex. 33, 36–38 filed under seal); ECF No. 653 (Ex. 40–44, 46, 48 filed under seal); and ECF No. 654 (Ex. 2–17 filed under seal). Nucap's exhibits to its Response to Bosch's Statement of Facts, filed under seal, can be found on the docket at ECF No. 468 (Ex. 1–22); ECF No. 469 (Ex. 23–32); ECF No. 470 (Ex. 33–46). Bosch's exhibits to its Local Rule 56.1 Statement of Facts can be found at ECF No. 343 (Ex. 13, 23–25, 35, 37) and ECF No. 347 (the remaining exhibits, numbers 1–36, filed under seal). Bosch's exhibits to its Response to Nucap's Statement of Facts, filed under seal, can be found on the docket at ECF No. 555 (Ex. 38–46).

injunction, and reply to that motion in responding to paragraph 71 as well as two depositions in their entirety.  (ECF No. 468 at 24.)  As explained in the next paragraph, the court disregards legal conclusions.  Nucap's citations to depositions in their entirety also fail to comply with Local Rule 56.1.  *See Bolden v. Dart*, No. 11 C 8661, 2013 WL 3819638, at *2 (N.D. Ill. July 23, 2013) (quoting *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004)) (disregarding inadequately supported response because Rule 56.1 responses must include "proper . . . citations to exact pieces of the record that support the factual contention contained in the paragraph" (quoting *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000)) (ellipsis in original; other citations omitted)).  To the extent those facts are material, the court considers the objections to paragraphs 8–9, 13, 29, 52, and 69 below.[2]

Second, Nucap argues several paragraphs of Bosch's Rule 56.1 statement improperly state legal conclusions rather than facts.  (ECF No. 468 at 2.)  Those objections are well-taken.[3] The court has sifted the undisputed facts from the legal conclusions in the parties' Rule 56.1 statements; the latter receive no deference.  *See Kenall Mfg. Co. v. Genlyte Thomas Grp. LLC*, 439 F. Supp. 2d 854, 860 (N.D. Ill. 2006) (citing *Greer v. Bd. of Educ. of City of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001)) (ignoring conclusions of law in Rule 56.1 statements and "pars[ing] out the parties' conclusions of law from their allegations of fact").

## A. The Parties and Their Contentions

Nucap Industries Inc. ("Nucap Industries") "is a corporation organized and existing under the laws of Ontario, Canada," with a principal place of business in Toronto.  (*Id.* ¶ 3.)  Nucap US

---

[2] Bosch also objects that certain paragraphs of Nucap's Local Rule 56.1(b)(3) response designating additional facts mischaracterize the underlying evidence.  (*E.g.*, ECF No. 495 ¶¶ 27, 32.)  While some of those objections amount to legal argument, the court addresses the disputes over the proper characterization of the evidence cited only to the extent the facts are material.

[3] Nucap also lodges an objection that the evidence cited does not support one of Bosch's statements of fact.  (*See* ECF No. 589 ¶ 39.)  The court need not resolve this objection because the facts in question—which parts were reordered after May 17, 2011—are not material in the summary judgment sense.

Inc., an indirectly wholly-owned subsidiary of Nucap Industries, is incorporated under the laws of Connecticut and keeps its principal place of business in that state. (*Id.* ¶ 4.) Nucap "invested money, engineering hours, and years of research and development to create a database of over 12,000 drawings of aftermarket brake components." (Bosch Resp. to Nucap SOF ¶ 2, ECF No. 556.) Nucap asserts that it considers those drawings its "crown jewel" and "core competitive asset." (*Id.* (disputed as statement of opinion and to qualitative characterization).)

Robert Bosch LLC and Bosch Brake Components LLC are incorporated in Delaware; they keep their principal places of business in Broadview, Illinois. (Nucap Resp. to Bosch SOF ¶¶ 1, 2, ECF No. 468.) Bosch has "affiliates in the United States, China, and Germany." (Nucap's SOF ¶ 14, ECF No. 474.) Bosch's affiliate in China, referred to by the parties as "Bosch China," has not been joined as a party to this litigation.[4] (Marschall Decl. ¶ 20, Bosch Tab 1; ECF No. 556 ¶ 14.)

Bosch assembles and sells aftermarket brake pads. (Nucap Resp. to Bosch SOF ¶ 5.) Ordinarily, aftermarket and original equipment brake pads "consist[ ] of a backing plate, friction material, a shim, and hardware (such as a wear sensor)." (*Id.* ¶ 7.) Bosch sources some of these components and assembles them into finished brake pads. (*Id.* ¶ 6.) Nucap sells brake components to finished-good suppliers throughout the world. (*Id.* ¶ 11.)

Bosch started buying brake components from Nucap in September 2008. (Bosch Resp. to Nucap's SOF ¶ 4, ECF No. 556.) Between 2008 and 2014, Nucap shipped backing plates to Bosch from its Toronto headquarters; those backing plates had been manufactured in Toronto. (Bosc Resp. to Nucap SOF ¶ 5.) "[T]here was and is no global supply agreement between Bosch

---

[4] Nucap's complaint alleges that Bosch GmbH is the indirect parent of "Bosch Trading (Shanghai) Co., Ltd. and Bosch Automotive Products (Nanjing) Co., Ltd. (collectively with Bosch Trading (Shanghai) Co. Ltd., "Bosch China"), and Bosch Sistemas de Frenos S. de C.V. and Bosch S. de R.L. de C.V. (collectively with Bosch Sistemas de Frenos S. de R.L. de C.V., "Bosch Mexico")." (ECF No. 239 ¶ 28.)

and Nucap or other general agreement governing the relationship between Bosch and Nucap . . . ."  (Nucap Resp. to Bosch SOF ¶ 14.)

The relationship between Bosch and Nucap came to a halt in November 2014.  As described in the parties' Local Rule 56.1 statements, the summary judgment record contains less information about what happened after November 2014 than the court heard at the preliminary injunction phase.  (*See* Slip Op. at 4–6, Aug. 29, 2016, ECF No. 609.)  Among other things, Nucap claims Bosch misused its proprietary drawings after the relationship's collapse; it brings claims for trade secret misappropriation and tortious interference with contract and prospective economic advantage.  Nucap alleges that "in response to Bosch's demands, [Nucap] allowed select pre-approved Bosch and Bosch China employees to access Nucap's extensive library of proprietary drawings . . . which Bosch claimed was necessary to satisfy Bosch's internal quality control requirements for Nucap-supplied components."  (1st Am. Compl. ¶ 16, ECF No. 239; *see also id.* ¶¶ 70–72.)  Nucap alleges that Bosch distributed Nucap's drawings to third-party suppliers of brake components and misused them to qualify and approve replacement suppliers' brake components.  (*See id.* ¶¶ 75–85.)

The pending summary judgment motions ask the court to determine what agreement or agreements governed Nucap and Bosch's relationship.  Bosch relies on its Purchase Order Terms and Conditions bearing a last revision date of September 1, 2010, ("the POTCs") to argue that its alleged use of Nucap's drawings was proper.  Nucap maintains that it rejected some or all of the terms of the POTCs and that Bosch and Nucap formed one or more confidentiality agreements.

Bosch brings seven counterclaims against Nucap.  (*See* Defs.' Ans., Affirmative Defenses, & Countercls. to Nucap's 1st Am. Compl. [hereinafter "Countercl."] at 45–73, ECF

No. 328.)[5]  Nucap moves to dismiss the first two—a claim for attempted monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, and the same theory pleaded as a violation of § 3 of the Illinois Antitrust Act, 740 ILCS 10/3 (collectively "antitrust counterclaims").  Bosch also alleges that Nucap breached outstanding purchase orders when it, among other things, refused to ship outstanding orders to Bosch in November 2014 and that by pursuing this lawsuit based on Bosch's use of its drawings, Nucap violated the terms of the POTCs.  (*See* Countercl. ¶¶ 111–24.)  Bosch also claims that Nucap violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*; unjustly enriched itself; tortiously interfered with Bosch's business expectancy; and breached a contract implied in fact.

Bosch's antitrust counterclaims stem from the collapse of the Nucap-Bosch relationship. For purposes of deciding Nucap's motion to dismiss, the court takes Bosch's allegations in its counterclaims as true and views them in the light most favorable to Bosch.

