NUCAP INDUSTRIES, INC., *et al.*, )
)
)
Plaintiffs, )     No. 15 C 02207
)
v. )
)     Judge Edmond E. Chang
ROBERT BOSCH LLC, *et al.*, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Nucap Industries, Inc. and Nucap US Inc. (Nucap) brought this suit against Robert Bosch LLC; Bosch Brake Components LLC; and Robert Bosch GmbH (Bosch) after the dissolution of their five-year commercial relationship.[1] Nucap brought both federal and state law claims, all of which relate to Bosch's use of Nucap's allegedly proprietary drawings of after-market brake pad components, which Nucap had originally allowed Bosch to access as part of their relationship. In turn, Bosch levelled counter-claims against Nucap, challenging Bosch's ownership of the drawings, as well as Nucap's decision to stop acting as a supplier for Bosch. The parties now cross-move for summary judgment. For the reasons discussed below, both motions are granted in part and denied in part.

---

[1]This Court has subject matter jurisdiction over the case via federal-question jurisdiction, 28 U.S.C. § 1331, as well as supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. Citations to the docket are indicated by "R." followed by the docket entry.

# I. Background

In deciding cross-motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So, when the Court evaluates Bosch's summary judgment motion, Nucap gets the benefit of reasonable inferences; conversely, when evaluating Nucap's cross-motion, the Court gives Bosch the benefit of the doubt.

## A. Aftermarket Brake Pads

Both parties in this suit operate in the industry of aftermarket brake pads. R. 1140.16, Khokhar Dec. ¶¶ 9, 10; R. 1116.8, Wilkes Dec. ¶¶ 8-10. Bosch buys component parts from suppliers to construct a final aftermarket brake system, which it then sells to auto-parts retailers like Autozone and O'Reilly's. Wilkes Dec. ¶ 8; R. 1159.2, Pls.' Resp. DSOF ¶¶ 1, 13. Nucap manufactures and sells aftermarket brake components. Pls.' Resp. DSOF ¶ 10. Bosch buys various parts—backing plates, shims, and brake hardware—from suppliers, such as Nucap, and then constructs the final product using its own proprietary friction material. *Id.* ¶ 912. It is undisputed that in order to design and create aftermarket brake components, suppliers need to reverse engineer original equipment (known as "OE" in the industry) brake pads. Pls.' Resp. DSOF ¶ 7. Nucap outlined its reverse-engineering process in an email to a Bosch employee, in which Nucap explained that it measures OE brake parts and then creates component drawings based on those measurements. Wilkes Dec. ¶¶ 18, 19;

*id.* at Ex. 1, 11/5/12 Khokhar Email. Nucap uses the drawings to create the component parts its sells to customers, like Bosch. Wilkes Dec. ¶ 18.

When Bosch sources a particular brake component from a supplier, Bosch typically requests either a drawing of the component part or a physical sample. Wilkes Dec. ¶ 10. Bosch then performs an initial evaluation to determine if the potential supplier's parts conform and fit with Bosch's existing tooling. *Id.* ¶ 11. "If the new component is an alternative or replacement, Bosch may compare the new suppliers' part drawings to the part already being provided [by the original supplier] to assure that they are close in shape and dimensions." *Id.* To be clear, Bosch does not request drawings from its suppliers, including Nucap, in order to develop its own competing parts. Instead, Bosch uses the drawings to determine if the components would work with its existing brake components, or so that it could develop its own mold tool to work with the new components. *Id.* at ¶ 13.

### B. Bosch-Nucap Relationship

The parties dispute when exactly Bosch began purchasing aftermarket brake components from Nucap, but it was no later than 2009. Pls.' Resp. DSOF ¶ 14. Bosch ordered its parts by submitting purchase orders to Nucap; the purchase orders initially went to Nucap customer-service representatives. R. 1140.10, Barruch Emails. Although Nucap's internal process of fulfilling the purchase orders is somewhat opaque, it is undisputed that Bosch's purchase orders were also sent to Nucap's senior-level executives at least 11 times after July 2011. Pls.' Resp. DSOF ¶ 27. Once Nucap received and processed the purchase orders, Nucap would ship the

goods to Bosch, along with invoices, packing lists, and bills of lading that referenced specific Bosch purchase-order numbers. *Id.* ¶¶ 15, 18. The invoices included some written text that addressed the calculation of interest charges, while the packing lists specified the time in which Bosch could report quantity discrepancies. *Id.* ¶ 21.

As is Prologue in countless commercial cases, the parties never executed a formal supply agreement outside of the purchase orders. R. 1166, Defs.' Resp. PSOF ¶ 15. In April 2010, however, the parties traded drafts of a Purchase and Supply Agreement. R. 1142.35, 4/9/10 Butera Email. At one point, Vince Butera, Nucap's Chief Executive Officer, sent Chris Thornton, Bosch's Purchasing Manager, a draft agreement in which Butera deleted a paragraph that Bosch had proposed. *Id.* at 5. There is no evidence that the parties ever executed this agreement. Nonetheless, between September 1, 2010 and November 10, 2014, Nucap filled thousands of Bosch purchase orders and, in exchange, received more than $170,000,000 from Bosch. Pls.' Resp. DSOF ¶¶ 20, 43. Throughout this time, Nucap also gave Bosch access to its drawings of the component parts that Bosch was purchasing. *Id.* ¶ 25.

Although the parties dispute the exact date, no later than September 2010, Bosch began including the following language in its purchase orders, referring to an online set of terms and conditions (the eye-numbing capitalization is in the original):

> THE TERMS AND CONDITIONS OF PURCHASE ARE AVAILABLE AT WWW.BOSCHNASUPPLIERS.COM AND INCORPORATED HEREIN BY REFERENCE, SHALL BECOME A BINDING AGREEMENT UPON SELLER COMMENCING PERFORMANCE OF THIS PURCHASE ORDER, OR UPON

SELLER OTHERWISE ACKNOWLEDGING ACCEPTANCE, WHICHEVER OCCURS FIRST.

Pls.' Resp. DSOF ¶ 17. Also, backing up a few months, in February 2010, Bosch sent Nucap a letter stating that it expects their "suppliers to understand and comply with the requirements in the Bosch Supplier Manual. The contents of the Supplier Manual are accessible via www.boschnasuppliers.com." *Id.* ¶ 19.

Bosch's terms and conditions of purchase (which the parties call "POTCs") purported to set out the terms that governed the parties' relationship, including warranties, customs, and remedies for incomplete or delayed deliveries. R. 1121, Bosch POTCs. The POTCs also included provisions that would preclude Nucap from suing Bosch for any alleged misuse of its component part drawings or other intellectual property. *See, e.g. id.* §§ 23.1, 23.4 (prohibiting Seller from asserting claims against Buyer "with respect to any technical information that Seller has disclosed … except to the extent expressly covered by a separate written confidentiality and/or license agreement"); *id.* §§ 22.4, 23.3 (establishing all intellectual property provided to Buyer and relating to the manufacture of the parts as the "sole and exclusive property of" the Buyer and assigning all "copyrights and moral rights" in the IP to the Buyer). According to Thornton (Bosch's Purchasing Manager), Bosch "would never eliminate the Bosch terms and conditions of purchase from the agreements that we have with suppliers. We just wouldn't do business with a company that would not agree to our terms and conditions of purchase." R. 1118.12, Thornton 30(b)(6) Dep. at 250:17-21.