In or around October 2012, Bosch began making inquiries about purchasing backing plates from Nucap's supplier in China.  (Countercl. ¶ 65.)  "Nucap refused and demanded that Bosch purchase backing plates from Nucap Canada or North America, requiring Bosch to pay more for parts that Bosch could have purchased from alternative suppliers at a lower cost."  (*Id.*) Bosch was buying "all of its shims and the majority of its backing plates from Nucap" by late 2013.  (*Id.* ¶ 66.)  Bosch pleads that there were fluctuations in Bosch's orders and Nucap's timely fulfillment in the first three quarters of 2014, leading, according to Bosch, to Nucap's not timely filling orders for shims under existing purchase orders in the third quarter of 2014.  (*See id.* ¶¶ 67–70.)  Bosch began shifting its orders of backing plates to other suppliers but kept buying "virtually all" of its shims from Nucap.  (*Id.* ¶ 70.)  In October 2014, Nucap changed its payment

---

[5] Citations to paragraph numbers of "Countercl." refer to the sequence of paragraph numbers beginning on page 45 of Bosch's live answer.  (ECF No. 328.)

terms from "Net 60 Days" to "cash in advance." (*Id.* ¶ 71.)  Bosch describes what happened next this way:

> 72. Then, on November 10, 2014, Nucap unilaterally, without justification and with no advance warning, placed Bosch on a "complete business pause" and stopped shipping components to Bosch - even those components subject to a previously accepted purchase order and for which Bosch had submitted pre-payment. On information and belief, Nucap instituted this "complete business pause" in order to cause Bosch financial and reputational distress so as to force Bosch to negotiate a long-term agreement with Nucap under terms that Nucap desired.

> 73. Eight days later, on November 18, 2014, Lutz Marschall, President of Bosch Brake Components, met Ray Arbesman, Chairman and Owner of Nucap Industries, at Mr. Arbesman's home in or around Toronto, Canada. During that meeting, Mr. Arbesman told Mr. Marschall that Nucap would not sell its shims to Bosch unless Bosch bought Nucap's backing plates.

(Countercl. ¶¶ 72–73.)

## B. Purchase Orders

Bosch and Nucap followed a "uniform procedure" until their relationship broke down in 2014.  (Nucap Resp. to Bosch SOF ¶ 15.)  Bosch issued a purchase order to Nucap specifying material terms, including price, quantity, and part number.  (*Id.* ¶ 15(a).)  Nucap delivered the parts Bosch ordered with a packing slip and then invoiced Bosch for the items supplied pursuant to the specific purchase order.  (*Id.* ¶¶ 15(c), (d); Bosch Resp. to Nucap SOF ¶ 6.)  Nucap contends that its clerks did not review each purchase order's terms, but only the price, quantity, and shipping address.  (Nucap Resp. to Bosch SOF ¶ 15.)

Beginning on September 1, 2010, each purchase order sent to Nucap included the following language: "THE TERMS AND CONDITIONS OF PURCHASE ARE AVAILABLE AT WWW.BOSCHNASUPPLIERS.COM AND INCORPORATED HEREIN BY REFERENCE, SHALL BECOME A BINDING AGREEMENT UPON SELLER COMMENCING

PERFORMANCE OF THIS PURCHASE ORDER, OR UPON SELLER OTHERWISE ACKNOWLEDGING ACCEPTANCE, WHICHEVER OCCURS FIRST." (*Id.* ¶ 17.) Bosch did not tell Nucap when it began including that text at the bottom of its purchase orders. (Bosch Resp. to Nucap SOF ¶ 43.)

Bosch sent Nucap over 8,000 purchase orders containing that language between September 1, 2010, and November 10, 2014. (Nucap Resp. to Bosch SOF ¶¶ 20, 32.) "Nucap shipped to Bosch the quantities of components, at the prices, specified in each purchase order that specified the proper agreed prices, and followed the delivery terms instructions agreed upon." (Nucap Resp. to Bosch SOF ¶ 21.) Bosch paid Nucap a total of more than $170 million under those purchase orders. (*Id.* ¶ 51.) "At no time did Nucap ever state to Bosch that Nucap could not locate and/or were [sic] unable to review a copy of the POTCs." (Nucap Resp. to Bosch SOF ¶ 55, ECF No. 486.)

Bosch contends several provisions of the POTCs, which the court assumes for summary judgment purposes were available on the website referenced on the purchase order,[6] allow it to use Nucap's drawings and preclude many of Nucap's claims. (*See* Nucap Resp. to Bosch SOF ¶¶ 34–50 (conceding that exhibit accurately sets forth POTCs' text but disputing whether it is legally binding).) Sections 23.3–23.4 of the POTCs, read as follows:

> Section 23.3. All documents containing proprietary information relating to the Supplies produced or acquired by Seller in connection with this Agreement shall belong to Buyer. All drawings, know-how, and confidential information supplied to Seller by Buyer and all rights therein shall remain the property of Buyer and shall be kept confidential by Seller in accordance with Section 23.1 above.

---

[6] Nucap attempts to assert in its Local Rule 56.1 responses that Bosch's evidence of this fact is insufficient to support a finding on this fact. As explained in the text, *infra*, even if this dispute is genuine, it is not material as the summary judgment evidence establishes Nucap's awareness of the POTCs by no later than May 2011.

Section 23.4 Seller agrees not to assert any claim against Buyer or its suppliers with respect to any technical information that Seller has disclosed or may disclose to buyer in connection with the Supplies covered by the Order, except to the extent expressly covered by a separate written confidentiality and/or license agreement signed by Buyer or by a valid patent expressly disclosed to Buyer prior to or at the time of the Order.

(Bosch POTC, Bosch Ex. 23 at BBCNU00199875, ECF No. 343-2; *see also id.* § 23.1 ("Seller further agrees not to assert any claims with respect to any technical information which Seller shall have disclosed or may hereafter disclose to Buyer in connection with the Supplies.").) Indeed, the POTCs make "prints and specifications for the Supplies" made part of "the order." (*Id.* § 2.2; *see also id.* §§ 22.1, 22.4, 22.5 (providing, among other things, that intellectual property "needed to manufacture, sell, or use the supplies" is the buyer's property).) Those obligations survive the order's termination, according to the POTCs. (*See id.* §§ 23.6, 35.) Finally, in § 32.4, the POTCs state that: "Neither course of performance, course of dealing or usage of trade may be used to vary the terms of the Order."

**C. Negotiations and Course of Dealings**

At its request, Bosch received access to Nucap's drawings and its engineering database beginning in October 2008. (Bosch Resp. to Nucap Counter SOF ¶¶ 4–5, ECF No. 495.) Nucap provided access to the electronic database on an "as needed basis" in response to requests made "by email or telephone." [7] (*Id.* ¶ 15.)

In March 2011, Bosch and Nucap discussed entering into a possible corporate agreement and purchase and sale agreement referencing the POTCs, but they did not execute either agreement. (Nucap Resp. to Bosch Counter SOF ¶ 33–34, ECF No. 580.) Bosch and Nucap

---

[7] Bosch lists this fact as denied in its Local Rule 56.1 response, but it cites no contrary evidence. (*See* ECF No. 495 at 13.) It argues only that the POTCs required Nucap to allow it to access the database, i.e., the source of the authority by which access was obtained. (*See id.*) That is a legal argument. The court therefore deems this fact admitted.

representatives discussed the terms of the POTCs at a meeting held May 17, 2011. (Nucap Resp. to Bosch SOF ¶ 25, ECF No. 468.) Bosch's representatives asked Nucap's representatives to identify any issues Nucap had with the POTCs. (*Id.* ¶ 27.) That same day, a Nucap employee wrote an e-mail message to Bosch employees containing a list of "talking points," including an assertion that Nucap "cannot have any blind acceptance of Bosch standard terms and conditions." (Bosch Resp. to Nucap SOF ¶ 47 (quoting Nucap Ex. 45 at NUCAP-0175871).)

On January 21, 2013 Wilkes e-mailed Khokhar and another Nucap employee about continuing access to Nucap's online database of drawings, stating that he could not form agreements without the approval of Bosch's legal department. (Wilkes Decl. Ex. 2, Bosch. Ex. 2.)