On March 2, 2011, Bosch sent Nucap a draft "Purchase and Sale Agreement" and a "Corporate Agreement," both of which incorporated the POTCs. Pls.' Resp. DSOF ¶¶ 28, 29. Bill Murray, Nucap's Vice President of Global Sales, discussed both agreements with other Nucap executives and Nucap's in-house legal counsel, but did not sign it. *Id.* ¶ 30. A few months later, on May 17, 2011, Murray sent Thornton an email listing ten "Talking Points for Contract," and specifically stated that Nucap "cannot have any blind acceptance of Bosch standard terms and conditions." *Id.* ¶ 33. The parties later met in person that same day to discuss a variety of matters, including Bosch's proposed contracts. *Id.* ¶ 34. Following the meeting, Nucap's Greg Andes prepared a summary email in which he stated, "[h]ave agreed on all of our issues on the contract, but [Bosch] wants us to tell them what issues we have with their standard terms and conditions on their PO's. They will then address with their legal department." *Id.* ¶ 35.

The parties dispute what happened next. Bosch contends that it did not hear any objections to the POTCs from Nucap following the May 17, 2011 meeting. R. 1116, DSOF ¶ 37; Thornton 30(b)(6) Dep. at 248:22-249:4, 253:6-8, 270:24-271:8. Nucap asserts that Butera told Thornton that Nucap "rejected" the POTCs and that it "would not go through the provisions one-by-one in multiple conversations between March and June 2011." Pls.' Resp. DSOF ¶ 37; R. 1143.8, Butera Dep. at 97:18-25, 180:23-181:15, 244:25-246:12. The parties met again on May 31, 2011, but no one raised the POTCs. Pls.' Resp. DSOF ¶ 39. Nucap also continued to fulfill Bosch's purchase orders without objection. *Id.* ¶ 40.

There appears to have been no meaningful correspondence between the parties about additional agreements for a couple of years. Then, in 2013, discussions on confidentiality and disclosure ramped up. First, in March 2013, Don Garrett, Bosch's Purchasing Director, and Robert Wilkes, Bosch's Director of Product Development, alerted other Bosch employees that their practice of using supplier drawings needed to be adjusted to avoid misusing the suppliers' intellectual property. R. 1141.4, 4/3/13 Wilkes Email. Wilkes shared this discussion with Murray (Nucap's Vice President of Global Sales). R. 1141.9, 3/22/13 Wilkes Email. Wilkes then sent a follow up email to Murray and Metu Khokhar, Nucap's Chief Operating Officer, explaining "what [Bosch was] doing to preserve the supplier drawings," which included embedding the supplier drawings within Bosch drawings, "thus preserving supplier information while fulfilling [Bosch's] needs for additional information outside of the original." R. 1141.12, 3/26/13 Wilkes Email. Bosch alleges that Wilkes's email clarified that "Bosch would maintain Nucap drawings together with other suppliers' drawings for the same parts." DSOF ¶ 65. The "Guideline" that Wilkes attached to the email implies that Bosch would maintain separate "sheets" for each vendor, but that multiple sheets were used to make up one drawing:



R. 1122.9, 3/26/13 Wilkes Email at 7. Nucap's Murray testified that he allowed Bosch continued access to Nucap's drawings based on Wilkes's promises in those emails. R. 1146.4, Murray Dep. at 575:7-17 ("Q. Why did Nucap allow these Bosch engineers to access its drawings if it hadn't signed—if they hadn't signed the terms of use agreement? A. Because we had repeated assurances by Bob Wilkes how they were going to handle our drawings, our IP, our proprietary information. Q. Did you rely on that in allowing Bosch the access to the drawing? A. It is what we relied on.").

Next, in June 2013, Murray and Garrett discussed a draft "Mutual Non-Disclosure Agreement," although it was never finalized nor executed. Pls.' Resp. DSOF ¶ 60. Garrett testified that Bosch sent the draft agreement to Murray in "an attempt to solve the issue of gaining access to [Nucap's] design information." R. 1144.4, Garrett Dep. at 128:15-25. That same month, Khokhar emailed several other Nucap employees and Wilkes to explain (1) "Bosch would not be able to sign the confidentiality contract," but (2) "Wilkes has sent us numerous emails showing us

how Bosch intends to control print distribution internally." R. 1141.7, Khokhar Emails at 4. Khokhar also stated that Nucap should provide Nucap's drawings to Bosch moving forward. *Id.* In his response, Wilkes copied additional Bosch employees and called the development "a major breakthrough in cooperation between Nucap and Bosch." *Id.* at 3. Wilkes also specified the Bosch engineers who were authorized to request Nucap drawings. *Id.* Bosch employee Christian Wecker later forwarded the email chain to additional Bosch employees and explained the steps they should take to "respect [Nucap's] intellectual property (IP) rights." *Id.* at 2. He told the other Bosch employees not to forward Nucap's documents to anyone outside of Bosch and explained that if a drawing "is based on Nucap's input it is still the IP of Nucap." *Id.*

Over a year later, in August 2014, Murray prepared another draft supply agreement—"Bosch-Nucap Supply Agreement Contract"—which incorporated Bosch's POTCs. Pls.' Resp. DSOF ¶ 48. The draft agreement also laid out the parties' mutual confidentiality obligations, specifically, each party was to use the other's intellectual property "only for the purpose of [Nucap] supplying Materials to [Bosch]," and that neither would disclose that IP to third parties. *Id.* It also specified that each party "remains the owner of any drawings, models, patterns, tools, dies, jigs, specifications of delivery or other documents" that the particular party provides. *Id.*; R. 1120.13, 8/5/14 Murray Email. But this document too was never executed.

### C. Dissolution of Bosch-Nucap Relationship

By October 2014, the parties' relationship was fraying, as Bosch began to search for alternative cheaper suppliers. Pls. Resp. DSOF ¶ 55; Defs.' Resp. PSOF

¶ 61. The next month, in November 2014, Thornton sent another draft "Purchase and Supply Agreement" to several Nucap employees, including Murray and Khokhar. Pls.' Resp. DSOF ¶ 49. Khokhar responded a few days later, explaining that "the current situation [had] resulted in a devastating impact on Nucap's business." R. 1120.17, 11/10/14 Khokhar Email. He also told Thornton that Nucap was placing Bosch on "a complete business pause." *Id.* At the time, Bosch sourced 90 percent of its components from Nucap. R. 1143.5, PI Hearing Tr., Chavda Testimony at 477:7-9. Nucap's refusal to fill orders put Bosch at serious risk of losing customers and shutting down its plant. *Id.* at 477:10-17.

To avoid this, Bosch reached out to alternate suppliers for the components it originally sourced by Nucap. R. 1122.10, Chavda 30(b)(6) Dep. at 100:21-101:4. As part of that outreach, Bosch asked for preexisting product samples from all of its suppliers in an attempt to quickly find replacement components that worked with its product. Chavda 30(b)(6) Dep. at 101:5-15 ("[B]ecause we were in survival mode, we requested samples from all our suppliers."). Bosch determined whether the components were compatible by performing physical fit tests on them. Pls.' Resp. DOSF ¶¶ 66, 67. At the same time, Bosch also requested drawings of the potential replacement components, which were quicker to obtain than the sample parts. Chavda 30(b)(6) Dep. at 311:3-8; PI Hearing Tr., Chavda Testimony at 478:1-8 ("We had to evaluate the critical features, okay, and we did drawing overlays to do that to expedite… We did not have component samples of every vendor."). Bosch engineers "overlayed" these drawings with drawings of the Nucap components in order to

compare the two and determine if the replacement components were likely to pass a fit test and be compatible with the Bosch products. R. 1116.8, Wilkes Dec. ¶ 33; Chavda 30(b)(6) Dep. at 98:6-9, 101:16-102:2; 121:3-10, 123:5-8; 129:17-22; R. 1116.9, Bouwma Rpt. ¶ 88 ("While waiting for each supplier's physical samples to arrive at Bosch's facilities for completion of physical fit testing, I understand that Bosch conducted overlays of potential replacement supplier parts with Nucap parts."); R. 1143.4, PI Hearing Tr., Wilkes Testimony at 412:21-414:17.