In June 2013, Bosch and Nucap circulated a proposed nondisclosure agreement governing the use of Nucap's drawings, but Bosch and Nucap never executed it. (Bosch Resp. to Nucap's SOF ¶¶ 12–14, ECF No. 556.) Nucap characterizes those communications as a confidentiality agreement. A pair of e-mail messages exchanged by Montu Khokhar ("Khokhar"), who held the title of Chief Executive Officer of Nucap Industries Inc., on June 27, 2013, and Nucap employees and copying Robert Wilkes ("Wilkes") at Bosch states that "Bosch will not be able to sign the confidentiality contract." (Nucap Ex. 17 at NUCAP-0231802.) The messages nevertheless specified that certain personnel would receive access to the drawings and that Bosch would take steps to control print distribution internally [of the drawings]." (*Id.*) In internal e-mails, Wilkes referred to this as a "major breakthrough in cooperation between Nucap and Bosch." (Bosch Resp. to Nucap SOF ¶ 18.) At that time, Wilkes, who held the title of "Director Product Development" at Bosch, communicated his understanding–an understanding Bosch now disputes both as nonbinding and not adequately informed–that the drawings were

Nucap's intellectual property.  (*See* Bosch Resp. to Nucap SOF at 10; *see also* Prelim. Inj. Hr'g Tr., Bosch Ex 45 at 334:12-19 (Wilkes' testimony that he was unaware of the POTCs in June 2013).)  Wilkes sent an e-mail message to another Bosch employee and a Bosch China employee on August 29, 2013, including the assertion that: "As I have put out a memo stating not to sent [sic] supplier drawings to competitors, as they are IP, this practice should have stopped. If not, I may have no other choice but to notify legal."  (Bosch Resp. to Nucap SOF ¶ 27 (alteration in original).)

As that e-mail demonstrates, Bosch employees continued to receive access to Nucap's engineering database until at least that date, and with an inference favorable to Nucap, until the relationship fell apart in November 2014.  (*See* Bosch Resp. to Nucap Counter SOF ¶¶ 4–5, ECF No. 495 (stating start date of access but listing no end date).)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In resolving summary judgment motions, "facts must be viewed in the light most favorable to, and all reasonable inferences from that evidence must be drawn in favor of, the nonmoving party–but only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

*Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

The issues raised in the pending motions for summary judgment largely overlap. The court applies the procedural requirements of Rule 56 separately to each cross motion for summary judgment. *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015). Each movant and nonmovant "must individually satisfy the requirements of Rule 56." *United Transp. Union v. Illinois Cent. R.R. Co.*, 998 F. Supp. 874, 880 (N.D. Ill. 1998) (citing *Proviso Ass'n of Retarded Citizens v. Vill. of Westchester*, 914 F. Supp. 1555, 1560 (N.D. Ill. 1996) and *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Kelly*, No. 95 C 501, 1996 WL 507258, *3 (N.D. Ill. Sept. 4, 1996)). Regarding the parties' factual contentions, the court adopts "a dual, 'Janus-like' perspective" on cross motions aimed at the same claim or defense. *Hotel 71*, 778 F.3d at 603 (citing *Shiner v. Turnoy*, 29 F. Supp. 3d 1156, 1160 (N.D. Ill. 2014)). On one motion, the court views the facts and inferences in the light

most favorable to the nonmovant; but if summary judgment is not warranted, the court changes tack on the cross motion and gives the unsuccessful movant "all of the favorable factual inferences that it has just given to the movant's opponent." *Id.* (citing *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engrs., Local Union 150*, 335 F.3d 643, 647–48 (7th Cir. 2003)). This dual perspective can sometimes lead to denial of all cross motions. *See Shiner*, 29 F. Supp. 3d at 1160.

Which party has the burden of proof at trial determines which party must "go beyond the pleadings and affirmatively . . . establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 324). Here, for instance, Bosch will have the burden of proof on its counterclaim for breach of contract at trial. *See, e.g.*, *Homeowners Choice, Inc. v. Aon Benfield, Inc.*, 938 F. Supp. 2d 749, 754, 757 (N.D. Ill. 2013) (applying Illinois law and requiring party bringing claim for breach of contract to carry burden of proof at bench trial). So Bosch has the burden of going beyond the pleadings to create a genuine issue of material fact if Nucap carries its initial summary judgment burden.

### III. BOSCH'S MOTION FOR SUMMARY JUDGMENT

Turning first to Bosch's motion for summary judgment, a genuine fact dispute exists on whether Nucap and Bosch formed a written confidentiality agreement memorialized in Wilkes and Khokhar's e-mail correspondence dated June 27, 2013. Recall that § 23.4 of the POTCs contains an exception allowing the seller, Nucap, to assert claims against the buyer, Bosch, "except to the extent expressly covered by a separate written confidentiality and/or license agreement signed by Buyer." (POTCs § 23.4.) Even if the POTCs govern the parties' dispute (more about this later), a factual dispute material to whether § 23.4 applies precludes summary judgment.

Bosch points to undisputed evidence that Wilkes, whose title was "Director Product Development," declined to execute the written confidentiality agreement Nucap proposed in June 2013. (*See* Bosch Resp. to Nucap's SOF ¶¶ 12–14, ECF No. 556.) Nevertheless, a reasonable fact finder could conclude that Bosch ratified the correspondence between Wilkes and Khokhar as an enforceable agreement, which counts as a signed, written agreement within the meaning of § 23.4 of the POTCs.

First, Bosch suggests that the e-mail messages dated June 27, 2013, cannot be a confidentiality agreement because they are not "signed." The POTCs do not facially require an ink signature on a piece of paper. (*See* § 23.4.) The Electronic Signatures in Global Commerce Act ("ESIGN Act") provides that "a signature, contract, or other recording relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form." 15 U.S.C. § 7001(a)(1). Given that rule, a reasonable fact finder could conclude that the names of Nucap and Bosch agents affixed to the bottom of the e-mail messages satisfied the signature requirement. *See Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295–96 (7th Cir. 2002) (name on e-mail correspondence satisfied signature require); *Princeton Indus., Prods, Inc. v. Precision Metals Corp.*, 120 F. Supp. 3d 812, 818–19 (N.D. Ill. 2015) (holding agent's name in automatically generated e-mail signature block sufficient to satisfy signature requirement under Illinois law); (*see also* Nucap Ex. 17 at Nucap-0231801 to -0231802, ECF No. 654-4 (concluding e-mail messages with "Thanks, Montu" and "Bob Wilkes").)

Bosch also contends that Wilkes lacked authority to form a binding agreement because he was a director of product development rather than a corporate officer. (ECF No. 556 at 7.) Nucap responds that Wilkes had apparent authority to bind Bosch or that Bosch ratified Wilkes'

actions. It has come forward with enough evidence to survive summary judgment on the latter theory.

In Illinois, a party seeking to bind a principal based on an agent's apparent authority must satisfy a three-part test: "(1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 673 (7th Cir. 2004) (quoting *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174, 183 (Ill. App. Ct. 2001)).

Nucap addresses the last two elements of apparent authority but not the first. (*See* Reply 6, ECF No. 579.) To establish apparent authority, Nucap needs to identify something the principal, i.e., Bosch, did or said that left Nucap with the impression that Wilkes had the power to form a binding confidentiality agreement in June 2013. *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016) ("To create apparent authority, the principal must speak, write, or otherwise act toward a third party. His conduct must make the third party reasonably believe that he has consented to an action done on his behalf by someone purporting to act for him." (citing *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 (7th Cir. 1998))); *Baumeister v. Deutsche Lufthansa, AG*, 811 F.3d 963, 968–69 (7th Cir. 2016). Even viewed in the light most favorable to it, Nucap ultimately points to nothing more than Wilkes' acts themselves to establish his authority to bind Bosch.[8] (*See* Reply 5-6.) Wilkes'

---

[8] Nucap points to e-mail messages from Wilkes to Bill Murray ("Murray"), Bosch's Vice President, Global Operations, dated March 23 and 26, 2013, in which Wilkes stated that, "This is what we are doing to preserve the supplier drawing." (Bosch Resp. to Nucap Counter SOF ¶ 8, ECF No. 495 (quoting message).) Wilkes sent Khokhar a copy of that message. (Ex. 29 to Nucap Resp. to Bosch SOF at Nucap-0144556, ECF No. 468.) Nucap suggests that message could be understood as clothing Wilkes with apparent authority, but the message does not concern forming a confidentiality agreement. (*See id.*) Nor is Murray Bosch's legal department, and Wilkes had already advised Khokhar by March 2013 that he could not form a binding agreement without approval from Bosch's

communications, especially in light of his January 2013 e-mail telling Khokhar that all agreements have to be approved by Bosch's legal department, do not create a fact issue on apparent authority. *See NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 575 (7th Cir. 1994) (holding under Indiana law, which is not materially different on this point, that assumption of corporate officer that person with whom he dealt had authority to form contracts was not sufficient to demonstrate apparent authority).