The overlay process was conducted on a computer and was done to compare the product "profile" of the Nucap component to the product "profile" of the component from the alternate vendor. PI Hearing Tr., Chavda Testimony at 479:14-25. Beyond that, the parties describe the overlay process in different terms. For its part, Bosch asserts that the only supplier information used during the overlay process is the manufacturing perimeter—or perimeter outline of the component part—taken from Computer Aided Design (CAD) drawings, and that it simply laid the alternate supplier's manufacturing perimeter on top of Nucap's manufacturing perimeter to compare the two. DSOF ¶ 70; Wilkes Dec. ¶ 23; Chavda 30(b)(6) Dep. at 120:3-121:15. In contrast, Nucap asserts that Bosch "copied Nucap's full and complete drawings of backing plates and shims from Nucap's CAD files and then overlaid Nucap's manufacturing perimeter drawing and competitor manufacturing perimeter drawing." Pls.' Resp. DSOF ¶ 70. Nucap's cited evidence does not directly support that proposition, but it tends to show that each manufacturing perimeter was more than just a mechanically traced outline of a component's measurements. PI Hearing

Tr., Wilkes Testimony at 367:15-22; R. 1143.2, PI Hearing Tr., Khokhar Testimony at 60:8-61:11; R. 1148.3, Bouwma Dep. at 178:3-180:15; R. 1148.4, Lange Dep. at 103:8-104:24, 162:23-163:7, 313:17-314:7. According to Nucap, the drawings were based on "Nucap's engineers' experience, knowledge, and creative and expressive design choices." Pls.' Resp. DSOF ¶ 70; PI Hearing Tr., Khokhar Testimony at 125:15-126:24; R. 1142.31, Stoloff Rpt. ¶¶ 81-91, 116-125.

Either way, because Bosch was "in survival mode," it decided to place "production quantity" orders of replacement supplier components— rather than first ordering samples of the components—as soon as the drawing of the component passed the overlay process. PI Hearing Tr., Chavda Testimony at 483:6-9. Bosch's witnesses testified, though, that each component was required to pass a fit test, in addition to the overlay process, before it would be placed into production. *Id.* at 483:8-19 ("So what I'm trying to clarify is that if it passed an overlay, we ordered production quantities. That did not mean that those parts went right into production. The parts still had to get fit tested."); PI Hearing Tr., Wilkes Testimony at 413:8-414:17.

The parties also dispute whether Bosch limited its distribution of the overlay comparisons—which incorporated Nucap's manufacturing perimeters—for internal use only. Pls.' Resp. DOSF ¶ 72; Defs.' Resp. PSOF ¶ 67. According to Wilkes, Bosch never sent original supplier's component drawings to replacement suppliers, Wilkes Dec. ¶¶ 36, 37, and Chavda testified that Bosch never intended to share the comparisons with anyone outside of Bosch, Chavda 30(b)(6) Dep. at 327:24-328:7. Nucap, on the other hand, asserts that Bosch disclosed the overlay comparisons to

third-party competitors in order to communicate proposed drawing changes. Pls.'
Resp. DSOF ¶ 72. Although Bosch disputes that it sent its overlays to third parties
so that the parties could "conform [their drawings] to Nucap's drawings," Defs.' Resp.
PSOF ¶ 67, Bosch does concede that it disclosed Nucap information to third parties
on nine occasions, *id.*

## II. Procedural Background

Nucap filed suit against Bosch in March 2015. R. 1, Compl. In January 2016,
it moved for a preliminary injunction, which the previously assigned judge granted
in part in August 2016. R. 609, PI Order. Amid the briefing on that motion, Nucap
amended its complaint and now brings claims for trade secret misappropriation,
copyright infringement, violations of the Digital Millennium Copyright Act (DMCA),
tortious interference with contract, tortious interference with prospective economic
advantage, unfair competition, and unjust enrichment. R. 239, First Am. Compl.,
¶¶ 100-158. In response to Nucap's amended complaint, Bosch filed counterclaims for
federal and state antitrust violations, breach of contract, violations of the Illinois
Consumer Fraud and Deceptive Business Practices Act (ICFA), unjust enrichment,
tortious interference with business expectancy, and breach of implied-in-fact contract
and  covenant of good faith and fair dealing. R. 329, Answer and Counterclaims to
First Am. Compl., ¶¶ 92-167. In March 2017, the previously assigned judge granted
Nucap's motion to dismiss Bosch's antitrust counterclaims but denied the parties'
first round of cross-motions for summary judgment on the remaining claims. R. 713,

SJ Order. After more discovery, the parties again cross-move for summary judgment on the remaining claims.

### III. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[2] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citaions have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

# IV. Analysis

## A. Waiver

Before turning to the specific merits of the competing motions, it is necessary to address Nucap's wholesale argument that Bosch waived any potential rights under the POTCs when Bosch did not rely on those rights in prelitigation discussions or assert them during the first year of litigation. R. 1159, Pls.' Opening Br. at 15-17; Pls.' Reply at 2-9. Under Illinois law, a party waives a contractual right if the party either "induced reliance" or an intentional waiver is "*clearly* inferable from the circumstances." *Bank v. Truck Ins. Exchange*, 51 F.3d 736, 739 (7th Cir. 1995) (emphasis in original); *see also Bd. of Trustees of City of Harvey Firefighters' Pension Fund v. City of Harvey*, 96 N.E. 3d 1, 42 (Ill. App. Ct. 2017) ("There must be either an intention to waive which, while unexpressed, can be clearly inferred from the circumstances, or where there is no such intention, the conduct of one party must have misled another into acting on a reasonable belief that waiver has occurred.") (cleaned up).

Here, Bosch did not expressly waive its potential rights under the POTCs, nor is there a clear inference of an intentional waiver. Nucap relies on correspondence between the parties where Wilkes and Garrett referred to the drawings as Nucap's intellectual property, but there is no evidence that either employee had the authority to bind Bosch to a waiver of rights under the POTCs. Indeed, the previously assigned judge already held that, as a matter of law, Wilkes had no apparent authority to do so. SJ Order at 14-16. As far as Bosch's litigation conduct, the Court granted Bosch

permission to amend its answer and counterclaims, just as Nucap was permitted to amend its complaint. Adding a claim under the POTCs via an authorized amendment to the pleadings does not qualify as an implied waiver. Nor can Nucap show that Bosch induced Nucap to act to its detriment before Bosch asserted rights under the POTCs in this litigation. Put another way, the parties' relationship is replete with fits-and-start of both sides asserting various positions and rights, yet the parties' failure to agree on formal terms did not stop Nucap and Bosch from continuing—for years—their supplier-customer relationship. No reasonable jury could find that Bosch waived its alleged rights under the POTCs.

## B. Application of POTCs

Turning to Bosch's alleged rights under the POTCs, as noted earlier, this issue was previously addressed during the first-round of summary judgment briefing. SJ Order at 13-18, 28-33. It was determined then that "a reasonable fact finder could draw multiple inferences about Nucap's intent to be bound by the POTCs." *Id.* at 30. The Court explained that, because Nucap's customer-service representatives processed the purchase orders, and the POTCs dictated a significant transfer of intellectual property, a reasonable juror could find that Bosch was aware "that Nucap would wish to negotiate the new terms had higher-level Nucap personnel been aware of it." *Id.* at 30-31. The Court also held that certain Nucap behavior bolstered this inference, including Murray's statement that he could not "blindly accept" the POTCs. *Id.* at 31. At the same time, the Court held that a reasonable juror could find in favor of *Bosch*, especially considering Nucap's continued shipment of "parts to

Bosch for years after it was chargeable with knowledge of the POTCs' contents." *Id.* at 32.