Nucap says that this case is like *SKF USA, Inc. v. Bjerkness,* 636 F. Supp. 2d 696, 708 (N.D. Ill. 2009). But in *SKF*, the principal corporation did something that led others to believe that its agent had authority to bind it on human resources issues in two facilities: it continued to allow the agent to be the human resources contact at the two facilities after a merger. *Id.* (pointing to testimony that "Comp was the human resources 'contact' at Elk Grove"). Nucap points to no comparable conduct on Bosch's behalf, such as Wilkes' having made binding agreements with Nucap in the past, that led it down the garden path as to Wilkes' authority. *See Bridgeview Health*, 816 F.3d at 939 (affirming trial ruling that no apparent authority existed because principal authorized sending faxes beyond a certain geographic radius and the plaintiff pointed to no evidence that he had communicated that he authorized his agent to exceed that radius); *Baumeister*, 811 F.3d at 968–69 (holding that references in airline's terms and conditions to other carriers was not a communication from specific "other carriers" that established airline's apparent authority to form contracts on their behalf).

---

legal department. (*See* Wilkes Decl. Ex. 2 at Nucap-0146692, ECF No. 347-4.) *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1065 (7th Cir. 2000) (holding that reasonable fact finder could conclude that agent had no apparent authority to sign bill of lading limiting principal's liability, in part, because principal previously told mover that she wanted to insure her property for its full value); *Anetsberger v. Metro. Life Ins. Co.*, 14 F.3d 1226, 1235 (7th Cir. 1994) (holding agent lacked apparent authority to waive terms of agreement because principal spelled out who could waive terms in the agreement itself and principal did not later acquiesce in agent's unauthorized alteration of terms).

Nucap has identified evidence creating a fact issue on whether Bosch ratified Wilkes' e-mail correspondence dated June 27, 2013. "Ratification may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction." *Sphere Drake*, 376 F.3d at 677 (quoting *Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 808 (Ill. App. Ct. 1998)). On a theory of ratification, the "important inquiry is whether [Bosch] repudiated the contract within a 'reasonable time.'" *Id.* (quoting *Corn Belt Bank v. Lincoln Sav. & Loan Ass'n*, 456 N.E.2d 150, 159 (Ill. App. Ct. 1983)).

The record contains evidence that Wilkes' June 27, 2013, e-mail message was circulated to several Bosch China employees the same day. (*See* E-mail dated June 27, 2013, at 9:19 p.m., ECF No. 654-4 (forwarding Wilkes' message and characterizing it as an "agreement between Bosch and Nucap to ensure that Bosch (China) gets access to component [drawings]" and describing requirements set forth in Wilkes' message as "rules" with "no exception").) This e-mail also described the "agreement" as the product of a team effort. (*See id.*) A reasonable jury could find that Nucap continued to give Bosch personnel access to drawings after Khokhar and Wilkes sent the messages dated June 27, 2013. (Bosch Resp. to Nucap Counter SOF ¶¶ 4–5, ECF No. 495.) Indeed, a message dated September 11, 2013, supports that inference because it can be reasonably understood to refer to the June 27, 2013, agreement as a precondition for gaining access to Nucap drawings as part of Bosch's reverse engineering efforts. (Nucap Ex. 16, Nucap SOF, ECF No. 654-4.) Viewing all of this evidence in the light most favorable to Nucap, a reasonable fact finder could decide that Bosch ratified Wilkes' agreement by reaping its benefits with notice. *See Condon and Cook, L.L.C. v. Mavrakis*, 69 N.E.3d 274, 286 (Ill. App. Ct. 2016) ("Although defendant's acquiescence to the agreement here lasted only six days, and thus was arguably not long-term, it was as long as it needed to be to accomplish his ends . . . .");

*Kulchawik v. Durabla Mfg. Co.*, 864 N.E.2d 744, 751 (Ill. App. Ct. 2007) (holding ratification occurred where insurer received claims under settlements it later alleged agent lacked authority to settle, paid claims, and raised authority issue "five or six months after it learned the settlement existed"); *Progress Printing Corp. v. Jane Byrne Political Comm.*, 601 N.E.2d 1055, 1068 (Ill. App. Ct. 1992) (affirming trial court's finding that ratification occurred because the "failure to return benefits after reasonable time may be construed as ratification" (citing *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1295–97 (Ill. App. Ct. 1987))).  Accordingly, fact issues preclude summary judgment for Bosch even if it can establish that the POTCs govern its relationship with Nucap.

## IV. NUCAP'S MOTION FOR SUMMARY JUDGMENT

Switch perspectives to the cross motion for summary judgment filed by Nucap, and the reasonable trier of fact need not find ratification as a matter of law.  Seen in a light more favorable to Bosch, the evidence just discussed could reasonably support the conclusion that Bosch's corporate officers with authority to bind it did not have knowledge of Wilkes' agreement with Khokhar.  For the most part, Nucap does not identify the roles of the people to whom Wilkes' e-mail messages about the June 27, 2013, agreement were circulated or explain why notice to them amounted to notice to Bosch.  Therefore, a jury disposed to view the facts in a light favorable to Bosch could infer that the legal department and others with authority to approve agreements did not know of Wilkes and Khokhar's alleged agreement.  Those findings would be enough to reject a ratification theory, so summary judgment for Nucap on that theory is inappropriate.  *See Sphere Drake*, 376 F.3d at 676–77 (holding no ratification occurred because principal acted promptly after conducting reasonable investigation once it learned of agents unauthorized acts); *Sec. Ins. Co. of Hartford v. Mato*, 298 N.E.2d 725, 730 (Ill. App. Ct. 1973)

(holding fact issue on ratification existed where 16-month delay in ratification could be explained by mistaken belief on principal's part and "even if plaintiff's actions were said to constitute ratification as a matter of law, the defense would apply only to those acts of which [the principal] had knowledge").

Nucap argues, however, that it is the law of this case that a separate confidentiality agreement exists. It also seeks partial summary judgment on an independent ground—that as a matter of law, Bosch cannot prove that Nucap is bound by the POTCs. The court addresses those arguments in turn, pausing between the first and second to determine what law governs the parties' dispute over contract formation.

## A. Law of the Case Regarding the Confidentiality Agreements With Bosch China

Nucap contends that this court's order denying Bosch's motion to stay pending arbitration (ECF No. 63) established the proposition that "the parties entered into separate confidentiality agreements governing Nucap's drawings" as the law of this case. (Nucap's Resp. to Bosch's Mot. Summ. J. 2, ECF No. 467.) The law of the case doctrine, among other things, recognizes that as a matter of sound policy and practice, the same "court should not revisit its earlier rulings unless there is a compelling reason to do so. It is designed to further consistency, to avoid constantly revisiting rulings, and to conserve judicial resources." *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009) (citing *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007)). The doctrine "expresses the practice of courts generally to refuse to reopen what has been decided." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)); *see also* Fed. R. Civ. P. 54(b). For those reasons, courts generally avoid revisiting issues they have decided "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would

work a manifest injustice.'" *Id.* (citing *Arizona v. California*, 460 U.S. 605, 618, n.8 (1983)).

Conversely, if a question has not been previously decided, the law of the case doctrine has no

role to play. *United States v. Robinson*, 724 F.3d 878, 886 (7th Cir. 2013) (an "actual decision of

an issue is required to establish the law of the case" (citing Charles Alan Wright, Arthur R.

Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4478 (3d ed. 2005)) (alteration

omitted)); *see also Gilbert v. Ill. State Bd. of Educ.*, 591 F.3d 896, 903 (7th Cir. 2010) ("the law-

of-the-case doctrine does not come into play when the transferor judge never decided the precise

issue that is before the successor judge" (citing *FMS, Inc. v. Volvo Const. Equip. N. Am., Inc.*,

557 F.3d 758, 762–63 (7th Cir. 2009))); *Key v. Sullivan*, 925 F.2d 1056, 1061 (7th Cir. 1991)

(stating that "the law of the case doctrine comes into play only with respect to issues previously

determined" when considering applicability of doctrine to district court's order remanding to

administrative agency).