The Court also held that the June 2013 email exchange between Wilkes and Khokhar could permit a reasonable jury to find "that Bosch ratified the correspondence between Wilkes and Khokhar as an enforceable agreement." SJ Order at 14. In particular, a September 11, 2013 email from Andreas Burg, Bosch's Global Head of Engineering for Aftermarket Division, forwarding the Wilkes-Khokhar exchange, supported the inference that the "agreement" between the parties was a precondition for Nucap to give Bosch access to its drawings. SJ Order at 17 (citing R. 1141.7, 9/11/13 Burg Email). As a result, the Court held that fact issues precluded summary judgment for Bosch, "even if it [could] establish that the POTCs govern[ed] its relationship with Nucap." *Id.* at 18.

Both parties now request that the Court abide by this order—as well as simultaneously ignore it. *See, e.g.*, R. 1115, Defs.' Opening Br. at 6-7 (citing previous judge's holdings on the parties' use of purchase orders); R. 1163, Defs.' Resp. at 3 (arguing that the previous holdings do not bind this Court); Pls.' Opening Br. at 5 (asking the Court to uphold the prior judge's decision on the application of the POTCs); *id.* at 10-11 (disregarding the prior judge's decision that Wilkes did not have apparent authority to enter into an agreement on behalf of Bosch). The law of the case doctrine provides that "a ruling made in an earlier phase of a litigation controls the later phases unless a good reason is shown to depart from it." *Tice v. American Airlines, Inc.*, 373 F.3d 851, 853 (7th Cir. 2004); *see also HK Systems, Inc. v. Eaton*

*Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009) ("The doctrine of law of the case counsels against a judge's changing an earlier ruling that he made in the same case... or that his predecessor as presiding judge had made."). The doctrine, however, "is not hard and fast, and so a party is free to argue that an intervening change in law or other changed or special circumstance warrants a departure." *Tice*, 373 F.3d at 854. Indeed, "[w]hen a district judge is presented with additional evidence, therefore, [the judge] is free to revisit a denial of summary judgment." *Curran v. Kwon*, 153 F.3d 481, 487 (7th Cir. 1998).

But here the additional evidence still does not alter the ultimate conclusion: a genuine issue of fact still exists on whether Nucap intended to be bound by the POTCs. To begin, Nucap argues that Bosch cannot prove that it ever accepted the terms of the purchase orders—in other words, that the parties formed an enforceable contract—because Nucap's invoices and packing lists comprised counter-offers, rather than acceptances. Pls.' Opening Br. at 17-18. The United Nations Convention on Contracts for the International Sale of Goods (CISG), which both parties agree governs here, applies a mirror-image rule: "A reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer." Convention art. 19(1). In addition, "Article 19 provides that *nonmaterial* additional terms in a purported acceptance become a part of the contract, but defines 'materiality' in a broad way." *VLM Food Trading Intern, Inc. v. Illinois Trading Co.*, 748 F.3d 780, 786 (7th Cir. 2014).

Nucap argues that the proposed terms that it sent back to Bosch with each order were material, rendering the invoices and the packing lists counter-offers. Pls.' Opening Br. at 18. A reasonable jury could find that those provisions—a later-payment interest provision and a quantity discrepancy provision—were material, because those terms relate to quantity and price. *See* Convention art. 19(3) ("Additional or different terms relating, among other things, to the price, payment, quality, and quantity of the goods, place and time of delivery … are considered to alter the terms of the offer materially."). Conversely, when the evidence is viewed in Bosch's favor, a jury could likewise find that Nucap's proposed terms were *not* material. The terms did not alter the amount of payment, when the payment was due, or the quantity of product that Bosch would receive. Instead, they explained how interest on overdue balances would be calculated and how Bosch should report any quantity discrepancies in Nucap's deliveries. A reasonable juror could find that these terms relate more to tying up odds and ends in the relationship, rather than materially altering price or quantity.[3]

Nucap next argues that, regardless of the materiality of the additional terms, the POTCs do not govern the parties' relationship because "Bosch knew, or at least could not have been unaware, of Nucap's intent not to be bound by" them. Pls.' Opening Br. at 7. Nucap cites various facts in support of this argument, the most persuasive of which are (1) Butera's testimony that he told Thornton multiple times

---

[3]It's also possible to read Nucap's additional terms as relating to the settlement of disputes, which the CISG considers to be material. Convention art. 19(3); *VLM Food*, 748 F.3d at 786. Nucap, however, did not argue that the terms were material for this reason. Even if it had, though, there would still be a question of fact as to the materiality of the terms.

in 2011 that Nucap would not accept the POTCs; and (2) Murray's May 2011 email stating that Nucap could not "have any blind acceptance" of the POTCs.[4] Pls.' Opening Br. at 7. That said, Nucap continued to fill thousands of Bosch purchase orders after 2011, even though Nucap knew that each purchase order incorporated the POTCs. The parties also went almost two years—June 2011 through March 2013—without discussing the POTCs or an alternative agreement. This evidence tends to undermine Nucap's position that it did not intend to be bound by the POTCs, and that Bosch was aware of that intent. The bottom-line: the jury will need to resolve this question.

Finally, Nucap makes two more arguments in support of its contention that the POTCs are not binding on them, but neither moves the needle in its direction. First, Nucap argues that the POTCs do not save Bosch because they extend only "to the specific components identified in the corresponding PO," and "Bosch has not proven that it issued POs identifying each of the Nucap components corresponding to the Nucap drawings that it used to qualify competitors." Pls.' Opening Br. at 14. This argument is a non-starter. It is undisputed that Bosch ordered all its parts from

---

[4]Nucap also cites to a letter from Bosch's general counsel—Thomas Williams—where he states" "I have also looked into the possible existence of any confidentiality/non-disclosure agreement, or any other agreement or that matter, between your client and mine, and from what I have been able to determine, there is no written agreement between them whatsoever." R. 1141.33, 1/23/15 Williams Ltr at 1. Although this sentence is poorly worded, it does not necessarily amount to an admission that Nucap was not bound by the POTCs. Indeed, one could easily find that the terms of each purchase order—including the POTCs— governed the parties' relationship *because* there was no written agreement between the two. In any event, it is entirely possible that Williams was referring specifically to confidentiality and non-disclosure agreements when he made this statement. So this evidence in insufficient to require summary judgment in Nucap's favor.

Nucap using purchase orders. Pls. Resp. DSOF ¶ 15. Nucap has not identified any part that Bosch purchased from it through another method. It is thus safe to infer that any drawing that was misused by Bosch corresponds to a part purchased by Bosch from Nucap through a purchase order. In other words, Bosch's choice to submit a small number of the thousands of purchase orders it issued to Nucap is not "fatal to its motion for summary judgment." Pls.' Opening Br. at 14.[5]

Second, Nucap asserts that, even if the parties' formed an agreement, the terms from the POTCs on which Bosch seeks to rely must be excluded as "surprising and unusual." Pls.' Opening Br. at 12-14. The CISG excludes from a contract terms "that are so surprising and unusual that a reasonable person of the same kind as the relevant party could not reasonably have expected such a term in the agreement." CISG Adv. Council Op. 13, Rule 7. The hitch for Nucap is that any company in its position would have expected the terms of the POTCs to be included with the purchase orders, because it is undisputed that Nucap had *actual notice* of the POTCs by May 2011 at the latest. As the previous judge already explained, "when the parties mutually intended to assent to a term that would surprise a reasonable person, their intentions still control." SJ Order at 31, n. 12. Bosch was correct when it asserted that this exception fails "as a matter of law and fact," and Nucap is precluded from arguing this at trial. Defs.' Resp. at 8.