The court's opinion denying Bosch's motion to stay pending arbitration includes the

following passage:

> Bosch's motion to stay raises a host of factual and legal issues.
> When did Bosch's purchase orders begin referencing the
> company's Terms and Conditions? Did Bosch's Terms and
> Conditions contain an arbitration clause before they were revised
> on September 1, 2010, and if so, what were its terms? With respect
> to the purchase orders executed after September 1, 2010, what law
> applies to determining whether the arbitration clause contained in
> Bosch's Terms and Conditions was validly incorporated into the
> purchase orders and became binding on the parties? And, of
> course, was Nucap in fact bound by the arbitration clause?
>
> Setting these questions aside, the court focuses its analysis on a
> different inquiry: if the purchase orders validly incorporated
> Bosch's Terms and Conditions, is the scope of the arbitration
> provision broad enough to encompass Nucap's allegations and
> claims?

(ECF No. 63 at 9–10.) Relying primarily on *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657 (7th Cir. 2002), this court found that for purposes of the motion to stay and compel arbitration, "Nucap's complaint involves a different subject matter altogether: Bosch's alleged misappropriation of Nucap's drawings and trade secrets in violation of the confidentiality agreements the parties executed." (ECF No. 63 at 14–15.)

Generally, a contract does not bind third parties absent some recognized exception to the rule. *See, e.g.*, *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 149 (7th Cir. 1987) (per curiam) (treating general rule as the default when affirming decision that plaintiff could not enforce contract against successor corporation because no exception applied); *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, No. 1:13-CV-01686, 2015 WL 832306, at *6–7 (N.D. Ill. Feb. 24, 2015) (holding contract was unenforceable against a newly formed corporation because party seeking to enforce it did not show contract was validly assigned to the new corporation, that new corporation was successor to party named in contract, or that new corporation validly assumed the contract's obligations). To prove that a contract between Nucap and Bosch existed, Nucap must come forward with evidence of "a meeting of the minds or mutual assent as to all material terms." *Bauer v. Qwest Commc'ns Co., LLC*, 743 F.3d 221, 227 (7th Cir. 2014) (quoting *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999)) (other citations omitted).

Nucap has not satisfied its summary judgment obligations. Since the court made its decision on arbitration, evidence produced during discovery has shed further light on the parties' dealings and the questions this court reserved in its July 1, 2015, opinion. The evidence now makes clear that "the Terms of Use agreement referenced in the [July 1, 2015,] order was an agreement executed by Nucap and Bosch China, a separate entity from the Bosch defendants [named] in this case." (Slip Op. at 26, Aug. 29, 2016, ECF No. 609.) Those facts remain

undisputed at summary judgment. (*See* Nucap's Resp. to Bosch's SOF at 20–21 ¶¶ 58–59, ECF No. 468.) Bosch China and Nucap may have reached an agreement (but the court need not, and does not, so decide), but Nucap raises no fact question about Bosch's (rather than Bosch China's) assent to the confidentiality agreements signed in September 2010. Even though the court gave Nucap a chance to supplement its summary judgment briefing after ruling on the motion for preliminary injunction, Nucap has suggested no legal theory by which the terms of use document signed by engineers employed by Bosch China binds the corporations collectively referred to as Bosch in this opinion.

The court mentioned and rejected one possible way of establishing Bosch's obligations at the preliminary injunction stage: corporate veil-piercing. (*See* Slip Op. at 26–27, Aug. 29, 2016, ECF No. 609 (setting forth framework under Illinois law).) At summary judgment, Nucap has not attempted to carry its burden to pierce the corporate veil between Bosch China and the defendants it has sued. (*See id.*) Under Illinois' choice-of-law rules, the law of the state in which a corporation is incorporated supplies the rule of decision when a party seeks to pierce its corporate veil. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008). The two Bosch defendants are incorporated in Delaware. (Bosch SOF ¶¶ 1–2.) Nucap does not discuss veil-piercing under any jurisdiction's laws, and because it bears the burden on veil-piercing, it has failed to create a fact issue on a theory of piercing the corporate veil between Bosch and Bosch China. *See, e.g.*, *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." (citing *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183–85 (Del. Ch. 1999))).

State law provides other means of establishing a third party's obligations under a contract under which it is not facially bound, including "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quoting 21 R. Lord, *Williston on Contracts* § 57:19, p. 183 (4th ed. 2001)); *see also Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 734 & n.9 (7th Cir. 2005) (listing subset of these doctrines under Illinois law). Nucap attempts to develop none of them at summary judgment, so it has waived them along with veil-piercing. *See, e.g.*, *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000) ("Because X–L did not raise the NCP issue at summary judgment, it has waived it." (citation omitted)); *LG Elecs. v. Whirlpool Corp.*, No. 08 C 242, 2009 WL 5579006, at *3 (N.D. Ill. Nov. 23, 2009) ("The law is clear in the Seventh Circuit that a party waives arguments not presented to the district court in response to summary judgment motions." (citing *Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999))).

Having set forth what the summary judgment record and briefing establish, the court returns to Nucap's argument that a finding that the terms of service bind only Bosch China would fly in the face of the court's prediscovery arbitrability ruling. As an initial matter, Nucap implicitly assumes that third parties are categorically precluded from enforcing contracts to arbitrate. But the Supreme Court held in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009), that "a litigant who was not a party to the relevant arbitration agreement may invoke § 3 [of the Federal Arbitration Act, 9 U.S.C. §§ 1–16,] if the relevant state contract law allows him to enforce the agreement." Furthermore, Nucap repeatedly asserted in its briefing on the motion to stay pending arbitration that "Bosch engineers" signed the terms of service without differentiating between Bosch China and the named defendants. (ECF No. 47 at 4, 10.) Bosch

foreshadowed many of its summary judgment arguments in its motion to stay and reply to that motion, but it drew no distinction between Bosch and Bosch China. (*See* ECF No. 57 at 5-7.) That is, the parties did not present this issue as an adversarial matter to be resolved by the court when deciding the motion to stay, and the court's treatment of this uncontested matter as undisputed at a prior stage of this litigation did not, therefore, establish it as the law of this case. *See Loera v. United States*, 714 F.3d 1025, 1030-31 (7th Cir. 2013) (holding order granting uncontested motion to exclude evidence at trial was not law of the case because nonopposition was based on understanding that evidence would not be used at trial); *see also Fenster v. Tepfer & Spitz, Ltd.,* 301 F.3d 851, 858 (7th Cir. 2002) (declining to apply law of the case doctrine even though matter was arguably previously raised because "to the extent the subject came up, [it] was a peripheral matter").

Even if the issue had been previously decided, "the law of the case doctrine does not compel a district court to ignore evidence presented at a hearing that clarifies a prior misunderstanding," and the court sees no reason why this principle applies any less at summary judgment. *United States v. Harris*, 531 F.3d 507, 509 (7th Cir. 2008). The parties have now had an opportunity to present the issues fully after discovery, and deferring to a ruling made without the benefit of discovery or briefing focusing on the issue makes little sense as a matter of discretion and practice. *See Robinson*, 724 F.3d at 887 (affirming decision not to invoke law-of-the-case doctrine, noting that the district court "afforded both parties an opportunity to reargue their positions, and only then did it decide not to conduct a hearing").

Nor does the court's ruling mean that Bosch and Nucap must immediately be sent to arbitration under the terms of the POTCs. The Federal Arbitration Act requires a motion to compel arbitration. *See* 9 U.S.C. § 2. "District courts should not *sua sponte* enforce arbitration

clauses." *Marzano v. Proficio Mortg. Ventures, LLC*, 942 F. Supp. 2d 781, 798 (N.D. Ill 2013) (citing *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007) and collecting additional cases) (declining to order arbitration on court's own initiative); *accord Kay v. Bd. of Educ. of City of Chi.*, 547 F.3d 736, 738 (7th Cir. 2008) (reversing district court based on two cases holding "that federal judges must not invoke arbitration agreements on their own motion" (citing *CPL, Inc. v. Fragchem Corp.*, 512 F.3d 389 (7th Cir. 2008) and *Auto. Mechs. Local 701*, 502 F.3d 740)).  As such, the court has no occasion to determine the proper analysis on arbitrability, including what, if any, role the law-of-the-case doctrine has to play.