---

[5]Nucap made the additional argument that the purchase orders were unenforceable because they did not adhere to Bosch's internal policy requiring at least two signatures of authorized Bosch employees. Pls. Opening Br. at 14. As Bosch points out, this argument fails because "an organization's internal rules do not create a legal duty." *Williams v. Chicago Transit Auth.*, 2018 WL 3068352, at *3 (N.D. Ill. June 21, 2018).

In sum, Nucap's motion for summary judgment on the application of the POTCs is denied. Bosch's motion on the same issue is also denied, except that it succeeded in showing that a reasonable jury *could not* find that the terms of the POTCs were excluded under the CISG for being too surprising or unusual. Nucap is disabled from making that argument at trial.

## C. Additional Agreements

Nucap next argues that, even if it accepted the terms of the POTCs and they governed the parties' relationship, they were superseded by at least one of two separate agreements between Khokhar and Wilkes. First up is an alleged 2009 oral confidentiality agreement. Pls.' Opening Br. at 12. Nucap's primary evidence supporting the existence of this agreement is Khokhar's testimony about things the now-deceased Wilkes said to him in 2009. Bosch objects to this evidence as hearsay and inadmissible under the Illinois Dead Man's Act. Defs.' Resp. at 13. Neither of these arguments is persuasive. Khokhar's testimony about Wilkes's reassurances is not offered for the truth of factual assertions in Wilkes's statements, but rather as statements that (allegedly) comprised an agreement. And the Illinois Dead Man statute is inapplicable here because no party is suing or defending as the representative of a deceased person. 735 ILCS 5/8-201.

That said, the evidence of the 2009 agreement is insufficient to grant summary judgment for Nucap. The Court has already held that Wilkes did not have actual or apparent authority to bind Bosch to any agreement. SJ Order at 14-16. Nucap has not provided any evidence that Bosch ratified the alleged agreement between

Khokhar and Wilkes. Nor has Nucap come forth with an alternative explanation for how Wilkes' alleged promise to Khokhar transforms into an agreement binding Bosch. Not surprisingly, Nucap dropped this argument in its reply. *See* Pls.' Reply.

The second alleged agreement stems from the June 2013 email exchange between Wilkes and Khokhar. *See* R. 1142.4, 9/10/13 Wecker Email at 2. Nucap made this same argument during the first-round of summary judgment briefing. The Court concluded that "a genuine fact dispute exists on whether Nucap and Bosch formed a written confidentiality agreement memorialized in Wilkes and Khokhar's e-mail correspondence." SJ Order at 13. The same holds true at this juncture. To begin, Nucap has not presented any new or additional evidence that undermines the previous holding that Wilkes lacked apparent authority to bind Bosch. Nor has it shown that Wilkes had implied authority to enter into an agreement with Nucap. Indeed, this argument was barely touched on in Nucap's briefing. Pls.' Opening Br. at 11 (devoting one sentence to implied authority); Pls.' Reply at 5, n. 4, 7, n. 6. So, Nucap is prohibited from arguing at trial that Wilkes had authority to enter into any agreement on behalf of Bosch.

But it remains disputed whether Bosch ratified the agreement between Wilkes and Khokhar and, if it did, what effect the agreement had on the parties' relationship. Under Illinois law, a principal "can ratify a contract when the principal enjoys the benefits of the contract and does not repudiate it." *NECA-IBEW Rockford Local Union 364 Health and Welfare Fund v. A & A Drug Co.*, 736 F.3d 1054, 1059 (7th Cir. 2013). The principal must have full knowledge of the facts, as well as a choice to either accept

or reject the benefit of the transaction. *Id.* A reasonable juror could find that Bosch had knowledge of the correspondence between Wilkes and Khokhar, because corporations are presumed to know what their employees know, at least "on subjects within the scope of their duties." *Id.* There is also evidence that the correspondence between Wilkes and Khokhar was circulated to several other Bosch employees, where it was characterized as "an agreement between Bosch and Nucap to ensure that Bosch (China) gets access to component [drawings]." 9/10/13 Wecker Email at 2. This email also supports an inference that the "agreement" between Wilkes and Khokar was a precondition for Bosch's access to the drawings. So there is enough evidence to create a question of fact on whether Bosch ratified the agreement.

Even so, Bosch argues that the email exchange between Khokhar and Wilkes cannot be considered a separate confidentiality agreement that supersedes the POTCs. Defs.' Opening Br. at 12-13. Bosch's evidence in support of that argument, though, is not enough to grant summary judgment in its favor. Bosch first argues that the email cannot be considered "a self-contained, formal legal agreement, setting forth all applicable terms, executed by an authorized Bosch representative acting within the scope of his or her authority," as required by § 23.4 of the POTCs. Defs.' Opening Br. at 12. To be clear, § 23.4 requires only "a separate written confidentiality and/or license agreement signed by the Buyer." Pls.' Resp. DSOF ¶ 54. A reasonable jury could find that the Wilkes-Khokhar email exchange to be a separate written agreement, as other Bosch employees referred to it as "an agreement" internally. 9/10/13 Wecker Email at 2. Bosch's second argument—that the email exchange was

not "signed" by Bosch—likewise fails. Defs.' Opening Br. at 12. Although Wilkes did not have authority to bind Bosch, he is still a Bosch employee. If the jury finds that Bosch ratified the agreement, then there is at least a question of fact on whether Wilkes's signature in the emails is enough to meet the requirements of § 23.4.[6]

Bosch also argues that the email exchange cannot be considered a confidentiality agreement because "it does not mention any confidentiality obligations (or restrictions on Bosch's use of drawings) whatsoever." Defs.' Opening Br. at 12. Bosch also points out that Khokhar begins the exchange by explaining that "Bosch will not be able to sign the confidentiality contract." Defs.' Resp. at 15. Although Bosch is right that the exchange does not use the actual terms "confidential" or "confidentiality," this does not foreclose a reasonable jury from finding that the exchange amounts to a confidentiality agreement. Khokhar's initial email states that Bosch "intends to control print distribution internally," and lays out the steps Bosch will take to do so. 9/10/13 Wecker Email at 3. There is also evidence that Bosch treated the exchange as a confidentiality-type agreement internally, as Wecker's email forwarding the exchange instructs other Bosch employees to "respect the intellectual property (IP) rights," and expressly prohibits forwarding Nucap data "to Nucap's competitors / alternative suppliers."[7] *Id.* at 2.

---

[6]The Court previously held that, under the Electronic Signatures in Global Commerce Act, "a reasonable fact finder could conclude that the names of Nucap and Bosch agents affixed to the bottom of the e-mail messages satisfied the signature requirement." SJ Op. at 14 (citing 15 U.S.C. § 7001(a)(1)).

[7]Article 8 of the "CISG rejects the parol evidence rule and clearly instructs the court to admit and consider probative parol evidence regarding the parties' negotiations inasmuch as that evidence reveals the subjective intent of the parties." *Mitchell Aircraft Spares, Inc. v.*

Finally, Bosch makes two related arguments on the interaction between the POTCs and the alleged Wilkes-Khokhar agreement. First, Bosch asserts that § 23.4's prohibition on Nucap asserting any claim "with respect to any technical information that Seller has disclosed," would remain in effect even if the email exchange was binding, because Nucap has not alleged that Bosch violated any of the terms included in the alleged agreement. Defs.' Opening Br. at 12-13; Defs.' Resp. at 15. This argument misses the mark; Nucap has alleged that the Wilkes-Khokhar exchange is an agreement requiring Bosch to keep Nucap's drawings confidential. Nucap has also alleged that Bosch misused the drawings internally and distributed them to third parties. Just because Nucap does not bring a claim for a breach of the alleged 2013 agreement does not mean that the agreement cannot, as a matter of law, supersede the POTCs.