**B.  Choice of Law Governing Contract Formation**

Bosch and Nucap disagree about what law governs their dispute over contract formation. Both sides agree that the U.N. Convention on Contracts for International Sale of Goods ("the CISG"), United Nations Convention on Contracts for the International Sale of Goods, Mar. 2, 1987, 52 Fed. Reg. 6262, 1489 U.N.T.S. 3,[9] applies to some degree.  *See Chi. Prime Packers, Inc. v. Northam Food Trading Co.*, 408 F.3d 894, 897 (7th Cir. 2005) (applying the CISG because it is "a self-executing agreement between the United States and other signatories, including Canada").  They differ over whether they have opted out of the CISG and selected Illinois law as the source of the decisional rules governing contract formation under the POTCs.

A federal district court sitting in diversity, *see* 28 U.S.C. § 1332(a), over a claim ordinarily applies the choice-of-law rules of the state in which it sits.  *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 383 (7th Cir. 2003) ("Although a court sitting in diversity normally applies the choice-of-law rules of the state in which it sits, when a case has been

---

[9] The official English text of the CISG can also be found at U.S. Ratification of 1980 United Nations Convention on Contracts for the International Sale of Goods: Official English Text, 52 Fed. Reg. 6262, 6263 (52 FR 6262-02, 1987 WL 128849.

transferred from another district, the court instead applies the choice-of-law rules that the court in the transferring state would apply." (citation omitted)); *In re Watson Fentanyl Patch Prods. Liab. Litig.*, 977 F. Supp. 2d 885, 888 (N.D. Ill. 2013) (discussing alternate rule in directly filed multidistrict litigation); *Gann v. Oltesvig*, 508 F. Supp. 2d 654, 656 (N.D. Ill. 2007) (citing *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1219 (7th Cir. 1995)). The Constitution's Supremacy Clause declares a duly ratified treaty to be "the supreme Law of the Land," U.S. Const., art. VI, cl. 2, so the CISG, which Congress has ratified, "preempts inconsistent provisions of Illinois law where it applies," *Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 673 (N.D. Ill. 2005) (citing *Usinor Industeel v. Leeco Steel Prods., Inc.*, 209 F. Supp. 2d 880, 884–85 (N.D. Ill. 2002)). By its plain terms, the CISG "governs only the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract." CISG art. 4. The CISG does not concern itself, except as it otherwise provides, "with: (a) the validity of the contract or of any of its provisions or of any usage; (b) the effect which the contract may have on the property in the goods sold." *Id.*

Bosch maintains that the POTCs allow it to opt out of the CISG in favor of Illinois law. Article Six of the CISG allows "[t]he parties [to] exclude the application of this Convention or, subject to Article 12, derogate from or vary the effect of any of its provisions." CISG art. 6. Bosch directs the court to § 32.3 of the POTCs, which states that "[t]he Order shall be construed and governed, at Buyer's option, in accordance with either the internal laws of the State of Michigan and the United States of America, or the laws of the state, province or district in the country in which the Order was issued by Buyer." If that were the only provision of § 32.3, it would circle back to the CISG because, as just explained, the CISG preempts inconsistent state law on contract formation. *See Remy, Inc. v. Tecnomatic, S.p.A.*, No. 1:08-cv-1227-SEB-WGH,

2010 WL 4174594, at *1 (S.D. Ind. Oct. 18, 2010) ("A provision that specifies only that a

signatory state's law applies is insufficient because the CISG *is* the law of that state." (citing *Ajax*

*Tool Works, Inc. v. Can–Eng Mfg. Ltd.*, No. 01 C 5938, 2003 WL 223187, at *3 (N.D. Ill. Jan. 30,

2003))); *Asante Techs., Inc. v. PMC–Sierra, Inc.*, 164 F. Supp. 2d 1142, 1150 (N.D. Cal. 2001)

(finding no opt out because "even Plaintiff's choice of applicable law generally adopts the 'laws

of' the State of California, and California is bound by the Supremacy Clause to the treaties of the

United States"). But the second sentence of § 32.3 provides that "[t]he provisions of the United

Nations Convention on Contracts for the International Sale of Goods, and any conflict-of-laws

provisions that would require application of another choice of law, are excluded." (Tab 32 at 13.)

Applying § 32.3's choice-of-law provision[10] would assume the answer to the antecedent

question of contract formation at issue (i.e., beg the question): Are the POTCs part of the

agreements between Nucap and Bosch? As this court has explained when deciding that a choice-

of-law clause did not govern a formation dispute in an arbitration case, "as an antecedent matter,

the court must determine whether the parties have a valid contract, and, before it can do that, it

must decide which state's law applies to the issue of contract formation. Only if the court finds a

valid contract may it turn to the choice of law provision in the Agreement . . . ." *Kaufman v. Am.*

*Express Travel Related Servs. Co., Inc.*, No. 07 C 1707, 2008 WL 687224, at *3 (N.D. Ill. Mar. 7,

2008) (Gottschall, J.) (finding choice-of-law law clause did not change the law that applied to

formation dispute over whether clause was part of the parties' agreement). In the case at hand, as

in *Kaufman*, the choice-of-law clause is one of the terms that is the subject of the formation

dispute.[11] *See Green v. Charter One Bank, N.A.,* 640 F. Supp. 2d 998, 1004 n.6 (N.D. Ill. 2009)

---

[10] The court assumes but does not decide that the language of § 32.3 is broad enough to opt the instant dispute out of the CISG.

[11] This does not mean that no opt-out on formation issues is possible under Article 6 of the CISG. At least one nation has opted out. *See Mitchell Aircraft Spares, Inc. v. European Aircraft Service AB*, 23 F. Supp. 2d 915, 918

(citing *DeJohn v. The .TV Corp. Int'l*, 245 F. Supp. 2d 913, 917–18 (N.D. Ill. 2003)) (applying default choice-of-law rules and rejecting reliance on choice-of-law clause because the plaintiff argued "that no contract was formed, [so] no assumption regarding the parties' choice of law can be made at this stage"); *Kaufman*, 2008 WL 687224, at *3–4 (substantively same analysis). The Supremacy Clause makes the CISG the law of Illinois on formation here, and the CISG therefore governs the parties' battle over what terms were incorporated into Bosch and Nucap's purchase orders. *See VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 748 F.3d 780, 787 (7th Cir. 2014) (reversing and remanding because district court incorrectly applied Illinois law to formation dispute govern by CISG).

## C. Formation

To resolve Nucap's cross motion for summary judgment, the court must decide whether a reasonable fact finder viewing the evidence in the light most favorable to Bosch could conclude that the POTCs bind Nucap under the CISG rules of formation. Nucap maintain that the parties' course of conduct compels the conclusion that it never agreed to be bound, at least, by the POTCs' terms related to Nucap's drawings and intellectual property. In particular, Nucap argues that those terms were so surprising that it cannot be deemed to have assented to them.

Contract formation under the CISG requires the familiar ingredients of an offer and an acceptance. *VLM*, 811 F.3d at 251. To be sufficiently definite, an offer must "indicate[ ] the goods and expressly or implicitly fix[ ] or make[ ] provision for determining the quantity and price." *Id.* (quoting CISG art. 14(1)). The offeree can "accept by words or conduct, but not by silence or inactivity," *id.* (quoting CISG art. 18(2)), and alternatively, acceptance can be

---

(N.D. Ill. 1998) (finding Illinois law governed formation issues "because Sweden declared in its instrument of ratification that it would not be bound by Part II").

"demonstrated through the offeree's conduct, if allowed 'as a result of practices which the parties have established between themselves or of usage,'" *id.* (quoting CISG Art. 18(3)).

Unlike the Uniform Commercial Code, the CISG embraces the mirror image rule in battles of form contracts. *VLM*, 811 F.3d at 251–52 (citing CISG art. 19(1)). Under the mirror image rule, "[a] reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer." *Id.* at 251 (quoting CISG art. 19(1)) (alteration in original).

Bosch's position is straightforward: there were over 8,000 separate offers and acceptances incorporating the POTCs by reference beginning September 1, 2010, when its purchase orders began including a link to a web page it alleges included a link to the POTCs. But the CISG makes the question of whether Bosch "knew or could not have been aware" of Nucap's subjective intent regarding the POTCs material. CISG art. 8(1).