Second, Bosch argues that the alleged 2013 agreement has no effect on the other relevant sections of the POTCs that, for example, vest Bosch with ownership of the drawings and grant it broad rights to use the drawings to secure alternative suppliers. Defs. Resp. at 15-16. This argument fails as well, because the terms of the alleged confidentiality agreement—that Nucap will provide its drawings only to Wilkes and his specified team members, and that Bosch will "control print distribution internally"—would negate the other terms of the POTCs on which Bosch relies. 9/10/13 Wecker Email at 3. For example, if Bosch was limited in their use of

---

*European Aircraft Serv. AB,* 23 F. Supp. 2d 915, 920 (N.D. Ill 1998); *see also VLM,* 811 F. 3d at 253.

Nucap drawings, they clearly did not own the rights to them. So this is not a reason to grant summary judgment for Bosch.

## D. Trade Secret Misappropriation

Bosch next moves for summary judgment on Nucap's trade-secret misappropriation claim. Bosch argues that, even if the POTCs do not govern the parties' relationship, the claim fails as a matter of law. Defs.' Opening Br. at 14-17. "A trade secret misappropriation involves the acquisition of a trade secret through improper means, which requires the breach of a confidential relationship or other duty to maintain secrecy." *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 503 (7th Cir. 2011) (citing 765 ILCS 1065/2(a), (b)). Under Illinois law, a trade secret consists of information that "is sufficiently secret to derive economic value," and is subject to efforts "to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d).

In support of its motion for summary judgment, Bosch first argues that it "did not 'know or have reason to know' that the alleged trade secrets were acquired under a duty to maintain their secrecy or limit their use." Defs.' Opening Br. at 15 (citing 765 ILCS 1065/2(b)(2)(B)). Bosch supports this proposition by pointing to Khokhar's statement that Bosch refused to sign a confidentiality contract, and to the absence of the term "confidentiality" and express restrictions on Bosch's use of the drawings in the Wilkes-Khokhar exchange. *Id.* Even so, Bosch had reason to know that it had a duty to limit the use of Nucap's drawings. Bosch had to request the drawings from Nucap in the first place, and it also had to make guarantees to different Nucap employees—Khokhar and Murray—that Bosch would implement internal measures

to limit their disclosure. What's more, Nucap's expert explained in his report that, under industry practice, CAD drawings would be treated as secret and should be limited to internal use. Stoloff Rpt. ¶¶ 26, 28, 54-57, 218.

At the same time, however, Nucap continued to supply the drawings to Bosch without a formal confidentiality agreement. There is also some evidence in the record that Bosch supplied Nucap with drawings from Nucap's competitors, R. 1116.23, Khokhar Dep. 207:1-208:18, and that Nucap employees knew Bosch employees were comparing Nucap's drawings to drawings from other suppliers, but did not object, *id.* at 250:8-253:11*; see also* R. 1122.20, 3/22/13 Wilkes Email at 2-3. So the question of whether Bosch knew it had a duty to keep the drawings confidential remains disputed.

Bosch next argues that, as a matter of law, it could not have misappropriated any trade secrets because Nucap's manufacturing perimeters were "nothing more than the outline/shape of a publicly available Nucap part." Defs.' Opening Br. at 16. But common sense refutes this as a basis for summary judgment: if anyone, including Bosch employees, could have simply drawn the outline and shape of the Nucap part to create these drawings, why did Bosch need to request the drawings from Nucap in the first place? And why did Bosch spend several months in 2013 attempting to secure its continued access to those drawings? The answers to these questions undermine the characterization of these drawings as publicly available. Both parties' experts also reported that a manufacturing perimeter of the same component would almost certainly vary depending on who drew it. Stoloff Rpt ¶¶ 86, 88; Bouwma Dep. at

170:22-173:24. This is enough for a reasonable juror to find that the manufacturing perimeters were secret.

Finally, Bosch argues that Nucap's trade-secret misappropriation claim fails specifically on its allegations of *external* distribution because it has not presented evidence of damages caused by disclosure of the drawings to third parties. Defs.' Opening Br. at 15-16. Bosch is correct. Nucap's expert did not allocate any of his damages calculation to the specific instances of external disclosure. As a result, no reasonable trier of fact could premise a damages award for Nucap on harm from disclosure of drawings to third parties. So summary judgment is granted to Bosch as to Nucap's trade secret misappropriation claim for *external* disclosure. *See Tex. Adv. Optoelec. v. Renesas Elecs.*, 895 F.3d 1304, 1317 (Fed. Cir. 2018).

### E. Copyright Infringement

Both parties move for summary judgment on Nucap's claim for copyright infringement. Bosch seeks summary judgment only on "Nucap's copyright claim based on alleged copying of 'manufacturing perimeters,'" and argues that, as a matter of law, the manufacturing perimeters are not copyrightable. Defs.' Resp. at 18; *see also* Defs.' Opening Br. at 17-19. Nucap asks the Court to declare that Nucap owns a valid copyright in its drawings. Pls.' Opening Br. at 26-29; Pls.' Reply at 11-15. The motion is denied on both sides, because Nucap's ownership of a valid copyright remains a disputed question of fact.

The Copyright Act confers on the owner of a copyright the exclusive rights to reproduce the work, to prepare derivative works based upon it, and to display the

copyrighted work publicly. 17 U.S.C. § 106(1), (2), (5). In order to prevail on a claim of copyright infringement, a plaintiff must establish: "(1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original." *Janky v. Lake County Convention and Visitors Bureau*, 576 F.3d 356, 361 (7th Cir. 2009) (*quoting Feist Publi'ns v. Rural Tel. Serv.*, 499 U.S. 340, 361 (1991)). Put another way, a work is copyrightable if it possesses a modicum of creativity. *Feist Publi'ns,* 499 U.S. at 345. The Supreme Court has long held that facts and ideas are not copyrightable. *Id.* at 349-50.

Here, there is evidence in the record supporting Bosch's argument that the manufacturing perimeters are factual depictions of a publicly available component part and thus not copyrightable. Defs.' Opening Br. at 18. To begin, Nucap has not actually registered any of its drawings with the Copyright Office, Pls.' Resp. DSOF ¶ 82, which would have imbued the drawings with a rebuttable presumption of validity. *Runstadler Studios, Inc. v. MCM Ltd. Partnership*, 768 F. Supp. 1292, 1294-95 (7th Cir. 1991); *Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, 2006 WL 4013750, at *20 (N.D. Ill. Oct. 6, 2006). Next, Nucap's expert referred to its manufacturing perimeters as "outlines" in his report, Stoloff Rpt. ¶ 116, and testified that the dimensions included in Nucap's drawings define the "shape" and "geometry" of the part, R. 1116.22, Stoloff Dep. at 163:16-164:11. Finally, Khokhar testified that a component part should reflect its associated manufacturing perimeter. R. 1146.5, Khokhar 30(b)(6) Dep. at 595:16-23.

But when the evidence is viewed in a light most favorable to Nucap, a reasonable jury could find that Nucap's manufacturing perimeters are "original" for purposes of copyright protection. Nucap's expert explained that each manufacturing perimeter "does not simply reflect the nominal dimensions," but rather "takes into account numerous considerations," like the capabilities of Nucap's tooling and Nucap's prior experience about how similar parts have performed. Stoloff Rpt. ¶¶ 88, 89. He also explained that there are areas in a manufacturing perimeter that do "not contain sufficient dimension and tolerance information to derive the shape depicted." *Id.* ¶ 90. Moreover, Bosch's expert testified that manufacturing perimeters are not purely a function of the nominal dimensions of tolerances of a component part. R. 1148.4, Lange Dep. at 174:19-175:13. Finally, both sides' experts agreed that different engineering teams would produce different manufacturing perimeters. Bouwma Dep. at 171:24-172:3; Stoloff Rpt. ¶ 91. To be sure, this copyright claim is not particularly strong. But the evidence is enough to create a triable issue of fact on whether Nucap's manufacturing perimeters are copyrightable.