Other courts in this district and around the country have determined that Article 8 of the "CISG rejects the parol evidence rule and clearly instructs the court to admit and consider probative parol evidence regarding the parties' negotiations inasmuch as that evidence reveals the subjective intent of the parties." *Mitchell Aircraft Spares, Inc. v. European Aircraft Serv. AB*, 23 F. Supp. 2d 915 (N.D. Ill. 1998) (citing and adopting reasoning of *MCC–Marble Ceramic Ctr., Inc. v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1389–90 (11th Cir. 1998)); *see also* Annot., Construction and Application of United Nations Convention on Contracts for the International Sale of Goods (CISG), 200 A.L.R. Fed. 541 § 10(b) (2005 & Supp.) (collecting cases); *contra Beijing Metals & Minerals Import/Export Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1182–83 & n.9 (5th Cir. 1993) (holding that CISG and Texas law both required application of parol evidence rule). Their analysis rests primarily on the language of Article 8 of the CISG:

(1) For the purposes of this Convention statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was.

(2) If the preceding paragraph is not applicable, statements made by and other conduct of a party are to be interpreted according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances.

(3) In determining the intent of a party or the understanding a reasonable person would have had, due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties.

CISG art. 8. Last year, the Seventh Circuit interpreted Articles 8(1) and 8(3) as permitting consideration of evidence of the parties' negotiations and subsequent conduct to determine whether they mutually, as contrasted with the hopes of but one of the parties, intended to incorporate a term when the contract was formed. *See VLM*, 811 F.3d at 253 (finding no indication of mutual intent to incorporate fee-shifting provision at time of contracting because fee shifting "was never mentioned during any negotiations, and none of [buyer]'s subsequent conduct indicates that it agreed to pay [seller]'s attorney's fees"); *Mitchell Aircraft*, 23 F. Supp. 2d at 921–22 (considering evidence of purchase order contents, parties' negotiations, and dealings to find that fact issue existed at summary judgment).

Reviewing the summary judgment evidence of the parties' negotiations and conduct, a reasonable fact finder could draw multiple inferences about Nucap's intent to be bound by the POTCs. On the one hand, Nucap's customer service clerks processed Bosch's purchase orders and shipped the goods, but Nucap asserts that its customer service personnel verified only price, quantity, part numbers, and shipping address. (Nucap Resp. to Bosch SOF ¶ 15, ECF No. 468.) Bosch's purchase orders before March 2009 included no terms comparable to the POTCs' intellectual property-related provisions. (*See* Bosch Resp. to Nucap SOF ¶ 37, ECF No. 556.)

Given the significant effective transfer of intellectual property wrought by the PTOCs, a reasonable jury could find that Bosch "knew or could not have been unaware" that Nucap would wish to negotiate the new terms had higher-level Nucap personnel been aware of it.[12]  CISG art. 8(1); *see also VLM*, 811 F.3d at 253–54 (stating evidence that bookkeeper knew of invoices purported altering terms of sale was "weak evidence of [buyer]'s subjective intent" to be bound (citing *CSS Antenna, Inc. v. Amphenol—Tuchel Elecs., GmbH*, 764 F. Supp. 2d 745, 754 (D. Md. 2011))).

The evidence of Nucap's subsequent conduct can be reasonably viewed as bolstering the inference that Bosch knew or could not have been unaware of Nucap's subjective intent.  *See MCC–Marble Ceramic Center*, 144 F.3d at 1392 (holding evidence created fact issue on parties' subjective intent not to be bound by terms printed on back of a form contract also required denial of summary judgment on whether parties were bound to similar terms in subsequent contract).  It is reasonable on this record to find that higher-level Nucap personnel told Bosch that they could not accept the POTCs' terms blindly when they became aware of them in May 2011.  (*See* Bosch Resp. to Nucap SOF ¶ 47, ECF No. 556 (stating e-mail message regarding talking points for a meeting to discuss a possible general supplier agreement between Bosch and Nucap that Nucap "cannot have any blind acceptance of Bosch standard terms and conditions."  (quoting Nucap Ex. 45 at NUCAP-0175871)).)  *See CSS Antenna*, 764 F. Supp. 2d at 754 (holding that purchase orders purportedly incorporating terms and conditions on buyer's website did not show seller's actual knowledge of conditions because buyer sent "purchase confirmation forms directly to

---

[12] Nucap and Bosch discuss the CISG Advisory Council Opinion 13, Rule 7, which provides that a standard term that is "so surprising or unusual" that a reasonable person could not have expected such a term, will not become part of an agreement."  (Bosch's Reply Mot. Summ. J., Ex. A, ECF No. 493-1.)  As the court sees it, Rule 7 sensibly expresses one way to determine what one party to a contract knew or was deemed to know about the other party's subjective intent under Article 8, but when the parties mutually intended to assent to a term that would surprise a reasonable person, their intentions still control.

[buyer]'s billing department, where no one with authority to enter into, modify, or otherwise accept any contracts worked"); *Calzaturificio Claudia s.n.c. v. Olivieri Footwear Ltd.*, No. 96 Civ. 8052(HB)(THK), 1998 WL 164824, at *7 (S.D.N.Y. Apr. 7, 1998) (holding fact issues existed where evidence showed that party sent timely facts disputing certain terms stated in invoices seller argued constituted their entire agreement); *cf.* CISG art. 19(3) ("Additional or different terms relating, among other things, to the price, payment, quality and quantity of the goods, place and time of delivery, extent of one party's liability to the other or the settlement of disputes are considered to alter the terms of the offer materially.").

On the other hand, the evidence of Nucap and Bosch's dealings can also be viewed in a light favorable to Bosch as recognizing that the POTCs were binding. After all, Nucap undisputedly continued to ship parts to Bosch for years after it was chargeable with knowledge of the POTCs' contents at the latest in May 2011. *See VLM*, 811 F.3d at 254 (rejecting argument that common industry practice was incorporated into written contract that did not mention practice and stating that "the content of each contract must be analyzed independently"). Drawing reasonable inferences in Bosch's favor, Nucap's efforts to negotiate a nondisclosure agreement that led to the June 27, 2013, Wilkes e-mail already discussed extensively in this opinion and the putative agreement itself could be viewed by a jury as recognizing that the POTCs were in force. *Cf. Filanto, S.p.A. v. Chilewich Int'l Corp.*, 789 F. Supp. 1229, 1240–41 (S.D.N.Y. 1992) (holding evidence that party sent letter recognizing existence of contract was "particularly strong" evidence of its existence). Seen from Bosch's perspective at summary judgment, Nucap needed a confidentiality agreement to reclaim Nucap's intellectual property consistent with § 23.4 of the POTCs. There is more, but that is enough to demonstrate that a fact issue exists sufficient to require denial of Nucap's motion for partial summary judgment on

contract formation under the CISG. *See Mitchell Aircraft*, 23 F. Supp. 2d at 921–22 (holding fact issue existed where evidence of communications be found to show that buyer and seller had different subjective beliefs about what part buyer intended to order); *Filanto, S.p.A.*, 789 F. Supp. at 1240–41.

## V. NUCAP'S MOTION TO DISMISS BOSCH'S ANTITRUST COUNTERCLAIMS

Nucap moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Bosch's antitrust counterclaims, attacking every element of them as insufficiently pleaded. Bosch does not plausibly define the relevant markets in its counterclaims, however, making further analysis of their elements untenable at this stage.

### A. Rule 12(b)(6) Standard

Because a counterclaim is "a claim for relief asserted in [a] pleading," Fed. R. Civ. P. 12(b), a plaintiff can move to dismiss it for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). *See, e.g.*, *Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034, 1038 (N.D. Ill. 2014) (citing *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001)) (applying Rule 12(b)(6) standard to motion to dismiss counterclaims); *see also* Fed. R. Civ. P. 12(a)(2), (4) (setting default deadline to respond to counterclaim if no Rule 12(b) motion is filed). To survive a Rule 12(b)(6) motion, a counterclaim must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016) (quoting *Twombly*, *supra*). When deciding a motion to dismiss under Rule 12(b)(6), the court takes all facts alleged by the counterclaimant as true and draws all reasonable inferences from those facts in the counterclaimant's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this

presumption of truth. *Katz-Crank*, 843 F.3d at 646 (citing *Iqbal*, 556 U.S. at 663); *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Sarkis' Cafe*, 55 F. Supp. 3d at 1038. A pleading satisfies the Rule 12(b)(6) standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56; *see also Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) ("[T]he complaint taken as a whole must establish a nonnegligible probability that the claim is valid, though it need not be so great a probability as such terms as 'preponderance of the evidence' connote."); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[T]he plaintiff must give enough details about the subject-matter of the case to present a story that holds together.").