### F. DMCA

Next up are Nucap's claims under §§ 1202(a) and (b) of the DMCA. 17 U.S.C. §§ 1202(a), (b). Bosch moves for summary judgment, asking the Court to toss these claims, Defs' Opening Br. at 20-25, while Nucap argues that it has shown Bosch violated the statute as a matter of law, Pls.' Opening Br. at 18-24. "The DMCA seeks to hamper copyright infringement in the digital age by protecting copyright management information (CMI) in various ways." *Personal Keepsakes, Inc. v.*

*Personalizationmall.com, Inc.*, 975 F. Supp. 2d 920, 928 (N.D. Ill. 2013) (citing 17 U.S.C. § 1202) (cleaned up). CMI includes any information that is conveyed in connection with copies of a work, including identifying information about the work, its author, or the copyright owner. 17 U.S.C. § 1202(c). Section 1202(a) prohibits providing, distributing, or importing for distribution CMI that is false, while § 1202(b) prohibits intentionally removing or altering CMI, or distributing CMI knowing it has been altered. 17 U.S.C. §§ 1202(a), (b). Knowledge or intent on the part of the defendant is required for liability under both sections. *Id.*

Bosch argues that it is entitled to summary judgment on this claim because there is insufficient evidence that it possessed the required mental state for violating the statute. Defs.' Opening Br. at 22-24. The Seventh Circuit has not yet analyzed the mental-state requirement in detail, but both the Second and Ninth circuits have concluded that the statute includes a "double scienter requirement." *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018) (interpreting § 1202(a)) (summary order); *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674 (9th Cir. 2018) (interpreting § 1202(b)). Put another way, Nucap must show that Bosch had either an intent to induce, enable, facilitate, or conceal infringement, or, at a minimum, knowledge or reasonable grounds to know that its actions would do so. 17 U.S.C. §§ 1202(a), (b).

Nucap has failed to make such a showing here, even when viewing the facts in its favor. There is ample evidence that Bosch did not know that it was committing copyright infringement when it overlayed Nucap's drawings with drawings from competitors. Wilkes explained in his declaration that Bosch does not send original

supplier's component drawings to replacement suppliers, and that the overlay process is conducted entirely internally. Wilkes Dec. ¶¶ 36, 37. He also explained that the overlay process was standard procedure. *Id.* ¶ 37. This is supported by Nucap's admission that Bosch disclosed Nucap information externally no more than nine times. Pls.' Resp. DSOF ¶ 81. Nucap's expert also testified that Bosch maintained enough of Nucap's CMI in the overlays that Bosch's engineers could identify which information came from Nucap drawings. Stoloff Dep. at 234:10-236:11.

Multiple witnesses also confirmed that Bosch turned to the overlay process in desperation after Nucap cut off its supply of component parts. Chavda 30(b)(6) Dep. at 100:21-101:15; PI Hearing Tr., Wilkes Test. at 411:13-412:20; PI Hearing Tr., Chavda Test. at 477:3-478:8. *See also* R. 1141.27, 11/14/14 Wilkes Email. Although this does not, by itself, entirely negate the possibility that Bosch had reason to know it was facilitating copyright infringement, it is strong evidence that Bosch was motivated *not* by an intent to infringe, but by a business necessity. Then, of course, there is Bosch's repeated expressed belief that it owned the rights to the drawings under the POTCs.

Against all this, there is insufficient countervailing evidence to support a jury's finding that Bosch acted with the requisite intent. Nucap points to several statements from Bosch employees that allegedly show Bosch was aware its overlay process would infringe Nucap's copyright. Pls.' SOF ¶¶ 31-33, 37-43. But none of Nucap's drawings were registered with the copyright office at the time these statements were made (or now, for that matter), making it much less likely Bosch would have reason to know

its overlay comparisons were infringing anything. Also, Bosch's emails show it was accommodating Nucap's requests about how its drawings were used, meaning Bosch sought to accommodate Nucap's assertion of ownership. There is also no evidence Bosch's actions varied significantly from what it promised Nucap it would do. For example, Wilkes told Murray that Bosch would "imbed the supplier drawing within our own thus preserving the supplier information while fulfilling our needs for additional information outside of the original." 3/26/13 Wilkes Email. Based on the record, that is indeed what Bosch did. Considering all this evidence, a reasonable jury could not find that Bosch believed or had reason to know it was inducing, enabling, facilitating, or concealing infringement when it overlaid Nucap's drawings. Bosch's motion for summary judgment on the DMCA claim is granted.

## G. Unfair Competition and Unjust Enrichment

Bosch next argues that it is entitled to summary judgment on Nucap's unfair competition and unfair enrichment claims because they are preempted under the Illinois Trade Secrets Act and the Copyright Act. Defs.' Opening Br. at 26-27. Bosch is correct. The Illinois Trade Secrets Act "displac[ed] conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8. Similarly, "[t]he copyright act preempts all legal and equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 and are in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103." *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 500 (7th

Cir. 2011) (cleaned up). The rights of a copyright owner are summarized as "reproduction, adaptation, publication, performance, and display of the copyrighted work." *Id.* at 501 (cleaned up).

Here, Nucap has presented no evidence nor argument that its unfair competition and unjust enrichment claims are based on any conduct separate and apart from Bosch's alleged copyright infringement and trade-secret misappropriation. Nucap argues that it "will prove … Bosch deliberately and deceitfully engaged in a host of misconduct as part of its scheme to drop Nucap." Pls.' Opening Br. at 33. But Nucap has not pointed to any underlying behavior outside of trade-secret misappropriation and copyright infringement as part of the alleged scheme. Although Nucap described what it believes to have been Bosch's end goal— dropping Nucap for a lower-cost supplier—this does not describe *conduct*. So Nucap's claims for unfair competition and unjust enrichment, to the extent they are based on trade-secret misappropriation or copyright infringement, are preempted.[8] Nucap, however, is permitted to pursue claims for unfair competition and unjust enrichment based on Bosch's alleged tortious interference, as discussed next.

---

[8]Even if the jury rejects Nucap's copyright-infringement claim, these claims are still preempted, as "the Copyright Act can preempt state law even when the rights are claimed in uncopyrighted or uncopyrightable materials." *Seng-Tiong Ho*, 648 F.3d at 501. The same holds true for Nucap's trade secret misappropriation claim. *See Spitz v. Proven Winners North America, LLC*, 759 F.3d 724, 733 (7th Cir. 2014) ("But Illinois courts have read the preemptive language in the ITSA to cover claims that are essentially claims of trade secret misappropriation, even when the alleged 'trade secret' does not fall within the Act's definition.").

## H. Tortious Interference

Nucap's final two claims are for tortious interference with contract and tortious interference with prospective economic advantage. Both claims are based on the theory that Bosch induced a third-party supplier—Trelleborg—to sell materials to its replacement component suppliers, which in turn caused them to breach their alleged exclusive contract with Nucap. Both claims also require Nucap to show that Bosch's actions were either intentional or unjustified. *Cromeens, et al. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003). Bosch moves for summary judgment on this claim and argues that Nucap cannot establish (1) that it had a valid and enforceable contract with Trelleborg; (2) that Bosch was aware of any such contract; or (3) that Bosch's actions were unjustified. Defs.' Opening Br. at 27-29. Although this claim presents a close call, Bosch's motion is denied.