## B. Section Two of the Sherman Act

"Because § 3(3) of the Illinois Antitrust Act was modeled upon § 2 of the Sherman Act, Illinois courts apply federal antitrust law to resolve questions arising under the state statutory provision," so the Rule 12(b)(6) analysis of Counts One and Two of Bosch's counterclaims collapses into the question of whether Nucap has stated a claim under § 2 of the Sherman Act. *See E- One, Inc. v. Oshkosh Truck Corp.*, No. 06CV1391, 2006 WL 3320441, at *2 (N.D. Ill. Nov. 13, 2006) (citing *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1479–80 (7th Cir. 1991) and *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 642 N.E.2d 470, 472-74 (Ill. 1994)) (analyzing Illinois Antitrust Act and Sherman Act claims together at Rule 12(b)(6) stage).

Bosch predicates its antitrust counterclaims on Nucap's unilateral behavior, so § 2 of the Sherman Act, 15 U.S.C. § 2, applies. The first two sections of the Sherman Act apply to distinct types of market activity. Section 1 "treat[s] concerted behavior more strictly than unilateral behavior." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) (quoting

*Copperweld Corp. v. Independence Tube Corp.*, 476 U.S. 752, 767 (1984)). "Section 1 applies

only to concerted action that restrains trade. Section 2, by contrast, covers both concerted and

independent action, but only if that action 'monopolize[s],' 15 U.S.C. § 2, or 'threatens actual

monopolization.'" *Id.* (quoting *Copperweld*, 467 U.S. at 767) (characterizing this as the "basic

distinction" between the two sections) (alteration in original). To state a claim for attempted

monopolization under § 2 of the Sherman Act, Bosch must plausibly allege: "(1) [Nucap's]

specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive

conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt

at monopolization will succeed." *Viamedia, Inc. v. Comcast Corp.*, --- F.Supp.3d ----, 2016 WL

6568074, at *8 (N.D. Ill. 2016) (quoting *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834,

854 (7th Cir. 2011) (other citation omitted); *accord Spectrum Sports, Inc. v. McQuillan*, 506 U.S.

447, 456 (1993); *E-One*, 2006 WL 3320441, at *2 (citing *Lektro–Vend Corp. v. Vendo Co.*, 660

F.2d 255, 270 (7th Cir. 1981)). As those elements presuppose the existence of a relevant market

for analysis, the court begins by asking whether Bosch has adequately delineated the relevant

markets in its antitrust counterclaims.

## C. Market Definitions

"Although market definition is a deeply fact-intensive inquiry, failure to offer a plausible

relevant market is a proper ground for dismissing an antitrust claim" at the Rule 12(b)(6) stage.

*Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886 (N.D. Ill.

2015) (citing *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d

712, 719–20 (6th Cir. 2003)) (internal quotation and other citations omitted) (applying rule on

motion for preliminary injunction but analyzing complaint's sufficiency); *see also Ploss v. Kraft

Foods Grp., Inc.*, 197 F. Supp. 3d 1037,1070–71 (N.D. Ill. 2016) (analyzing whether complaint

plausibly identified the relevant market on Rule 12(b)(6) motion). Without a relevant market defined, the court cannot assess the defendant's market power or determine whether the defendant's attempted conduct pleaded in the complaint had a dangerous probability of actually monopolizing the relevant market. *Digene Corp. v. Third Wave Techs., Inc.*, 536 F. Supp. 2d 996,1004 (W.D. Wis. 2008) (stating on Rule 12(b)(6) motion to dismiss counterclaim that "[W]ithout a definition of [the relevant] market there is no way to measure the [alleged monopolist's] ability to lessen or destroy competition" (quoting *Spectrum Sports*, 506 U.S. at 455) (first and third alterations in original)); *see also Spectrum Sports*, 506 U.S. at 455 (citing *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)); *Viamedia*, 2016 WL 6568074, at *13 (analyzing effect of the defendant's alleged conduct on markets defined in the complaint); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335–38 (7th Cir. 2012) (holding that the plaintiff had to identify a relevant market to state a claim under § 1 of the Sherman Act because § 1 requires courts to analyze whether the defendant's alleged conduct "could have had anticompetitive effects (thus implicating the Sherman Act)").

To establish a relevant market, a plaintiff must define both a geographic market and a product market. *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 64657, at *5 (N.D. Ill Jan. 8, 2014) (citing *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004)). Nucap contends, among other things, that Bosch's allegations defining the relevant product markets are not specific enough to satisfy Rule 8(a)(2)'s "short and plain statement" requirement. A product market for Sherman Act purposes "is defined by the reasonable interchangeability of the products and the cross-elasticity of demand for those products." *Ploss*, 197 F. Supp. 3d at 1070 (quoting *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011)) (restating this proposition as "the

products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market" (quotation omitted).

In its antitrust counterclaims, Bosch identifies two product markets: a market for automotive shims and a market for automotive backing plates. (Countercl. ¶¶ 93–95.) The gist of its antitrust counterclaims is that by refusing to sell Bosch shims in November 2014 unless Bosch also sourced backing plates from Nucap, Nucap attempted improperly to harm its competitors in the market for backing plates using its ninety percent market power in the shim market. (*See id.* ¶¶ 97–103.) Bosch specifically pleads that shims and plates are separate products and that it has assembled aftermarket brake pads from different suppliers of shims and backing plates. (*Id.* ¶ 93.)

Bosch further narrows its market definitions to shims and backing plates "sold to automotive brake pad manufacturers for installation in aftermarket automotive brake pads," but it offers no plausible justification for narrowing the market in this way. (*Id.* ¶¶ 94, 95.) Original equipment manufacturers ("OEM's"), Bosch asserts, "design and develop" (but not manufacture) finished brake pads consisting of shims, backing plates, and the other components of aftermarket brake pads. (Countercl. ¶¶ 7, 9, 14.) Perhaps market constraints make suppliers of shims and backing plates noninterchangable as between OEM's and aftermarket brake pad manufacturers, and never the twain shall meet. But the counterclaims leave the matter to speculation, which they cannot do. *See Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) (emphasizing that a pleading asserting a claim for relief "must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level" (emphasis omitted) (quoting *Windy City Metal Fabricators & Supply, Inc. v.*

*CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008))). Moreover, Bosch's theory of anticompetitive effect appears to hinge on the market's definition as limited to aftermarket brake pad manufacturers.[13] (*See* Countercl. ¶ 97 (alleging that Bosch's and other manufacturers' need for "full catalog" of aftermarket shims created a barrier to entering the "relevant shim market").) Without some plausible reason to limit the definition of the markets of relevant consumers to aftermarket brake pad manufacturers, the court cannot meaningfully analyze the elements of Bosch's antitrust counterclaims. *See Shionogi Pharma, Inc. v. Mylan, Inc.*, No. Civ.A. 10-1077, 2011 WL 2550835, at *6 (D. Del. June 10, 2011) (dismissing counterclaim because its "wholly conclusory" definition of the relevant market was "not supported by facts showing a product market of reasonably interchangeable commodities from the perspective of the consumer" (citation omitted)); *cf. Right Field Rooftops*, 87 F. Supp. 3d at 887–88 (holding that relevant market for a single brand of sports entertainment in the Chicago metropolitan area was defined too narrowly under controlling precedent); *House of Brides*, 2014 WL 64657, at *5–6 (dismissing antitrust claim on Rule 12(b)(6) motion because the plaintiff did not plausibly explain existence of proposed market, stating "spare assertions of consumer preferences fall short of rendering it plausible that there exist no interchangeable substitutes for" a particular brand of wedding supplies).

## VI. CONCLUSION

For the reasons stated above, Nucap and Bosch's cross motions for partial summary judgment (ECF Nos. 340, 473) are denied. Nucap's motion to dismiss Bosch's antitrust

---

[13] Bosch does not propose to define the market in terms of the breadth of the suppliers' catalogs of shims or backing plates. (*See* Countercl. ¶¶ 92–93.) In any event, Bosch's allegations that it and many other aftermarket manufacturers required a single supplier with a "full catalog" of shims sheds no light on the cross-elasticity of demand for shims and plates between OEM and aftermarket brake pad manufacturers. *See id.* ¶ 97; *see also House of Brides*, 2014 WL 64657, at *6 (explaining that preferences, like a preference for "full catalog" suppliers, do not plausibly allege a market in the consumer preference).

counterclaims (ECF No. 498) is granted.  A status conference is set for April 12, 2017, at 9:30

a.m.


Date:   March 31, 2017                    _____/s/_____

                                          Joan B. Gottschall
                                          United States District Judge