First, when taking all reasonable inferences in Nucap's favor, as the Court must do at this stage, there is enough evidence to find a valid and enforceable contract between Nucap and Trelleborg. Bosch points out that Trelleborg denied ever having a written or oral contract with Nucap for the sale of aftermarket brake pad materials. DSOF ¶ 93 (citing R. 1123.17 Bennett 30(b)(6) Dep. at 21:23-22:17, 40:14-19). But the same witness also stated that the parties had "a business of how we work together," and conceded that, at least at one point, there was an exclusive supply arrangement between Trelleborg and Nucap. R. 1193.2, Corrected Bennett Dep. at 135:2-136:25, 156:20-158:5; R. 1123.18, Bennett Dep. at 270:6-271:7. There is also evidence that Trelleborg's employees referred internally to the parties' relationship as a "contract."

Corrected Bennett Dep. at 134:16-135:18; R. 1156.2, 2/4/10 Lundstrom Email at 1 ("[W]e MUST continue to honour [*sic*] our contract with Anstro.").[9] Although it is not certain that Nucap could have sued Trelleborg for selling materials to Bosch or any other North American supplier, the record is sufficient to at least create a genuine dispute on the question.

Bosch's arguments that the contract lacked consideration and violated the statute of frauds also are not winners. Defs.' Opening Br. at 28. Nucap had an obligation to pay Trelleborg under the contract, so consideration is not at issue. And it is not at all clear that the statute of frauds, UCC § 2-201, would apply to a contract between Trelleborg and Nucap, considering Nucap is a Canadian company. In all likelihood the CISG applies to the parties' relationship, under which "[a] contract for sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form." Convention art. 11. So summary judgment is not warranted on these grounds.

Second, there is enough evidence in the record for a reasonable jury to find that Bosch knew about an exclusive-supplier agreement between Nucap and Trelleborg. Murray testified that he told Bosch about the agreement and that "they lived by it as we lived by it, as Trelleborg lived by it." R. 1144.1, Murray Dep. at 238:24-239:18; *see also id.* at 204:3-205:17.[10] Wilkes also testified that someone from Nucap told him that Trelleborg was contractually prohibited from selling materials to Bosch, PI

---

[9] The evidence references a contract with Anstro, Nucap's predecessor.

[10] Bosch's argument that Nucap waived its right to enforce any contract it had with Trelleborg fails for this same reason. *See* Defs.' Opening Br. at 28. Murray told Bosch that Nucab had an exclusive agreement with Trelleborg.

Hearing Tr., Wilkes Testimony at 355:19-24, and Thornton testified that he was aware Trelleborg sold at least some materials exclusively to Nucap, PI Hearing Tr., Thornton Testimony at 754:5-8. This testimony is supported by internal Bosch emails discussing the "exclusivity contract" between Nucap and Trelleborg, although it is also referred to as a "gentleman's agreement" in the same email chain. R. 1150.8, 6/3/13 Wilkes Email. This is enough to send this question to the jury.

Finally, Bosch has not proven, as a matter of law, that its actions were justified. Bosch argues that its actions were protected by the competitor's privilege, which applies if Bosch and Nucap were competitors, Nucap's relationship with Trelleborg "concerns a matter involved in the competition," Bosch did not act wrongfully, and Bosch's "purpose was at least in part to advance [its] interest in competing with" Nucap. *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1405 (7th Cir. 1992); *see also Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 867 (7th Cir. 1999).

Here, Bosch and Nucap's status as competitors is a disputed question of fact. As Nucap points out, Bosch was a customer of Nucap's for the vast majority of their relationship. Pls.' Resp. DSOF ¶ 14. There is no evidence that Nucap and Bosch ever competed for the same customers. And, even if there were, "the mere fact that the parties engage in some of the same activities, and target some of the same customers, does not necessarily indicate that they are competitors." *Foboha GmbH v. Gram Technology, Inc.*, 2008 WL 4619795, at *5 (N.D. Ill. Oct. 15, 2008). It is also far from clear that Bosch's attempt to purchase materials from Trelleborg "advance[d] its

interest in competing with Nucap," if it even had such an interest in the first place. Instead, there is evidence that Bosch sought out Trelleborg out of desperation to stay in business, rather than to diminish Nucap's success or profits. Bosch's motion for summary judgment on Nucap's claims for tortious interference is denied.

## I. Counter-Claims

Nucap moves for summary judgment on two of Bosch's counter-claims, namely, unjust enrichment and implied-in-fact contract. To show unjust enrichment under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 682 (7th Cir. 2013) (cleaned up). In addition, "a contract implied in fact is one in which a contractual duty is imposed by a promissory expression which may be inferred from the facts and circumstances and the expressions [on] the part of the promisor which show an intention to be bound." *Marcatante v. City of Chicago, Ill.*, 657 F.3d 433, 440 (7th Cir. 2011) (cleaned up). Nucap first correctly points out that if it is determined that the POTCs govern the parties' relationship, Bosch cannot pursue either claim. Pls.' Opening Br. at 34 (*citing Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004)); *see also Marcatante*, 657 F.3d at 440. Bosch responds that it is entitled to pursue these claims in the alternative and that it only purchased parts from Nucap "because Nucap led Bosch to believe that it was accepting and would abide by the POTCs." Defs.' Resp. at 24-25.

39

The problem for Bosch is that both of these claims rise and fall with its breach of contract claim. First, Bosch has not alleged that Nucap retains any benefit to its detriment that exists outside of the POTCs. Bosch claims that it is not alleging that Nucap failed to produce the parts Bosch paid for, but rather that "Nucap led Bosch to believe that it was accepting and would abide by the POTCs," and that this deprives Bosch of certain benefits. Defs.' Resp. at 25. But if Nucap did lead Bosch to believe it was accepting the POTCs, then the parties formed a contract, and a claim for unjust enrichment is unavailable. If Nucap did not do so, then the claim fails on the merits. Either way, Bosch cannot move forward with its claim for unjust enrichment. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim.").

The same holds true for Bosch's implied in-fact contract claim. Because the CISG applies in this case, the Court is already taking into account Nucap's course of conduct, expressions, and actions in its consideration of the POTCs. If the facts and circumstances show that Nucap intended to be bound by the terms of the POTCs, then Bosch will prevail on its breach of contract counterclaim. If not, Bosch will win neither the breach of contract nor the implied in-fact-contract claims. Nucap's motion for summary judgment is granted as to Bosch's counterclaims for unjust enrichment and implied in-fact contract.

# V. Conclusion

For the reasons discussed, Bosch's motion for summary judgment is granted as to Nucap's DMCA claim, Nucap's unfair competition and unjust enrichment claims (as far as those relate to Bosch's alleged trade-mark misappropriation and copyright infringement), and Nucap's trade-secret misappropriation claim for disclosure to third parties. Nucap is also barred from arguing at trial that Bosch waived its rights under the POTCs; that the terms of the POTCs are excluded under the CISG for being too surprising or unusual; or that Wilkes had authority to enter into any agreement on behalf of Bosch. The motion is otherwise denied. That means the following claims advanced by Nucap remain for the jury to decide: trade secret misappropriation (for internal use and disclosure), copyright infringement, and tortious interference. The jury will also determine whether the POTCs govern the parties' relationship.

Nucap's motion for summary judgment is granted against Bosch's counter-claims for unjust enrichment and implied in-fact contract, but denied as to all other counter-claims. So the jury will decide Bosch's counter-claims for breach of contract, ICFA, and tortious interference with business expectancy. In light of this Opinion, the parties shall reinitiate settlement negotiations and will report on them at the

next status hearing. In advance of the status hearing, the parties may ask for a settlement referral to the magistrate judge. If the negotiations fail and no referral is sought, then both sides shall be prepared to set the trial schedule at the next status hearing.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: September 7, 2019